**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| MELVYN A. JOHNSON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 07–0935 (RMC) |
| ) | ECF |
| ADRIAN M. FENTY, Mayor, ) | |
| ) | |
| UNITED STATES DEPARTMENT, ) | |
|  OF JUSTICE, ) | |
| DRUG ENFORCEMENT AGENCY, ) | |
| ) | |
| UNITED STATES ATTORNEY'S ) | |
|  OFFICE FOR THE DISTRICT OF ) | |
|  COLUMBIA, ) | |
| ) | |
| DEPARTMENT OF CORRECTIONS, ) | |
| ) | |
| ) | |
| Defendants. ) | |
| ) | |

**FEDERAL DEFENDANTS' MOTION
TO DISMISS, OR IN THE ALTERNATIVE,
FOR SUMMARY JUDGMENT**

Federal Defendants United States Department of Justice, Drug Enforcement Agency, and

United States Attorney's Office for the District of Columbia, by and through the undersigned

counsel, respectfully move this Court pursuant to Rules 12(b)(1), (b)(2), (b)(3), (b)(6), and (b)(7)

of the Federal Rules of Civil Procedure, for an order dismissing this action. In the alternative,

Defendants move the Court, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for an

order granting summary judgment to the Defendants on the grounds that no genuine issue of

material fact exists and Defendants are entitled to judgment as a matter of law. In support of this

motion, Defendants respectfully refer the Court to the accompanying Statement of Material Facts As To Which There Is No Genuine Dispute, Memorandum of Points and Authorities, and Exhibits 1-6.  A proposed order is also attached.

Plaintiff, *pro se*, should take notice that any factual assertions contained in the attachments in support of Defendants' motion will be accepted by the Court as true unless the Plaintiff submits his own affidavit or other documentary evidence contradicting the assertions in Defendants' materials.  See Neal v. Kelly, 963 F.2d 453 (D.C. Cir. 1992); see also Local Rule 7(h); Fed. R. Civ. P. 56(e).  Rule 56(e) provides:

> Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.  Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith.  The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits.  When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.  If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed. R. Civ. P. 56(e).

Dated: August 28, 2007

Respectfully Submitted,


\_\_/s/_____
JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney


\_\_\_/s/_____
RUDOLPH CONTRERAS, D.C. BAR # 434122
Assistant United States Attorney


\_\_/s/_____
JONATHAN C. BRUMER, D.C. BAR # 463328
Special Assistant United States Attorney
555 Fourth Street, N.W., Room E4815
Washington, D.C. 20530
(202) 514-7431
(202) 514-8780 (facsimile)

3

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MELVYN A. JOHNSON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 07–0935 (RMC) |
| ) | |
| ADRIAN M. FENTY, Mayor, ) | |
| ) | |
| UNITED STATES DEPARTMENT, ) | |
| OF JUSTICE, ) | |
| DRUG ENFORCEMENT AGENCY, ) | |
| ) | |
| UNITED STATES ATTORNEY'S ) | |
| OFFICE FOR THE DISTRICT OF ) | |
| COLUMBIA, ) | |
| ) | |
| DEPARTMENT OF CORRECTIONS, ) | |
| ) | |
| Defendants. ) | |
| ) | |
| ) | |

## MEMORANDUM OF POINTS AND AUTHORITIES
## IN SUPPORT OF FEDERAL DEFENDANTS'
## MOTION TO DISMISS, OR IN THE ALTERNATIVE,
## FOR SUMMARY JUDGMENT

## INTRODUCTION

Federal Defendants United States Department of Justice, Drug Enforcement Agency

("DEA"), and United States Attorney's Office for the District of Columbia ("USAO"), by and

through the undersigned counsel, respectfully move for dismissal of this matter pursuant to Fed.

R. Civ. P. 12(b)(1), (b)(2), (b)(3), (b)(6), and (b)(7), or in the alternative, for summary judgment

under Fed. R. Civ. P. 56(c).

Plaintiff, Melvin A. Johnson (a/k/a "Melvyn" A. Johnson), is a Federal prisoner, currently

housed in Petersburg, Virginia.  <u>See</u> Exhibit ("Ex.") 1 (Public Information Inmate Data for

Plaintiff) at 001.[1]  On March 29, 2007, Plaintiff filed a Complaint in the Superior Court for the

District of Columbia, which alleged that "an error made on his DEA LAB analysis report,"

namely the fact that "[a] decimal was missing" from a purity test of drugs found in his possession

so that it registered as "29%" rather than 2.9%, "caused him to lose his [criminal] trial," to

"receive[] [a sentence of] 30 years [incarceration]," and to " suffer[] much for the past 18 years

mentally and physically."  <u>See</u> Docket Entry No. 1, Exhibit A (Complaint filed by Plaintiff in

Superior Court) ("Compl.").  Plaintiff's Superior Court complaint named four defendants:

(1) Mayor Adrian Fenty, (2) the D.C. Office of the Attorney General, (3) the U.S. Department of

Justice, Drug Enforcement Agency, and (4) the D.C. Department of Corrections Office.  <u>See</u> <u>id</u>.

(caption).  His complaint "demands judgment against Defendants in the sum of $1,500,000.00."

<u>Id</u>.  On May 21, 2007, Plaintiff's action was removed from the Superior Court for District of

Columbia to this Court. <u>See</u> Docket Entry No. 1 (notice of removal).  The Notice of Removal

inadvertently and erroneously listed the United States Attorney's for the District of Columbia

("USAO") as a Defendant, even though USAO had not been listed as a Defendant in Plaintiff's

Superior Court complaint.  <u>Compare</u> Docket Entry No. 1, Exhibit A (Complaint filed by Plaintiff

in Superior Court, which does not name the USAO as a Defendant) *with* Docket Entry No. 1

(notice of removal), caption, ¶ 1 (which incorrectly asserts that the USAO was among those

"named as Defendants" in the Superior Court action).

      For the reasons set forth below, this suit should be dismissed for lack of subject matter

---

[1]  Plaintiff's date of birth has been redacted from the as filed version of the Public
Information Inmate Data report, in order to protect his privacy.

jurisdiction and failure to state a claim upon which relief can be granted.  In the alternative,

summary judgment should be granted for Defendants because there are no genuine issues in

dispute and Defendants are entitled to judgment as a matter of law.

## STATEMENT OF FACTS AND PRIOR PROCEEDINGS

### I.    Plaintiff's 1989 Arrest, and His Trial, Conviction, and Sentencing in 1990

Plaintiff, Melvin A. Johnson (a/k/a "Melvyn" A. Johnson), is a prisoner currently housed

in the Federal Correction Institution ("FCI") in Petersburg, Virginia.  See Ex. 1 (Public

Information Inmate Data for Plaintiff) at 001.  Plaintiff's complaint in this action arises from

events which occurred nearly twenty years ago: his 1989 arrest; his conviction, following a non-

jury trial, in 1990 for possession with intent to distribute heroin and cocaine, in violation of D.C.

Code § 33-541; and his sentencing in that same year.

On August 22, 1989, Metropolitan Police Department Detective Gary O'Neal was on

duty in an alley behind 146 "L" Street, Southeast, Washington, D.C., an area which was known

to be an "open air distribution center."[2]  See, e.g., Ex. 2 (Gov't's Superior Court Brief) at 2; Ex.

---

[2]   The facts in this section are mainly derived from three sources: (1) a brief the government filed in the Superior Court for the District of Columbia concerning Plaintiff's criminal conviction, (2) a brief the government filed on appeal in the District of Columbia Court of Appeals  concerning the conviction, and (3) a decision of the District of Columbia Court of Appeals upholding the conviction.  See, e.g., Ex. 2 (Government's Opposition to Defendant's Motion to Vacate Sentence, Set Aside in Conviction and Order a New Trial, filed in United States v. Melvyn Johnson, Jr., Crim. No. F-9926-89, filed in the Superior Court for the District of Columbia, Criminal Division-Felony Branch on July 29, 1991) ("Gov't's Sup. Ct. Brf.") at 2-7; Ex. 3 (government's brief filed in the D.C. Court of Appeals in Melvyn A. Johnson v. United States, No. 90-566, 91-1406) ("Gov't's D.C. Ct. of App. Brf.") at 2-8; Johnson v. United States, 636 A. 2d 978, 979 (D.C. App. 1994).  Each of these documents provide considerable detail about the circumstances of Plaintiff's arrest, conviction, and sentencing.

3 (Govt's D.C. Ct. of App. Brf.) at 2; <u>Johnson v. United States</u>, 636 A. 2d 978, 979 (D.C. App. 1994).  Detective O'Neal observed Plaintiff standing in a walkway and holding several blue zip lock packets of white powder in the palm of his outstretched hand while a female reached within one inch of Plaintiff's hand.  <u>See</u> Ex. 2 at 2-3; Ex. 3 at 2-3; <u>Johnson</u>, 636 A. 2d at 979. Suspecting a drug transaction, Detective O'Neal identified himself and demanded that Plaintiff and the female came out of the walkway.  <u>Id</u>.  The female fled and Plaintiff dropped his hand.  <u>Id</u>. After struggling with the Plaintiff, Detective O'Neal recovered nine packets of powder from Plaintiff's hand which field tested positive for heroin.  <u>Id</u>.  Another officer searched the Plaintiff and found one packet of a white substance that tested positive for crack cocaine and $74.00 in cash in a pouch strapped around his waist.  <u>Id</u>.

The suspected heroin and the suspected cocaine were seized and sent to the DEA's Mid-Atlantic Laboratory for testing.  <u>See</u> Ex. 4 at 3 (Report of Chain of Custody and Certificate of Compliance), 5-6 (Laboratory Analysis Comparison Report section near bottom of Report of Drug Property Collected Purchased or Seized), 12 (Forensic Chemist Worksheet, notes, and test results).  On December 18, 1989, Forensic Chemist Lois Lamb analyzed the suspected heroin and the suspected cocaine.  <u>See</u> Ex. 4 at 5-12.  When analyzed, the suspected heroin was confirmed to be heroin with strength of 29%.  <u>See</u> Ex 4 at 5-8.  The suspected cocaine was confirmed to be cocaine base with strength of 90%.  <u>See</u> Ex. 4 at 5-8..  On December 20, 1989, Chemist Lamb completed the report of chain of custody and certificate of compliance pursuant to 33 D.C. Code § 556.  <u>See</u> Ex. 3 at 3 (Report of Chain of Custody and Certificate of Compliance).  Prior to Plaintiff's trial, Assistant United States Attorney ("AUSA") Andrew Klingenstein subsequently filed a notice of compliance with the Court and provided the report of custody, the analysis of the

4

controlled substance, and the certificate of legal custody.  See Ex. 4 at 1-2; Ex. 4 *generally*.

AUSA Klingenstein served Plaintiff's counsel with a copy of these documents.  Id.

At trial, the government called Metropolitan Police Department Officer David Stroud as

an expert in street trafficking and packaging of illicit drugs.  See Ex. 2 (Gov't's Superior Court

Brief) at 3-5; Ex. 3 (Govt's D.C. Ct. of App. Brf.) at 4-5; Johnson, 636 A. 2d at 979-80.  He

testified that the nine packets of heroin had a street value of $180.00 as packaged, but the same

quantity of heroin could be purchased in bulk for $60.00.  Id..  He also testified that the quantity,

variety, and value of the drugs were more consistent with distribution than personal use and that

the maximum amount that a heroin addict would use in a day would be six packets, and that a

heroin addict would buy no more than two bags of heroin at one time.  Id.

Plaintiff, the sole defense witness, testified that he was a heroin addict, had purchased the

drugs in exchange for his girlfriend's camcorder, and that he intended to use all of the nine

packets of heroin within the next twenty-four hours.  See Ex. 2 at 5-7; Ex. 3 at 5-7; Johnson, 636

A. 2d at 980.  He also testified that he had two prior convictions for distribution of drugs, had

been sentenced under the addict exception under D.C. Code § 33-541(c)(2), had previously

participated in drug programs, and had been hospitalized because of his long drug addiction.  Id.

Plaintiff was convicted during a non-jury trial for possession with intent to distribute

heroin  in violation of D.C. Code § 33-541(a)(1).  See Ex. 1 (Public Information Inmate Data for

Inmate) at 003, 005, 007; Ex. 2 at 7; Ex. 3 at 7-8; Johnson, 636 A. 2d at 980.  The Court,

crediting Detective O'Neal's testimony, found that the Plaintiff was interrupted during a drug

transaction in which he was the seller.  See Ex. 2 at 7; Ex. 3 at 7-8; Johnson, 636 A. 2d at 980.

Applying "common sense" and recognizing his "powerful motivation to lie" to avoid mandatory

5

minimum sentencing[3], the Court disbelieved Plaintiff's testimony that he had purchased the heroin for a trade-in with the camcorder. Id. The trial court found Plaintiff guilty of both counts (the heroin and cocaine possession with distribute charges). See Ex. 2 at 2, 7; Ex. 3 at 1; Johnson, 636 A. 2d at 980. It sentenced Plaintiff to a 10-30 year term of incarceration for the possession with intent to distribute heroin count, followed by 1 year's incarceration for cocaine possession. See Ex. 1 at 003-007; Ex. 2 at 2; Ex. 3 at 1-2. Plaintiff filed a motion to vacate the sentence, set aside the conviction, and order a new trial. See Ex. 2 at 1-2. After a hearing, on October 31, 1991, the presiding Judge determined that Plaintiff's motion for a new trial should be denied. See Ex. 3 at 2. Plaintiff then filed an appeal to the D.C. Court of Appeals, in which he challenged his conviction and the denial of his request for a new trial. See Johnson, 636 A. 2d at 980. On February 3, 1994, the D.C. Court of Appeals affirmed the conviction and sentence. Id. generally.

Plaintiff was represented by counsel during the pendency of the Superior Court trial, his post trial motions, and his appeal. See, e.g., Ex. 2 (Gov't's Superior Court Brief) at 7-23 (addressing the issue of whether his counsel effectively represented him during the trial); id. at 30 (certificate of service, referring to Plaintiff's attorney of record); Ex. 3 (Govt's D.C. Ct. of App.

---

[3] Plaintiff had been previously convicted of distributing heroin (1985), distributing PCP (1985), forgery (1984), carrying a pistol without a license (1983), and burglary II (1982). See Ex. 2 at 7, n. 12; Ex. 3 at 7, n. 6; Ex. 1 (Public Information Inmate Data for Plaintiff) at []. D.C. Code § 33-541(c) established mandatory minimum sentences for certain drug offenses, including distribution, and subparagraph A-1 of that provision, applicable to cases involving heroin, prescribed minimum sentences of four years for the first offense, seven years for the second, and ten years for the third or subsequent offense. See, e.g., Gilmore v. U.S., 699 A.2d 1130, 1131, n. 1 (D.C. App. 1997) (explaining the operation of the provision). Because of Plaintiff's prior convictions and the escalating penalties for repeat offenders, he had an incentive to lie at trial.

6

Brf.) at 25-40 (addressing the adequacy of Plaintiff's counsel at trial); id. at 43 (certificate of

service, referring to "counsel for appellant Melvyn A. Johnson"); Johnson, 636 A. 2d at 979

(referencing appellant's counsel).  It appears that neither Plaintiff nor his attorneys ever argued

that the DEA had miscalculated the purity of the heroin which had been found in Plaintiff's

possession during Plaintiff's trial, in connection with his post-trial motions to vacate the

sentence, set aside the conviction, and order a new trial, or in connection with his appeal to the

D.C. Court of Appeals.  See Ex. 2 (Gov't's Sup. Ct. Brf.) *generally* (responding to a myriad of

arguments by Plaintiff, but is devoid of any suggestion that Plaintiff argued that the DEA

miscalculated the purity of the heroin at that stage); Ex. 3 (Gov't's D.C. Ct. of App. Brf.)

*generally* (same); Johnson, 636 A. 2d 978 (D.C. App. 1994) (makes no mention of the purity

issue and does not suggest that Plaintiff raised it.)

## II.    Plaintiff's February 4, 1992 Letter to Paul De Zan of the DEA's Field Laboratory

On or about February 24, 1992, Plaintiff mailed a letter to Paul De Zan, the then

Laboratory Director of the DEA's Mid-Atlantic Field Laboratory.  See Ex. 5.  In his letter,

Plaintiff explained that he was "currently incarcerated at the Lorton Correctional Facility at

Lorton, Virginia, serving a sentence of thirty (30) years for possession of a controlled substance."

Id.  He claimed that "[t]he severity of his sentence is a direct result of the potent quality of heroin

which I allegedly possessed."  Id.  By way of explanation, he noted that "[t]hroughout my trial, it

was my contention that the drugs found on my person was for my personal use," but asserted that

"because of the quality reported by a certified chemist in your laboratory, I was subsequently

convicted," that "[t]he quality of twenty-nine (29%) transforms my image from urban city drug

addict to a supplier from Amsterdam," and that "I . . . find the test results to be somewhat at

7

variance with qualities consistent with street level substance abuse." Id. Thus, Plaintiff requested that his laboratory report be reassessed. Id. Notably, the letter did not provide any evidence that the purity of the heroin found in Plaintiff's possession played any role in his conviction or sentencing. Id. Nor did it set forth a "sum certain" of damages allegedly suffered by Plaintiff as a result of the DEA's purported error. Id.

Upon receipt of Plaintiff's letter dated February 24, 1992, a chemist at the laboratory (believed to be Director De Zan) confirmed that the analysis of Chemist Lamb was correct. Plaintiff's letter was forwarded to DEA's Office of Chief Counsel for response. Due to the passage of time, we are unable to locate DEA's response to Plaintiff's 1992 letter. Upon receipt of the present complaint, Laboratory Director James V. Malone re-verified the calculation and confirmed that the report value of 29% was correct.[4]

## ARGUMENT

Plaintiff's Superior Court complaint alleges that an error was made by a federal employee within the Drug Enforcement Agency, and names as Defendants: (1) Mayor Adrian Fenty, (2) the D.C. Office of the Attorney General, (3) the DEA, and (4) the D.C. Department of Corrections Office. See Docket Entry No. 1, Ex. A. Inasmuch as Plaintiff alleges negligence on the part of a federal agency or employee acting within the scope of her official duty and seeks damages, his claims are only cognizable under the Federal Tort Claims Act ("FTCA"), the United States is the only proper Defendant, and he is bound by requirements of that Act, including its exhaustion and statute of limitations requirements. To the extent that this action is

---

[4] The Federal Defendants are prepared to submit evidence, including in the form of a declaration, to establish these matters should the Court deem this step necessary and appropriate.

properly understood as an FTCA action, it should be dismissed because: (1) Plaintiff has named

Defendants other than the United States; (2) he has failed to exhaust his administrative remedies

under the FTCA; (3) he has run afoul of the applicable statute of limitations; and (4) Plaintiff's

claims fail to state a claim for damages under the FTCA because Plaintiff has not demonstrated

that his sentence has been formally overturned or declared invalid.

To the extent that Plaintiff seeks to challenge the fact or duration of his incarceration and

his success in this action could result in earlier release, he may only proceed through a writ of

habeas corpus against his warden brought in a court with jurisdiction over the warden.  However,

he cannot bring a habeas corpus action in this District because he is housed in a Virginia prison.

Finally, in any event, Plaintiff's claims are barred by the doctrines of *res judicata* and

*collateral estoppel* because they arise from the same nucleus of facts as his Superior Court trial

and sentencing as well as his subsequent appeal to the D.C. Court of Appeals, and could have

been raised during those proceedings.  In the alternative, summary judgment should be granted

for Defendants because there are no genuine issues in dispute and Defendants are entitled to

judgment as a matter of law.

## I.    STANDARD OF REVIEW

### A.    Motion to Dismiss (Fed. R. Civ. P. 12(b)(1) and 12(b)(6))

Defendants move for dismissal under Rule 12(b)(1), as the Court lacks jurisdiction over

several of Plaintiff's claims, and Rule 12(b)(6), as Plaintiff fails to state any claim upon which

relief can be granted.  Plaintiff bears the burden of establishing subject matter jurisdiction.  See,

e.g., Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992); Oppermann v. U.S., 2007 W.L.

1748920, *2 (D.D.C. 2007); <u>A.N.S.W.E.R. Coal. v. Kempthorne</u>, 2007 W.L. 1703431, *4 (D.D.C. 2007); <u>Brady Campaign to Prevent Gun Violence v. Ashcroft</u>, 339 F.Supp.2d 68, 72 (D.D.C. 2004); <u>Rann v. Chao</u>, 154 F. Supp.2d 61, 64 (D.D.C. 2001), <u>aff'd</u>, 346 F.3d 192 (D.C. Cir. 2003); <u>Thompson v. Capitol Police Bd.</u>, 120 F. Supp.2d 78, 81 (D.D.C. 2000) (observing that "[on] a motion to dismiss pursuant to Rule 12(b)(1), the plaintiff bears the burden of persuasion to establish subject-matter jurisdiction by a preponderance of the evidence.")

A court may resolve a motion to dismiss for lack of jurisdiction under Rule 12(b)(1) in either of two ways.  First, the court may determine the motion based solely on the complaint. <u>See</u>, <u>e.g.</u>, <u>Herbert v. Nat'l Acad. of Sci.</u>, 974 F.2d 192, 197 (D.C. Cir. 1992).  Alternatively, to determine the existence of jurisdiction, it may look beyond the allegations of the complaint, consider affidavits and other extrinsic information, and ultimately weigh the conflicting evidence.  <u>Id.</u>; <u>Rann</u>, 154 F. Supp.2d at 64 ("[t]he court is not required . . . to accept inferences unsupported by the facts alleged or legal conclusions that are cast as factual allegations.")

Furthermore, a motion to dismiss brought pursuant to Rule 12(b)(6) should be granted if it is beyond doubt that a plaintiff can demonstrate no set of facts that supports his claim entitling him to relief.  <u>See</u> <u>Conley v. Gibson</u>, 355 U.S. 41, 45-46 (1957); <u>Sparrow v. United Air Lines, Inc.</u>, 216 F.3d 1111, 1117 (D.C. Cir. 2000).  Although the plaintiff is given the benefit of all inferences that reasonably can be derived from the facts alleged in the complaint, the court need not accept inferences that are not supported by such facts, nor must the court accept plaintiff's legal conclusions cast in the form of factual allegations.  <u>See</u> , <u>e.g.</u>, <u>Nat'l Treasury Employees Union v. United States</u>, 101 F.3d 1423, 1430 (D.C. Cir. 1996); <u>Kowal v. MCI Commc'ns Corp.</u>, 16 F.3d 1271, 1276 (D.C. Cir. 1994); <u>Holman v. Williams</u>, 436 F.Supp. 2d 68, 73 (D.D.C. 2006).

It is well established that at the motion to dismiss stage the Plaintiff need only <u>allege</u> facts rather than <u>establish</u> them, since this Court will assume the alleged facts to be true.  <u>See, e.g.</u>, <u>Mobil Exploration v. Babbit</u>, 913 F. Supp. 5, 9 (D.D.C. 1995).  However, without an allegation of facts that meets all elements of a cause of action, a claim should be dismissed. <u>Cf</u>. <u>Saltz v. Lehman</u>, 672 F.2d 207, 209 (D.C. Cir. 1982) (plaintiff's failure to allege elements of equitable tolling required dismissal of complaint).

### B.    Motion for Summary Judgment (Fed. R. Civ. P. 56)

If matters outside the pleadings are considered, generally the motion shall be treated as one for summary judgment under Rule 56.  Summary judgment is appropriate when the record shows that no genuine issue exists as to any material fact and the moving party is entitled to judgment as a matter of law.  <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986); <u>Matsushita Elec. Indus. Co. v. Zenith Radio</u>, 475 U.S. 574, 587 (1986); <u>Tao v. Freeh</u>, 27 F.3d 635, 638 (D.C. Cir. 1994).  In determining whether a genuine issue of material fact exists, the trier of fact must view all facts, and reasonable inferences drawn therefrom, in the light most favorable to the non-moving party. <u>Matsushita</u>, 475 U.S. at 587.  The mere existence of a factual dispute, however, will not defeat summary judgment.  The non-moving party must show that the dispute is genuine and material to the case.  That is, the factual dispute must be capable of affecting the substantive outcome of the case and supported by sufficiently admissible evidence that a reasonable trier of fact could find for the non-moving party.  <u>Anderson</u>, 477 U.S. at 247-48; <u>Laningham v. U.S. Navy</u>, 813 F.2d 1236, 1242-43 (D.C. Cir. 1987).  If the evidence favoring the non-moving party is merely colorable, or is not significantly probative, summary judgment may be granted.  <u>Anderson</u>, 477

11

U.S. at 249-50 (citations omitted).  "[A] complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial[,] [and] [t]he moving party is 'entitled to judgment as a matter of law.'"  Celotex, 477 U.S. at 323.

Moreover, Rule 56 does not require the moving party to negate the non-movant's claim or to show the absence of a genuine issue of material fact.  Id. at 323.  Rather, when the movant files a properly supported summary judgment motion, the burden shifts to the nonmoving party to show "specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).  The non-movant cannot manufacture genuine issues of material fact with "some metaphysical doubt as to the material facts," Matsushita, 475 U.S. at 586, or with "conclusory allegations," "unsubstantiated assertions," "or by only a 'scintilla' of evidence." Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994).  Summary judgment is not a disfavored procedural shortcut, but rather is an integral part of the overall design of the rules of civil procedure, which is to secure the just, speedy, and inexpensive determination of every action.  See Celotex, 477 U.S. at 327.

## II. To the Extent that Plaintiff Alleges Negligence by a Federal Employee and Seeks Damages on this Basis, His Action is Only Cognizable Under the Federal Torts Claims Act, and the Sole Proper Defendant to an FTCA Claim is the United States

Plaintiff has named Mayor Fenty[5], the United States Department of Justice, DEA, the D.C. Office of the Attorney General, and the Department of Corrections as Defendants in his Complaint.  See Docket Entry No. 1, Ex. A.  However, for the reasons set forth below, none of the named Defendants are proper Defendants in this FTCA action.

As mentioned, the Plaintiff bears the burden of proving subject-matter jurisdiction of this

---

[5]  The undersigned do not represent Mayor Fenty or the D.C. Department of Corrections.

Court.  McNutt v. Gen. Motors Acceptance Corp., 298 U.S. 178, 182 (1936); Dist. Of Columbia Ret. Bd. v. United States, 657 F. Supp. 428 431 (D.D.C. 1987).  Absent an explicit waiver, the doctrine of sovereign immunity shields the federal government from suit.  See, e.g., FDIC v. Meyer, 510 U.S. 471, 475 (1994); Ardestani v. INS, 502 U.S. 129, 137 (1991); Library of Congress v. Shaw, 478 U.S. 310, 318 (1986); United States v. Nordic Village, Inc., 503 U.S. 30, 32-34 (1990) ("[w]aivers of the Government's sovereign immunity, to be effective, must be 'unequivocally expressed'") (quoting Irwin v. Dep't of Veterans Affairs, 498 U.S. 89, 95 (1990)); United States v. Mitchell, 445 U.S. 535, 538 (1980); United States v. Testan,  424 U.S. 392, 399 (1976); Tri-State Hospital Supply Corp. v. U.S., 341 F.3d 571, 575 (D.C. Cir. 2003).  Because sovereign immunity is jurisdictional in nature, see Meyer, 510 U.S. at 475, "the terms of [the government's] consent to be sued in any court define that court's jurisdiction to entertain the suit."  See, e.g., United States v. Mitchell, 445 U.S. 535, 538 (1980).  As the Supreme Court has often observed, waiver of sovereign immunity must be "unequivocally expressed in the statutory text" and "strictly construed, in terms of its scope, in favor of the sovereign."  See, e.g., Dep't of Army v. Blue Fox, Inc., 525 U.S. 255, 261 (1999) (internal quotations omitted).  A party bringing suit against the United States bears the burden of proving that the government has unequivocally waived its immunity.  See, e.g., Tri-State Hospital Supply Corp., 341 F.3d at 575.

In the context of tort claims against the United States, the FTCA represents a limited waiver of sovereign immunity.  28 U.S.C. §§ 1346(b) and 2671-80.  For a plaintiff suing a federal agency or employee acting within the scope of his official duty, the sole available remedy is to pursue an action against the United States under the FTCA.  See, e.g., Bancoult v. McNamara, 370 F. Supp. 2d 1, 10 (D.D.C. 2004).  Specifically, the FTCA represents a limited

13

waiver of the government's sovereign immunity "'grant[ing] the federal district courts jurisdiction over a certain category of claims for which the United States has ... 'render[ed]' itself liable.'"  See Tri-State Hospital Supply Corp., 341 F.3d at 575 (citing United States v. Orleans, 425 U.S. 807, 813 (1976) and Meyer, 510 U.S. at 477).  Specifically, section 1346(b)(1) of the FTCA confers exclusive jurisdiction to the district courts over

> civil actions on claims against the United States, ... for money damages ... for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

See 28 U.S.C. § 1346(b)(1).

Under the FTCA, only the United States is the proper Defendant.  See, e.g., 28 U.S.C. § 2679(a); Hall v. Administrative Office of the United States Courts, 2007 W.L. 2219319, *2 (D.D.C. 2007) ("[o]nly the United States can be a defendant to a claim under the FTCA"); Cox v. Sec'y of Labor, 739 F. Supp. 28, 29 (D.D.C. 1990) (dismissing an FTCA suit against the Secretary of Labor for lack of subject-matter jurisdiction because only the United States is a proper defendant to such suits); Hagmeyer v. Dep't of Treasury, 647 F. Supp. 1300, 1304-05 (D.D.C. 1986) (reaching the same conclusion, in the case of an FTCA claim against the Department of Treasury).  Thus, the Department of Justice and DEA should be dismissed from this action.  See Fed. R. Civ. P. 12(b)(1), (b)(6).[6]

---

[6]  Moreover, the Defendant USAO should be dismissed because it was not a part of the original Superior Court action which was removed to this action.  The Notice of Removal inadvertently and erroneously listed the United States Attorney's for the District of Columbia ("USAO") as a Defendant, even though USAO had not been listed as a Defendant in Plaintiff's

III.    **Plaintiff Failed to Exhaust His Administrative Remedies Under the FTCA by Presenting a Claim for Money Damages to the Agency Before Filing Suit**

To the extent Plaintiff raises any tort claims for which the government has waived sovereign immunity under the FTCA, Plaintiff has failed to exhaust his administrative remedies, and the Court lacks jurisdiction to entertain Plaintiff's suit.

It is well established that exhaustion is a mandatory jurisdictional prerequisite to an FTCA action; that the FTCA prohibits a plaintiff from filing suit in federal court until he or she has exhausted administrative remedies.[7]  Specifically, the FTCA provides that

> [a]n action shall not be instituted upon a claim against the United States for money damages for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, unless the claimant shall have first presented the claim to the appropriate Federal agency and his claim shall have been finally denied by the agency in writing and sent by certified

---

Superior Court complaint.  Compare Docket Entry No. 1, Exhibit A (Complaint filed by Plaintiff in Superior Court, which does not name the USAO as a Defendant) *with* Docket Entry No. 1 (notice of removal), caption, ¶ 1 (which incorrectly asserts that the USAO was among those "named as Defendants" in the Superior Court action).

[7]  See, e.g., McNeil v. United States, 508 U.S. 106, 112 (1993) (finding that "[t]he most natural reading of the statute indicates that Congress intended to require complete exhaustion of Executive remedies before invocation of judicial process"); id. at 113 (concluding that "[t]he FTCA bars claimants from bringing suit in federal court unless they have exhausted their administrative remedies" and that "[b]ecause petitioner failed to heed that clear statutory command, the District Court properly dismissed his suit"); Carter v. McKain, 2004 W.L. 830949, **1 (D.C. Cir. 2004); Grant v. Secretary, U.S. Dep't of Veterans Affairs, 2004 W.L. 287125, *1 (D.C. Cir. 2004); Borowy v. United States Marshals Service, 1998 W.L. 545426 (D.C. Cir. 1998); Mittleman v. United States, 104 F.3d 410, 413 (D.C. Cir. 1997) (noting that "[a] claim not so presented and filed is forever barred"); Bowden v. United States, 106 F.3d 433, 441 (D.C. Cir. 1997); Alston v. Hawk, 1994 W.L. 71568 (D.C. Cir. 1994); Jackson v. United States, 730 F. 2d 808, 809 (D.C. Cir. 1984); Hall v. Administrative Office of the United States Courts, 2007 W.L. 2219319, *2 (D.D.C. 2007); Satti v. United States Dep't of Defense, 2007 W.L. 1794102, *1 (D.D.C. 2007); Bancoult v. McNamara, 370 F. Supp.2d 1, 10 (D.D.C. 2004).

or registered mail.

See 28 U.S.C. § 2675(a) (emphasis added).  To satisfy the FTCA's exhaustion requirement, a

plaintiff must have filed within two years after the claim accrued "(1) a written statement

sufficiently describing the injury to enable the agency to begin its own investigation, and (2) a

sum-certain damages claim."  See, e.g., 28 U.S.C. §§ 2401(b) (setting forth the two year

requirement), 2675(a); Bowden v. United States, 106 F.3d 433, 441 (D.C. Cir. 1997) (internal

quotations omitted); G.A.F. Corp. v. United States, 818 F.2d 901, 919-20 (D.C. Cir. 1987)

(same); Murphy v. United States, 121 F. Supp.2d 21, 27 (D.D.C. 2000) (same); Satti v. United

States Dep't of Defense, 2007 W.L. 1794102, *1 (D.D.C. 2007) (same); Williams v. United

States, 2007 W.L. 1549182, * 2 (D.D.C. 2007) (same); see also Grant v.Secretary, U.S. Dep't of

Veterans Affairs, 2004 W.L. 287125, * 1 (D.C. Cir. 2004) (noting that "[t]o satisfy the FTCA's

exhaustion requirement, an administrative claim must describe the alleged injury with sufficient

particularity to allow the agency to investigate and assess the strength of the claim" and that

"[t]he claim must also set forth a 'sum certain' of damages so that the agency may make an

informed decision whether to attempt settlement negotiations").

  As mentioned, the FTCA's exhaustion requirements are jurisdictional and full

compliance with those requirements is mandatory, "including for pro se plaintiffs."  See Satti v.

United States Dep't of Defense, 2007 W.L. 1794102, *1 (D.D.C. 2007); Williams v. United

States, 2007 W.L. 1549182 (D.D.C. 2007) (same); see also Grant v. Sec'y, U.S. Dep't of

Veterans Affairs, 2004 W.L. 287125, *1 (D.C. Cir. 2004) (affirming dismissal of pro se litigant's

action based on failure to exhaust under the FTCA); Simpkins v. Dist. of Columbia, 108 F.3d

16

366, 371 (D.C. Cir. 1997) (further stating that "forcing these cases through the administrative process helps sort out not only worthless claims, but also worthy ones, which may be settled at that stage"); <u>G.A.F. Corp. v. United States</u>, 818 F.2d at 904; <u>Hobley v. United States</u>, 2007 W.L. 1821157, *3 (D.D.C. 2007) (finding that pro se Plaintiff failed to exhaust); <u>Asemani v. U.S.</u>, 2005 W.L. 975635, *3 (D.D.C. 2005) (finding that "this action was filed prior to the exhaustion of administrative remedies" and noting that "[t]he fact that plaintiff is proceeding pro se does not excuse the failure to satisfy the statutory requirements"); <u>Adeogba v. Migliaccio</u>, 266 F.Supp.2d 142, 146 (D.D.C. 2003) ("a pro se plaintiff must exhaust his administrative remedies prior to filing an action under the FTCA"); <u>see also</u> <u>McNeil v. United States</u>, 508 U.S. 106, 110-13 (1993); supra at 15, n. 7.

In the present matter, Plaintiff failed to present an administrative claim to the appropriate federal agency - the DEA - a written statement describing the alleged accident and setting forth a sum certain, as he was required to do under 28 U.S.C. §§ 2401(b) and 2675(a), and the implementing published agency regulations. <u>See</u> Ex. 6, Declaration of Bettie E. Goldman; 28 U.S.C. § 2675(a); 28 C.F.R. § 14.2(a) (requiring FTCA plaintiffs to first file with the agency a timely Standard Form 95 stating their claim); 28 C.F.R. § 14.2(b)(1) (requiring plaintiffs to submit FTCA claims to the agencies whose actions gave rise to the claim).  He had two years to present his claim, but at this point it is well past that deadline.  <u>See</u> 28 U.S.C. §§ 2401(b).

It is true that Plaintiff mailed a letter to the DEA on or about February 24, 1992, in which he claimed that "[t]he severity of [the] sentence" he had received was "a direct result of the potent quality of heroin which I allegedly possessed," asserted that "because of the quality reported by a certified chemist in your laboratory, I was . . . convicted," suggested that the

17

laboratory might have made an error in computing the purity of the heroin found in his

possession, and requested that the laboratory report be reassessed.  See Ex. 5.  Even assuming,

arguendo, that this letter constituted "a written statement sufficiently describing the injury to

enable the agency to begin its own investigation," it did not set forth a "sum certain" of damages

allegedly suffered by Plaintiff as a result of the DEA's purported error.  See Ex. 5.  Thus,

Plaintiff has failed to properly exhaust his FTCA claim, and this court lacks subject matter

jurisdiction over that claim.  See, e.g., Bowden, 106 F.3d at 441 (noting that "Bowden failed to

satisfy the second of these requirements [the sum certain damages claim requirement] because he

never informed the INS of the amount of amount of damages he sought from its alleged failure to

bear the entire tax liability on his settlement payment"); G.A.F. Corp., 818 F.2d at 919-20;

Murphy, 121 F. Supp.2d at 27; Satti, 2007 W.L. 1794102 at *1; Williams, 2007 W.L. 1549182 at

* 2; see also Grant, 2004 W.L. 287125 at * 1.  For this reason, among others, the Court lacks

subject-matter jurisdiction over this action.  See Fed. R. Civ. P. 12(b)(1).

**IV.    Plaintiff's FTCA Claims are Barred because He is Untimely: He Failed to Satisfy
the FTCA's 2 Year Presentment Requirement and 6 Month Statute of Limitations**

The FTCA sets forth not only a two year presentment requirement (as mentioned), but

also a six month statute of limitations.  Specifically, the FTCA provides that:

> A tort claim against the United States shall be forever barred unless it is presented
> in writing to the appropriate Federal agency within two years after such claim
> accrues or unless action is begun within six months after the date of mailing, by
> certified or registered mail, of notice of final denial of the claim by the agency to
> which it was presented.

See 28 U.S.C. § 2401(b) (emphasis added).  A claim "accrues" for purposes of this provision

when a plaintiff has knowledge of the purported injury and its cause.  See, e.g., United States v. Kubrick, 444 U.S. 111, 122 (1979); Hall v. Administrative Office of the United States Courts, 2007 W.L. 2219319, *2 (D.D.C. 2007) ("[a]n FTCA claim accrues once the injured party knows both the fact of his injury and its cause"); Sexton v. United States, 832 F.2d 629, 633 (D.C. Cir.1987); Stokes v. United States Postal Service, 937 F.Supp. 11 (D.D.C. 1996).

Here, Plaintiff was arguably aware of his alleged injury and its cause at the time of his trial and sentencing in 1990.  After all, prior to Plaintiff's trial, an AUSA filed and served upon Plaintiff and his counsel a Notice of Compliance, along with copies of the official reports of custody and the DEA's analysis of the controlled substances found on Plaintiff at the time of his arrest, with the D.C. Superior Court.  See Ex. 4.  Furthermore, Plaintiff certainly was aware of his alleged injury and its cause by the time of his February 4, 1992 letter as it was the subject of that letter.  See Ex. 5.  Plaintiff however did not initiate his Superior Court action until March 2007, at least fifteen (15) years after he became aware of his alleged injury and its cause.  See Docket Entry No. 1, Ex. A (copy of Superior Court complaint).  Thus, the FTCA's two year presentment requirement and six month statute of limitations had both run without Plaintiff having submitted a proper administrative claim to the DEA, or having filed his action in D.C. Superior Court.

As mentioned, the FTCA "is a limited waiver of the United States' sovereign immunity" which defines the terms upon which the United States may be sued, and as such, "absent full compliance with the conditions . . . placed upon its waiver, courts lack jurisdiction to entertain tort claims against it." GAF Corp., 818 F. 2d at 904 (emphasis added).  The FTCA's commands are "unambiguous" and courts are "not free to rewrite the statutory text" of the FTCA.  See

19

McNeil, 508 U.S. at 111; United States v. Kubrick, 444 U.S. at 113, 117-18 (discussing

presentment requirement of 28 U.S.C. § 2401(b)); Schuler v. United States, 628 F.2d 199, 201

(D.C. Cir. 1980) (finding that section 2401(b) "requires the claimant both to file the claim with

the agency within two years after accrual of the claim and then to file a complaint in the District

Court within six months after the agency denies the claim," not just one of the two) (emphasis

added). Accordingly, Plaintiff must strictly comply with the FTCA's limitations period and that

his failure to do so in this case deprives the Court of jurisdiction. See Stokes v. United States

Postal Service, 937 F.Supp. 11, 17 (D.D.C. 1996) (citations omitted) (rejecting plaintiff's FTCA

claim as time barred where, as here, plaintiff's pleadings demonstrated that plaintiff had

knowledge of the alleged tort more than two years before she filed an administrative claim).

Thus, Plaintiff's action is subject to dismissal for this reason, among others. See Fed. R. Civ. P.

12(b)(1), 12(b)(6).

**V.      Plaintiff's Action Fails to State a Claim for Damages under the FTCA, because He
         has Not Shown that His Sentence Has Been Overturned or Declared Invalid, and He
         May Only Proceed through a Writ of Habeas Corpus Against his Warden Brought
         in a Court with Jurisdiction over the Warden (i.e., in Virginia)**

         To the extent that Plaintiff seeks damages resulting from his allegedly unlawful

incarceration, he fails to state a claim upon which relief can be granted. This court has held that

"[a]bsent a showing that [a] plaintiff's conviction or sentence has been overturned or declared

invalid . . . he cannot recover damages under the FTCA" See, e.g., Hall v. Administrative Office

of U.S. Courts, 2007 W.L. 2219319, *4 (D.D.C. 2007); Watkins v. Holt, 2006 WL 2331090, *2

(D.D.C. 2006) (same).

         In reaching this conclusion, this Court apparently relied in part on Heck v. Humphrey,

20

512 U.S. 477 (1994) ("Heck"), a case which admittedly arose in a different context: the context of a section 1983 action, but whose language this Court has concluded has broader application. In Heck, the Supreme Court held that:

> [I]n order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ for habeas corpus, 28 U.S.C. § 2254.

Id. at 486-87.

Although Plaintiff seeks monetary damages in his action, his action appears to be a collateral challenge to his conviction which, in effect, challenges the "fact or duration" of his confinement and in that success in this action might demonstrate the invalidity of his confinement or its duration. Thus, Plaintiff should have proceeded through proper petition for a writ of habeas corpus against his warden brought in a court with jurisdiction over the warden. See, e.g., Watkins v. Holt, 2006 W.L. 2331090, *2 (D.D.C. 2006) (observing that "[n]otwithstanding plaintiff's having chosen the FTCA as the jurisdictional basis of this suit, it is clear that his claims sound in habeas" and explaining that "[i]nsofar as plaintiff demands immediate release from his current custody, his sole remedy is through a petition for a writ of habeas corpus, which names the warden as the respondent, filed in the district where he is incarcerated").[8]

---

[8]  See also Wilkinson v. Dotson, 544 U.S. 74, 82 (2005) (habeas is the exclusive remedy if the success of the action "would necessarily demonstrate the invalidity or confinement or its duration"); Preiser v. Rodriguez, 411 U.S. 475 (1973); Bourke v. Hawk-Sawyer, 269 F.3d 1072, 1074 (D.C. Cir. 2001) (even where a prisoner's claim that he was illegally denied a chance to secure his release would not necessarily result in his being released any earlier, it would raise that

In <u>Guerra v. Meese</u>, 786 F.2d 414 (D.C. Cir. 1986), this Court held that a district court may not entertain a habeas corpus action unless it has personal jurisdiction over the custodian of the prisoner. <u>See also</u> <u>Chatman-Bey</u>, 864 F.2d at 810 (reaffirming that "the appropriate defendant in a habeas action is the custodian of the prisoner," and also holding that the "custodian" of a federal prisoner seeking release on parole is the warden of the prison in which he is confined); <u>Blair-Bey v. Quick</u>, 151 F.3d 1036, 1039 (D.C. Cir. 1998) (same); <u>see</u> <u>Anyanwutaku v. Moore</u>, 151 F.3d 1053, 1055 (D.C. Cir. 1998); <u>see also</u> <u>Rumsfeld v. Padilla</u>, 542 U.S. 426, 447 (2004) (explaining that "[w]henever a § 2241 habeas petitioner seeks to challenge his present physical custody within the United States, he should name his warden as respondent and file the petition in the district of confinement."); <u>Stokes v. U.S. Parole Comm'n</u>, 374 F.3d 1235, 1237-38 (D.C. Cir. 2004) (noting that "[b]ecause '[a] writ of habeas corpus does not act upon the prisoner who seeks relief, but upon the person who holds him in ... custody,' . . . a court may issue the writ only if it has jurisdiction over that person," the warden of the facility in which the inmate is incarcerated) (internal citations omitted); <u>Dominguez</u>, 2006 W.L. at *3.

---

possibility and thus have a probabilistic impact on the duration of his custody, requiring that he resort to habeas in the jurisdiction of his incarceration); <u>Razzoli v. Federal Bureau of Prisons</u>, 230 F.3d 371, 373 (D.C. Cir. 2000) (concluding that "[f]or a federal prisoner, habeas is indeed exclusive even when a non-habeas claim would have a merely probabilistic impact on the duration of custody"); <u>Chatman-Bey v. Thornburgh</u>, 864 F.2d 804, 809 (D.C. Cir. 1988) (en banc) (holding that [the U.S. Supreme Court case of <u>Preiser v. Rodriguez</u>] . . . makes clear that, as a matter of Congressional intent, prisoners mounting a challenge to the lawfulness of their custody are to proceed by means of habeas); <u>id</u>. at 809 (finding that a federal prisoner seeking to challenge his parole eligibility date was required to proceed in habeas, even though success upon his claims would not necessarily result in his earlier release); <u>see also</u> <u>Dominguez v. BOP</u>, 2006 W.L. 1445041, *3 (D.D.C. 2006); <u>McGlamary v. Lappin</u>, 2006 W.L. 1382185, *1, n.1 (D.D.C. 2006); <u>Boyer v. Conaboy</u>, 983 F. Supp. 4 (D.D.C. 1997) ("[t]he Court will reaffirm a principle that has unwaveringly governed federal-court practice for almost a quarter-century: that a prisoner who attacks the legality or duration of his sentence must proceed by habeas corpus"); <u>Bayless v. United States Parole Commission</u>, 1996 W.L. 525325, *7 (D.D.C. 1996).

In this instance, Plaintiff is held in Virginia, not the District of Columbia. See, e.g., Ex. 1 at 001; see also Docket Entry No. 9 (Notice of Plaintiff's New Address). Thus, venue in this jurisdiction is not proper. Nor has Plaintiff named his Warden as a defendant as would be required for a habeas corpus action. And this Court could not exercise jurisdiction over the Warden even if the Warden was named as a Defendant. For this reason, among others, Plaintiff's action should be dismissed. See Fed. R. Civ. P. 12(b)(1), (b)(2), (b)(3).

Only if the Court has jurisdiction over the Plaintiff's custodian may it afford meaningful relief, and then it would be in the context of habeas relief. Plaintiff's action should be dismissed in part because he failed to join his Warden as the Defendant.[9] When an inmate in a federal prison files a civil action in the District of Columbia challenging the lawfulness of his custody, his case must either be dismissed or transferred to the jurisdiction where the prisoner's immediate custodian is located. See, e.g., Bourke, 269 F.3d 1074; In re Tripati, 836 F.2d 1406, 1407 (D.C. Cir. 1988); Guerra v. Meese, 786 F.2d 414 (D.C. Cir. 1986).

**VI.    In any Event, Plaintiff's Action is Barred by the Doctrines of *Res Judicata* and *Collateral Estoppel* Because He Had an Opportunity to Raise the Claims he Now Makes when He was Before the D.C. Superior Court and D.C. Court of Appeals**

The Complaint which Plaintiff filed in the Superior Court for the District of Columbia, alleged that "an error made on his DEA LAB analysis report," namely the fact that "[a] decimal was missing" from a purity test of drugs found in his possession so that it registered as "29%"

---

[9] Fed. R. Civ. P. 12(b)(7) calls for dismissal for "failure to join a party under Rule 19." That rule, in turn, calls for joinder of persons if, "in the person's absence complete relief cannot be accorded among those already parties". Fed. R. Civ. P. 19(a). Where the person cannot be made a party, but is indispensable, the court shall dismiss the matter. Fed. R. Civ. P. 19(b). As noted above, the prisoner's custodian is a necessary party in an action such as this.

23

rather than 2.9%, "caused him to lose his [criminal] trial," to "receive[] [a sentence of] 30 years [incarceration]," and to " suffer[] much for the past 18 years mentally and physically." <u>See</u> Docket Entry No. 1, Exhibit A (Complaint filed by Plaintiff in Superior Court). Plaintiff's entire action is barred by the doctrines of *res judicata* and *collateral estoppel* as his claims (1) could have been presented to the D.C. Superior Court or D.C. Court of Appeals during the pendency of Plaintiff's trial and sentencing before the D.C. Superior Court and his appeal to the D.C. Court of Appeals, during a period when he was represented by counsel, and (2) arise out of the same "nucleus" of facts as did his trial, sentencing, and appeal.

Under the doctrine of *res judicata*, "a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were <u>or could have been</u> raised in that action." <u>See</u> <u>San Remo Hotel, L.P. v. City and County of San Francisco, Cal.</u>, 545 U.S. 323, 336, n. 16 (2005) (internal citation omitted and emphasis added).[10]  The doctrine of res judicata describes two discrete effects: (1) "claim preclusion," the fact that "a valid final adjudication of a claim precludes a second action on that claim or any part of it" and (2) "issue preclusion, long called 'collateral estoppel,'" that is that "an issue of fact or law, actually litigated and resolved by a valid final judgment, binds the parties in a subsequent action, whether on the same or a different claim." <u>See</u> <u>Baker v. Gen. Motors Corp.</u>, 522 U.S. 222, 233, n. 5 (1998) (internal

---

[10]  <u>See also</u> <u>Rivet v. Regions Bank of Louisiana</u>, 522 U.S. 470, 476 (1998); <u>Nevada v. United States</u>, 463 U.S. 110, 129-130 (1983); <u>Federated Dep't Stores, Inc. v. Moitie</u>, 452 U.S. 394, 398 (1981); <u>Parklane Hosiery Co. v. Shore</u>, 439 U.S. 322, 326, n. 5 (1979); <u>Montana v. United States</u>, 440 U.S. 147, 153 (1979); <u>Smalls v. United States</u>, 471 F. 3d 186, 192 (D.C. Cir. 2006); <u>Tutt v. Doby</u>, 459 F.2d 1195, 1197 (D.C. Cir. 1972); <u>Burnett v. Sharma</u>, 2007 W.L. 1020782, *2 (D.D.C. 2007) ("Res judicata bars not only claims that actually were litigated, but also claims that could have been litigated in the previous action.")

citation omitted); <u>San Remo</u>, 545 U.S. at 336, n. 16 (explaining that under the doctrine of

<u>collateral estoppel</u>, "once a court has decided an issue of fact or law necessary to its judgment,

that decision may preclude relitigation of the issue in a suit on a different cause of action

involving a party to the first case."); <u>Parklane</u>, 439 U.S. at 326, n. 5; <u>Montana</u>, 440 U.S. at 153.

The doctrines of *res judicata* and *collateral estoppel* are both designed to "'preclude

parties from contesting matters that they have had a full opportunity to litigate.'" <u>See</u> <u>Montana</u>,

440 U.S. at 153-154; <u>Carter v. Rubin</u>, 14 F. Supp.2d 22, 33 (D.D.C. 1998). "These doctrines

protect parties from the expense and burdens associated with multiple lawsuits, conserve judicial

resources, and reduce the possibility of inconsistent decisions." <u>Id.</u> at 33-34 (citing <u>United States</u>

<u>v. Mendoza</u>, 464 U.S. 154, 158-59 (1984)); <u>Hardison v. Alexander</u>, 655 F.2d 1281, 1288 (D.C.

Cir. 1981) (noting that the purpose of *res judicata* is to "conserve judicial resources, avoid

inconsistent results, engender respect for judgments of predictable and certain effect, and to

prevent serial forum-shopping and piecemeal litigation"); <u>Westgate-Sun Harbor Co. v. Watson</u>,

206 F.2d 458, 462 (D.C. Cir. 1953) (noting that "there must some time be an end to litigation,

not only in the interest of the adverse party who should not be vexed twice or thrice or even more

times for the same cause, but also in the interest of the state in settled law and legal relations and

that of courts and litigants in an orderly judicial process which would be seriously jeopardized by

unnecessary overcrowding of already crowded dockets").

*Res judicata* forecloses a cause of action that is based on the same "nucleus of facts,"

<u>Page v. United States</u>, 729 F.2d 818, 820 (D.C. Cir. 1984), and which comprises "any part of the

transaction, or series of connected transactions, out of which [a prior] action arose." <u>Stanton v.</u>

<u>Dist. of Columbia Court of Appeals</u>, 127 F.3d 72, 78 (D.C. Cir. 1997). For *res judicata*

purposes, "it is the facts surrounding the transaction or occurrence which operate to constitute the cause of action, not the legal theory upon which a litigant relies." Page, 729 F.2d at 820. To determine whether or not two suits involve the same cause of action, this Circuit has adopted the "transactional" approach under which a claim, or cause of action, consists of "all rights of the plaintiff to remedies against the defendant with respect to all or any part of the transaction, or series of connected transactions, out of which the action arose." See Stanton, 127 F.3d at 78 (internal citations and quotations omitted). In assessing whether facts constitute a "transaction" or "series of transactions" the court must consider "whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage." Id. at 78.

Plaintiff's action in this Court arises from the same underlying series of transactions or "nucleus of facts" as did his action in the D.C. Superior Court and D.C. Court of Appeals: Plaintiff's 1989 arrest; his conviction, following a non-jury trial, in 1990 for possession with intent to distribute heroin and cocaine, in violation of D.C. Code § 33-541; and his sentencing in that same year. Compare Ex. 2 (Gov't's Superior Court Brief"), Ex. 3 (Govt's D.C. Ct. of App. Brf.), and Johnson v. United States, 636 A. 2d 978, 979 (D.C. App. 1994) (referencing all of these events) with Compl. generally.

Plaintiff certainly had a "full opportunity to litigate" the claims he now presses upon this Court. See, e.g., Montana, 440 U.S. at 153-154; Carter v. Rubin, 14 F. Supp.2d 22, 33 (D.D.C. 1998). Plaintiff was represented by counsel during the pendency of the Superior Court trial, his post trial motions, and his appeal. See, e.g., Ex. 2 (Gov't's Superior Court Brief) at 7-23 (addressing the issue of whether his counsel effectively represented him during the trial); id. at 30

26

(certificate of service, referring to Plaintiff's attorney of record); Ex. 3 (Govt's D.C. Ct. of App.

Brf.) at 25-40 (addressing the adequacy of Plaintiff's counsel at trial); id. at 43 (certificate of

service, referring to "counsel for appellant Melvyn A. Johnson");  Johnson, 636 A. 2d at 979

(referencing appellant's counsel).  During the pendency of his trial and sentencing in the D.C.

Superior Court, and his appeal to the D.C. Court of Appeals, Plaintiff could have (but failed to)

raise the claim which he now asserts in this Court, that the DEA miscalculated the purity of the

heroin found on his possession.  Plaintiff certainly was on notice of the DEA's calculations prior

to his trial as AUSA Andrew Klingenstein filed and served upon Plaintiff's counsel a notice of

compliance with the Court and provided the report of custody, the analysis of the controlled

substance, and the certificate of legal custody prior to Plaintiff's trial *prior to Plaintiff's trial*.

See Ex. 4 at 1-2; Ex. 4 *generally*.  Moreover, Plaintiff could have made the argument during his

appeal to the D.C. Court of Appeals as he mentioned it in a February 4, 1992 letter to the DEA,

two years before the D.C. Court of Appeals rendered its decision on his appeal.  See Ex. 5;

Johnson v. United States, 636 A. 2d 978, 979 (D.C. App. 1994).

    Moreover, both the Superior Court and the D.C. Court of Appeals found Plaintiff had

committed the drug offenses at issue.  A Federal court must give decisions by the D.C. Superior

and Court of Appeals courts the same preclusive effect as it would give other federal courts.[11]

---

[11]  See, e.g.,  Moment v. Dist. of Columbia, 2007 WL 861138, *4 (D.D.C. 2007) (noting that the Plaintiff "does not contest that the Superior Court is a court of competent jurisdiction" for res judicata purposes and that "[t]he defendants have shown that Moment's current claims are the same that were previously asserted and adjudicated in his prior Superior Court litigation" and that "[t]herefore, defendants' motion for judgment on the pleadings will be granted and plaintiff's complaint will be dismissed"); Lee v. Bradford, 2006 WL 2520614, at *2 (D.D.C. Aug. 30, 2006) (noting that a dismissal in Superior Court for failure to state a claim in a complaint alleging deprivation of constitutional rights was a final judgment on the merits by a court of

Thus, Plaintiff's action is barred by the doctrines of *res judicata* and *collateral estoppel* as: (1) he

had an opportunity to raise his allegations before the D.C. Superior Court and the D.C. Court of

Appeals, and (2) they arise from the same "nucleus" of facts as those prior actions.

---

competent jurisdiction); <u>Redman v. Graham</u>, 2005 W.L. 3211938, *2-3 (D.D.C. 2005) (deciding
that one of the defendants in that case, "Graham will be dismissed based on the doctrine of res
judicata" because the plaintiff "has pleaded the same facts and named the same parties here as in
her D.C. Superior Court case and her proceeding before the RACD" and that "[s]he did not raise
her discrimination and Fair Housing Act claims as defenses in Dr. Pitts' suit for possession, but
she could have."); <u>Flynn v. 3900 Watson Place, Inc.</u>, 63 F.Supp.2d 18, *19 (D.D.C.,1999) ("The
court concludes that District of Columbia law precludes relitigation of plaintiffs' Fair Housing
Act claim in federal court because that claim arises from the same nucleus of facts as those
adjudicated in the landlord-tenant court [i.e., the Landlord and Tenant Branch of D.C. Superior
Court], and the plaintiffs had an opportunity to raise their Fair Housing Act claim as a defense in
that proceeding.")

Dated: August 28, 2007                    Respectfully Submitted,


                                          __/s/_____
                                          JEFFREY A. TAYLOR, D.C. BAR # 498610
                                          United States Attorney


                                          ___/s/_____
                                          RUDOLPH CONTRERAS, D.C. BAR # 434122
                                          Assistant United States Attorney


                                          __/s/_____
                                          JONATHAN C. BRUMER, D.C. BAR # 463328
                                          Special Assistant United States Attorney
                                          555 Fourth Street, N.W., Room E4815
                                          Washington, D.C. 20530
                                          (202) 514-7431
                                          (202) 514-8780 (facsimile)

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| MELVYN A. JOHNSON,        ) | |
|        ) | |
|           Plaintiff,        ) | |
|        ) | |
|           v.        ) | Civil Action No. 07–0935 (RMC) |
|        ) | ECF |
| ADRIAN M. FENTY, Mayor,        ) | |
|        ) | |
| UNITED STATES DEPARTMENT,        ) | |
|   OF JUSTICE,        ) | |
| DRUG ENFORCEMENT AGENCY,        ) | |
|        ) | |
| UNITED STATES ATTORNEY'S        ) | |
|   OFFICE FOR THE DISTRICT OF        ) | |
|   COLUMBIA,        ) | |
|        ) | |
| DEPARTMENT OF CORRECTIONS,        ) | |
|        ) | |
|        ) | |
|           Defendants.        ) | |
|        ) | |
|        ) | |

## STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

      Pursuant to Local Rule 7(h), Defendants submit this statement of material facts as to which there is no genuine issue:

      1. Plaintiff, Melvin A. Johnson (a/k/a "Melvyn" A. Johnson), is a prisoner currently housed in the Federal Correction Institution ("FCI") in Petersburg, Virginia. See Exhibit ("Ex.") 1 (Public Information Inmate Data for Plaintiff) at 001; see also Docket Entry No. 9 (Notice of Plaintiff's New Address).

2.   Prior to Plaintiff's criminal trial, Assistant United States Attorney ("AUSA") Andrew Klingenstein filed and served upon Plaintiff the following documents: a notice of compliance with the D.C. Superior Court and provided a report of custody, an analysis of the controlled substances found in Plaintiff's possession, and a certificate of legal custody.  See Ex. 4 at 1-2; Ex. 4 *generally*.  AUSA Klingenstein served Plaintiff's counsel with a copy of these documents. Id.

3.   Plaintiff was convicted during a non-jury trial for possession with intent to distribute heroin  in violation of D.C. Code § 33-541(a)(1).  See Ex. 1 (Public Information Inmate Data for Inmate) at 003, 005, 007; Ex. 2 at 7; Ex. 3 at 7-8; Johnson v. United States, 636 A. 2d 978, 979-80 (D.C. App. 1994)

4.   The D.C. Superior court found Plaintiff guilty of two counts (possession with intent to distribute heroin and cocaine).  See Ex. 2 at 2, 7; Ex. 3 at 1;  Johnson, 636 A. 2d at 980.  It sentenced Plaintiff to a 10-30 year term of incarceration for the possession with intent to distribute heroin count, followed by 1 year's incarceration for cocaine possession.  See Ex. 1 at 003-007; Ex. 2 at 2; Ex. 3 at 1-2.

5.   Plaintiff filed a motion to vacate the sentence, set aside the conviction, and order a new trial.  See Ex. 2 at 1-2.  After a hearing, on October 31, 1991, the presiding Judge determined that Plaintiff's motion for a new trial should be denied.  See Ex. 3 at 2.

6.   Plaintiff then filed an appeal to the D.C. Court of Appeals, in which he challenged his conviction and the denial of his request for a new trial.  See Johnson, 636 A. 2d at 980.  On February 3, 1994, the D.C. Court of Appeals upheld affirmed the conviction and sentence.  Id.

2

*generally.*

7.  Plaintiff was represented by counsel during the pendency of the Superior Court trial, his post trial motions, and his appeal.  See, e.g., Ex. 2 (Gov't's Superior Court Brief) at 7-23 (addressing the issue of whether his counsel effectively represented him during the trial); id. at 30 (certificate of service, referring to Plaintiff's attorney of record); Ex. 3 (Govt's D.C. Ct. of App. Brf.) at 25-40 (addressing the adequacy of Plaintiff's counsel at trial); id. at 43 (certificate of service, referring to "counsel for appellant Melvyn A. Johnson");  Johnson, 636 A. 2d at 979 (referencing appellant's counsel).

8.  It appears that neither Plaintiff nor his attorneys ever argued that the DEA had miscalculated the purity of the heroin which had been found in Plaintiff's possession during Plaintiff's trial, in connection with his post-trial motions to vacate the sentence, set aside the conviction, and order a new trial, or in connection with his appeal to the D.C. Court of Appeals. See Ex. 2 (Gov't's Sup. Ct. Brf.) *generally* (responding to a myriad of arguments by Plaintiff, but is devoid of any suggestion that Plaintiff argued that the DEA miscalculated the purity of the heroin at that stage); Ex. 3 (Gov't's D.C. Ct. of App. Brf.) *generally* (same); Johnson, 636 A. 2d 978 (D.C. App. 1994) (makes no mention of the purity issue and does not suggest that Plaintiff raised it.)

## II.     Plaintiff's February 4, 1992 Letter to Paul De Zan of the DEA's Field Laboratory

9.  On or about February 24, 1992, Plaintiff mailed a letter to Paul De Zan, the then Laboratory Director of the DEA's Mid-Atlantic Field Laboratory.  See Ex. 5.  In his letter, Plaintiff explained that he was "currently incarcerated at the Lorton Correctional Facility at

Lorton, Virginia, serving a sentence of thirty (30) years for possession of a controlled substance."
<u>Id</u>.  He claimed that "[t]he severity of his sentence is a direct result of the potent quality of heroin
which I allegedly possessed."  <u>Id</u>.  By way of explanation, he noted that "[t]hroughout my trial, it
was my contention that the drugs found on my person was for my personal use," but asserted that
"because of the quality reported by a certified chemist in your laboratory, I was subsequently
convicted," that "[t]he quality of twenty-nine (29%) transforms my image from urban city drug
addict to a supplier from Amsterdam," and that "I . . . find the test results to be somewhat at
variance with qualities consistent with street level substance abuse."  <u>Id</u>.  Thus, Plaintiff
requested that his laboratory report be reassessed.  <u>Id</u>.  Notably, the letter did not provide any
evidence that the purity of the heroin found in Plaintiff's possession played any role in his
conviction or sentencing.  <u>Id</u>.  Nor did it set forth a "sum certain" of damages allegedly suffered
by Plaintiff as a result of the DEA's purported error.  <u>Id</u>.

10.  Plaintiff has never presented a proper administrative claim to the appropriate federal
agency - the DEA - a written statement describing the alleged accident and setting forth a sum
certain, as he was required to do under 28 U.S.C. §§ 2401(b) and 2675(a), and the implementing
published agency regulations.  <u>See</u> Ex. 6, Declaration of Bettie E. Goldman.

Respectfully submitted,


__/s/_____
JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney


__/s/_____
RUDOLPH CONTRERAS, D.C. BAR # 434122
Assistant United States Attorney



__/s/_____
JONATHAN C. BRUMER, D.C. BAR # 463328
Special Assistant United States Attorney
555 Fourth Street, N.W., Room E4815
Washington, D.C. 20530
(202) 514-7431
(202) 514-8780 (facsimile)

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that, on this 28th day of August, 2007, the foregoing Federal Defendants' Motion to Dismiss, or in the Alternative, for Summary Judgment, Memorandum of Points and Authorities in Support of Federal Defendants' Motion to Dismiss, or in the Alternative for Summary Judgment, and Federal Defendants' Statement of Material Facts Not in Dispute, and the accompanying Exhibits, were served via the Electronic Case Filing System upon the non-Federal Defendants, and were served upon the *pro se* Plaintiff by first class mail, postage prepaid mail addressed as follows:

> Melvyn A. Johnson
> R 07904-007
> Federal Correctional Complex
> Petersburg-Medium
> P.O. Box 90043
> Petersburg, VA 23804

__/s/_____
JONATHAN C. BRUMER, D.C. BAR # 463328
Special Assistant United States Attorney
555 Fourth Street, N.W., Room E4815
Washington, D.C. 20530
(202) 514-7431
(202) 514-8780 (facsimile)

# EXHIBIT   1

Public Information Inmate Data for Plaintiff (redacted)

```
PEMC6               *      PUBLIC INFORMATION        *    08-16-2007
PAGE 001            *         INMATE DATA            *    14:28:53
                              AS OF 08-16-2007

REGNO..: 07904-007 NAME: JOHNSON, MELVIN ANTHONY JR

                    RESP OF: PEM / DESIGNATED, AT ASSIGNED FACIL
                    PHONE..: 804-504-7200    FAX: 804-504-7204
                                             RACE/SEX...: BLACK / MALE
FBI NUMBER.: 410423AA1                       DOB/AGE...:        /
PROJ REL MT: PAROLE FROM PAR COM OR CT       PAR ELIG DT: COMMISSION
PROJ REL DT: 11-23-2007                      PAR HEAR DT:
--------------------------- ADMIT/RELEASE HISTORY ---------------------------
FCL     ASSIGNMENT DESCRIPTION               START DATE/TIME STOP  DATE/TIME
PEM     A-DES      DESIGNATED, AT ASSIGNED FACIL 06-27-2007 1200 CURRENT
9-L     RELEASE    RELEASED FROM IN-TRANSIT FACL 06-27-2007 1200 06-27-2007 1200
9-L     A-ADMIT    ADMITTED TO AN IN-TRANSIT FACL 06-04-2007 1157 06-27-2007 1200
DSC     ADMIN REL  ADMINISTRATIVE RELEASE      06-04-2007 1057 06-04-2007 1057
DSC     A-ADMIN    ADMINISTRATIVE ADMISSION    06-04-2007 1050 06-04-2007 1050
CDC     PAROLE     PAROLE FROM PAR COM OR CT   08-01-2005 0900 06-04-2007 1050
CDC     A-DES      DESIGNATED, AT ASSIGNED FACIL 05-16-2005 1248 08-01-2005 0900
0-Q     RELEASE    RELEASED FROM IN-TRANSIT FACL 05-16-2005 1248 05-16-2005 1248
0-Q     A-ADMIT    ADMITTED TO AN IN-TRANSIT FACL 05-16-2005 0815 05-16-2005 1248
CBR     TRANSFER   TRANSFER                    05-16-2005 0815 05-16-2005 0815
CBR     A-DES      DESIGNATED, AT ASSIGNED FACIL 05-03-2005 2145 05-16-2005 0815
8-A     RELEASE    RELEASED FROM IN-TRANSIT FACL 05-03-2005 2145 05-03-2005 2145
8-A     A-ADMIT    ADMITTED TO AN IN-TRANSIT FACL 05-03-2005 1200 05-03-2005 2145
RIV     FURL TRANS FURL W/UNESCORTED TRF TO A CCC 05-03-2005 1200 05-03-2005 1200
RIV     A-DES      DESIGNATED, AT ASSIGNED FACIL 07-29-2004 1247 05-03-2005 1200
B20     RELEASE    RELEASED FROM IN-TRANSIT FACL 07-29-2004 1247 07-29-2004 1247
B20     A-ADMIT    ADMITTED TO AN IN-TRANSIT FACL 07-29-2004 0957 07-29-2004 1247
PEM     HLD REMOVE HOLDOVER REMOVED            07-29-2004 0957 07-29-2004 0957
PEM     A-HLD      HOLDOVER, TEMPORARILY HOUSED 07-28-2004 1449 07-29-2004 0957
7-O     RELEASE    RELEASED FROM IN-TRANSIT FACL 07-28-2004 1449 07-28-2004 1449
7-O     A-ADMIT    ADMITTED TO AN IN-TRANSIT FACL 07-28-2004 1445 07-28-2004 1449
CDC     TRANSFER   TRANSFER                    07-28-2004 1445 07-28-2004 1445
CDC     A-BOP HLD  HOLDOVER FOR INST TO INST TRF 06-21-2004 1406 07-28-2004 1445
0-X     RELEASE    RELEASED FROM IN-TRANSIT FACL 06-21-2004 1406 06-21-2004 1406
0-X     A-ADMIT    ADMITTED TO AN IN-TRANSIT FACL 06-21-2004 1404 06-21-2004 1406
CDC     TRANSFER   TRANSFER                    06-21-2004 1404 06-21-2004 1404
CDC     A-DES      DESIGNATED, AT ASSIGNED FACIL 06-08-2004 1913 06-21-2004 1404
8-A     RELEASE    RELEASED FROM IN-TRANSIT FACL 06-08-2004 1913 06-08-2004 1913
8-A     A-ADMIT    ADMITTED TO AN IN-TRANSIT FACL 06-08-2004 0450 06-08-2004 1913
RIV     FURL TRANS FURL W/UNESCORTED TRF TO A CCC 06-08-2004 0450 06-08-2004 0450
RIV     A-DES      DESIGNATED, AT ASSIGNED FACIL 03-25-2004 1238 06-08-2004 0450
B20     RELEASE    RELEASED FROM IN-TRANSIT FACL 03-25-2004 1238 03-25-2004 1238
B20     A-ADMIT    ADMITTED TO AN IN-TRANSIT FACL 03-25-2004 1232 03-25-2004 1238
PEM     HLD REMOVE HOLDOVER REMOVED            03-25-2004 1232 03-25-2004 1232
PEM     A-HLD      HOLDOVER, TEMPORARILY HOUSED 03-24-2004 1500 03-25-2004 1232
3-W     RELEASE    RELEASED FROM IN-TRANSIT FACL 03-24-2004 1500 03-24-2004 1500


G0002      MORE PAGES TO FOLLOW
```

```
PEMC6          *     PUBLIC INFORMATION        *     08-16-2007
PAGE 002        *        INMATE DATA           *     14:28:53
                      AS OF 08-16-2007
```

REGNO..: 07904-007 NAME: JOHNSON, MELVIN ANTHONY JR

```
                    RESP OF: PEM / DESIGNATED, AT ASSIGNED FACIL
                    PHONE..: 804-504-7200   FAX: 804-504-7204
3-W    A-ADMIT      ADMITTED TO AN IN-TRANSIT FACL 03-24-2004 1426 03-24-2004 1500
MXR    ADMIN REL    ADMINISTRATIVE RELEASE         03-24-2004 1426 03-24-2004 1426
MXR    A-ADMIN      ADMINISTRATIVE ADMISSION       03-24-2004 1420 03-24-2004 1426
3-W    RELEASE      RELEASED FROM IN-TRANSIT FACL  03-24-2004 1420 03-24-2004 1420
3-W    A-ADMIT      ADMITTED TO AN IN-TRANSIT FACL 03-19-2004 1517 03-24-2004 1420
MXR    ADMIN REL    ADMINISTRATIVE RELEASE         03-19-2004 1517 03-19-2004 1517
MXR    A-ADMIN      ADMINISTRATIVE ADMISSION       03-11-2004 1139 03-19-2004 1517
CDC    PAROLE       PAROLE FROM PAR COM OR CT      06-26-2002 1400 03-11-2004 1139
CDC    A-DES        DESIGNATED, AT ASSIGNED FACIL  06-07-2002 1000 06-26-2002 1400
3-W    RELEASE      RELEASED FROM IN-TRANSIT FACL  06-07-2002 1000 06-07-2002 1000
3-W    A-ADMIT      ADMITTED TO AN IN-TRANSIT FACL 05-09-2002 0908 06-07-2002 1000
MXR    ADMIN REL    ADMINISTRATIVE RELEASE         05-09-2002 0908 05-09-2002 0908
MXR    A-DCOB       ADMIT TO D.C. OFFENDER BRANCH  05-08-2002 1126 05-09-2002 0908
BOP    DCOB REL     REL FROM D.C. OFFENDER BRANCH  01-11-2000 1412 05-08-2002 1126
BOP    A-DCOB       ADMIT TO D.C. OFFENDER BRANCH  08-09-1999 1120 01-11-2000 1412
```

```
G0002        MORE PAGES TO FOLLOW . . .
```

```
PEMC6            *        PUBLIC INFORMATION        *     08-16-2007
PAGE 003         *          INMATE DATA             *     14:28:53
                          AS OF 08-16-2007
```

REGNO..: 07904-007 NAME: JOHNSON, MELVIN ANTHONY JR

```
            RESP OF: PEM / DESIGNATED, AT ASSIGNED FACIL
            PHONE..: 804-504-7200     FAX: 804-504-7204
PRE-RELEASE PREPARATION DATE: 10-16-2007
```

THE FOLLOWING SENTENCE DATA IS FOR THE INMATE'S CURRENT COMMITMENT.
THE INMATE IS PROJECTED FOR RELEASE:  11-23-2007 VIA PAROLE

```
--------------------CURRENT JUDGMENT/WARRANT NO: 030 --------------------
COURT OF JURISDICTION...........: DIST OF COLUMBIA, SUPERIOR CRT
DOCKET NUMBER...................: F-9926-89
JUDGE...........................: WERTHEIM
DATE SENTENCED/PROBATION IMPOSED: 05-09-1990
DATE WARRANT ISSUED.............: 10-16-2006
DATE WARRANT EXECUTED...........: 10-26-2006
DATE COMMITTED..................: 10-26-2006
HOW COMMITTED...................: RETURN OF PAROLE VIOLATOR
PROBATION IMPOSED...............: NO
SPECIAL PAROLE TERM.............:
```

RESTITUTION...: PROPERTY: NO  SERVICES: NO      AMOUNT: $00.00

```
-------------------CURRENT OBLIGATION NO: 010 --------------------
OFFENSE CODE....: 620
OFF/CHG: 33-541(D), POSSESSION OF COCAINE
         33-541(C)(1)(A(I), POSSESSION WITH INTENT TO DISTRIBUTE HEROIN

SENTENCE PROCEDURE..............: DC GTCA ADULT SENTENCE
SENTENCE IMPOSED/TIME TO SERVE.:   21 YEARS
NEW SENTENCE IMPOSED...........: 3671 DAYS
BASIS FOR CHANGE...............: PAROLE VIOLATOR WARRANT EXEC
DATE OF OFFENSE................: 08-22-1989
```

G0002       MORE PAGES TO FOLLOW . . .

```
PEMC6              *       PUBLIC INFORMATION        *     08-16-2007
PAGE 004           *         INMATE DATA             *     14:28:53
                            AS OF 08-16-2007
```

REGNO..: 07904-007 NAME: JOHNSON, MELVIN ANTHONY JR

```
                 RESP OF: PEM / DESIGNATED, AT ASSIGNED FACIL
                 PHONE..: 804-504-7200    FAX: 804-504-7204
--------------------CURRENT COMPUTATION NO: 030 --------------------
```

COMPUTATION 030 WAS LAST UPDATED ON 06-18-2007 AT DSC AUTOMATICALLY
COMPUTATION CERTIFIED ON 06-20-2007 BY DESIG/SENTENCE COMPUTATION CTR

THE FOLLOWING JUDGMENTS, WARRANTS AND OBLIGATIONS ARE INCLUDED IN
CURRENT COMPUTATION 030: 030 010

```
DATE COMPUTATION BEGAN..........: 10-26-2006
TOTAL TERM IN EFFECT............: 3671 DAYS
TOTAL TERM IN EFFECT CONVERTED..:   10 YEARS     18 DAYS
EARLIEST DATE OF OFFENSE........: 08-22-1989

TOTAL JAIL CREDIT TIME..........: 0
TOTAL INOPERATIVE TIME..........: 0
STATUTORY GOOD TIME RATE........: 10
TOTAL SGT POSSIBLE..............: 1206
PAROLE ELIGIBILITY..............: COMMISSION'S DISCRETION
STATUTORY RELEASE DATE..........: 07-25-2013
TWO THIRDS DATE.................: N/A
180 DAY DATE....................: N/A
EXPIRATION FULL TERM DATE.......: 11-12-2016

PAROLE EFFECTIVE................: 11-23-2007
PAROLE EFF VERIFICATION DATE....: 05-23-2007
NEXT PAROLE HEARING DATE........: UNKNOWN
TYPE OF HEARING.................: UNKNOWN

PROJECTED SATISFACTION DATE.....: 11-23-2007
PROJECTED SATISFACTION METHOD...: PAROLE
```

G0002      MORE PAGES TO FOLLOW . . .

```
 PEMC6            *        PUBLIC INFORMATION        *     08-16-2007
 PAGE 005         *          INMATE DATA             *     14:28:53
                           AS OF 08-16-2007
```

REGNO..: 07904-007 NAME: JOHNSON, MELVIN ANTHONY JR

               RESP OF: PEM / DESIGNATED, AT ASSIGNED FACIL

PRE-RELEASE PREPARATION DATE: 05-28-2005

THE FOLLOWING SENTENCE DATA IS FOR THE INMATE'S PRIOR COMMITMENT.
THE INMATE WAS SCHEDULED FOR RELEASE: 08-01-2005 VIA PAROLE

-------------------------PRIOR JUDGMENT/WARRANT NO: 020 -------------------------

```
COURT OF JURISDICTION..........: DIST OF COLUMBIA, SUPERIOR CRT
DOCKET NUMBER..................: F-9926-89
JUDGE..........................: WERTHEIM
DATE SENTENCED/PROBATION IMPOSED: 05-09-1990
DATE WARRANT ISSUED............: 09-09-2003
DATE WARRANT EXECUTED..........: 10-03-2003
DATE COMMITTED.................: 03-17-2004
HOW COMMITTED..................: RETURN OF PAROLE VIOLATOR
PROBATION IMPOSED..............: NO
SPECIAL PAROLE TERM............:
```

RESTITUTION...: PROPERTY: NO  SERVICES: NO       AMOUNT: $00.00

-------------------------PRIOR OBLIGATION NO: 010 -------------------------
OFFENSE CODE....: 620
OFF/CHG: 33-541(D), POSSESSION OF COCAINE
         33-541(C)(1)[A(I), POSSESSION WITH INTENT TO DISTRIBUTE HEROIN

```
SENTENCE PROCEDURE............: DC-GTCA ADULT SENTENCE
SENTENCE IMPOSED/TIME TO SERVE.:   21 YEARS
NEW SENTENCE IMPOSED..........: 4340 DAYS
BASIS FOR CHANGE..............: PAROLE VIOLATOR WARRANT EXEC
DATE OF OFFENSE...............: 08-22-1989
```

G0002     MORE PAGES TO FOLLOW . . .

```
    PEMC6           *        PUBLIC INFORMATION          *      08-16-2007
    PAGE 006        *   *         INMATE DATA             *      14:28:53
                              AS OF 08-01-2005

REGNO..: 07904-007 NAME: JOHNSON, MELVIN ANTHONY JR

                    RESP OF: PEM / DESIGNATED, AT ASSIGNED FACIL
                    PHONE..: 804-504-7200    FAX: 804-504-7204
--------------------------------PRIOR COMPUTATION NO: 020 --------------------

COMPUTATION 020 WAS LAST UPDATED ON 07-19-2005 AT CRO AUTOMATICALLY

THE FOLLOWING JUDGMENTS, WARRANTS AND OBLIGATIONS ARE INCLUDED IN
PRIOR COMPUTATION 020:   020 010

DATE COMPUTATION BEGAN..........: 10-03-2003
TOTAL TERM IN EFFECT............:  4340 DAYS
TOTAL TERM IN EFFECT CONVERTED..:    11 YEARS     10 MONTHS      18 DAYS
EARLIEST DATE OF OFFENSE........: 08-22-1989

TOTAL JAIL CREDIT TIME..........: 0
TOTAL INOPERATIVE TIME..........: 0
STATUTORY GOOD TIME RATE........: 10
TOTAL SGT POSSIBLE..............: 1426
PAROLE ELIGIBILITY..............: COMMISSION'S DISCRETION
STATUTORY RELEASE DATE..........: 09-24-2011
TWO THIRDS DATE.................: N/A
180 DAY DATE....................: N/A
EXPIRATION FULL TERM DATE.......: 08-20-2015

PAROLE EFFECTIVE................: 08-01-2005
PAROLE EFF VERIFICATION DATE....: 06-09-2005
NEXT PAROLE HEARING DATE........: N/A
TYPE OF HEARING.................: PAROLE EFFECTIVE

ACTUAL SATISFACTION DATE........: 08-01-2005
ACTUAL SATISFACTION METHOD......: PAROLE
ACTUAL SATISFACTION FACILITY....: CDC
ACTUAL SATISFACTION KEYED BY....: PN

DAYS REMAINING..................: 3671
FINAL PUBLIC LAW DAYS...........: 0




    G0002       MORE PAGES TO FOLLOW . . .
```

```
PEMC6              *      PUBLIC INFORMATION          *    08-16-2007
PAGE 007           *         INMATE DATA             *    14:28:53
                           AS OF 06-26-2002
```

REGNO..: 07904-007 NAME: JOHNSON, MELVIN ANTHONY JR

RESP OF: PEM / DESIGNATED, AT ASSIGNED FACIL

THE FOLLOWING SENTENCE DATA IS FOR THE INMATE'S PRIOR COMMITMENT.
THE INMATE WAS SCHEDULED FOR RELEASE: 06-26-2002 VIA PAROLE

```
------------------------PRIOR JUDGMENT/WARRANT NO: 010 --------------------------

COURT OF JURISDICTION..........: DIST OF COLUMBIA, SUPERIOR CRT
DOCKET NUMBER..................: F9926-89C,D
JUDGE..........................: WERTHEIM
DATE SENTENCED/PROBATION IMPOSED: 05-09-1990
DATE WARRANT ISSUED............: 07-24-2000
DATE WARRANT EXECUTED..........: 11-26-2001
DATE COMMITTED.................: 06-07-2002
HOW COMMITTED..................: RETURN OF PAROLE VIOLATOR
PROBATION IMPOSED..............: NO
SPECIAL PAROLE TERM............:
```

RESTITUTION...: PROPERTY: NO SERVICES: NO        AMOUNT: $00.00

```
--------------------------PRIOR OBLIGATION NO: 010 ----------------------------
OFFENSE CODE....: 620
OFF/CHG: DC CODE: POSS/W/I/T/D HEROIN, 7-21Y, CT C
         DC CODE: POSSESSION OF COCAINE, 1Y CC, CT D

SENTENCE PROCEDURE............: DC GTCA ADULT SENTENCE
SENTENCE IMPOSED/TIME TO SERVE.: 21 YEARS
NEW SENTENCE IMPOSED..........: 4560 DAYS
BASIS FOR CHANGE..............: PAROLE VIOLATOR WARRANT EXEC
DATE OF OFFENSE...............: 08-22-1989
```

G0002      MORE PAGES TO FOLLOW . . .

AUG/17/2007/FRI 03:49 AM                                                    P. 010

```
   PEMC6            *        PUBLIC INFORMATION          *     08-16-2007
PAGE 008 OF 008  *             INMATE DATA              *     14:28:53
                           AS OF 06-26-2002

REGNO..: 07904-007 NAME: JOHNSON, MELVIN ANTHONY JR

              RESP OF: PEM / DESIGNATED, AT ASSIGNED FACIL
                PHONE..: 804-504-7200   FAX: 804-504-7204
-------------------------PRIOR COMPUTATION NO: 010 --------------------

COMPUTATION 010 WAS LAST UPDATED ON 06-26-2002 AT CDC AUTOMATICALLY

THE FOLLOWING JUDGMENTS, WARRANTS AND OBLIGATIONS ARE INCLUDED IN
PRIOR COMPUTATION 010:   010 010

DATE COMPUTATION BEGAN............: 11-26-2001
TOTAL TERM IN EFFECT..............: 4560 DAYS
TOTAL TERM IN EFFECT CONVERTED..:    12 YEARS    5 MONTHS    26 DAYS
EARLIEST DATE OF OFFENSE..........: 08-22-1989

TOTAL JAIL CREDIT TIME...........: 0
TOTAL INOPERATIVE TIME...........: 0
STATUTORY GOOD TIME RATE.........: 10
TOTAL SGT POSSIBLE...............: 1498
PAROLE ELIGIBILITY...............: COMMISSION'S DISCRETION
STATUTORY RELEASE DATE...........: 04-14-2010
TWO THIRDS DATE..................: N/A
180 DAY DATE.....................: N/A
EXPIRATION FULL TERM DATE........: 05-21-2014

PAROLE EFFECTIVE.................: 06-26-2002
PAROLE EFF VERIFICATION DATE.....: 05-01-2002
NEXT PAROLE HEARING DATE.........: N/A
TYPE OF HEARING..................: PAROLE EFFECTIVE

ACTUAL SATISFACTION DATE.........: 06-26-2002
ACTUAL SATISFACTION METHOD.......: PAROLE
ACTUAL SATISFACTION FACILITY....: CDC
ACTUAL SATISFACTION KEYED BY....: JAF

DAYS REMAINING...................: 4347
FINAL PUBLIC LAW DAYS............: 0




    G0000       TRANSACTION SUCCESSFULLY COMPLETED
```

# EXHIBIT   2

Government's Opposition to Defendant's Motion to Vacate Sentence, Set Aside in Conviction and Order a New Trial, filed in <u>United States v. Melvyn Johnson, Jr.,</u> Crim. No. F-9926-89, in the Superior Court for the District of Columbia, Criminal Division-Felony Branch on July 29, 1991

SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
Criminal Division - Felony Branch

UNITED STATES OF AMERICA               )
                                       )      Crim. No. F-9926-89
            v.                         )      (J. Wertheim)
                                       )      (Closed Case)
MELVYN JOHNSON, JR.                    )

GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION
TO VACATE SENTENCE, SET ASIDE CONVICTION AND ORDER A NEW TRIAL

The United States of America, through its attorney, the United States Attorney for the District of Columbia, hereby opposes defendant's motion to vacate sentence, set aside conviction and order a new trial. The United States submits the following supporting points and authorities.

## Summary

Defendant seeks a retrial alleging he has uncovered "new evidence" since his first (bench) trial and that he then received ineffective assistance of counsel. Armed with the recently written affidavits of three fellow Lorton inmates in part corroborating his trial testimony and with a copy of discharge summary from the Veterans Administration Hospital that quantifies his drug habit in 1985, the defendant simultaneously seeks accreditation of these submissions as "new evidence" and discreditation of his counsel's performance for having failed to present them at his first trial.1/

---

1/ Specifically, defendant claims his counsel failed (1) adequately to investigate pretrial (2) to call specific witnesses to testify at trial (3) to object to portions of the government's drug expert's testimony that allegedly fell outside his "proffered" qualifications (4) to repeat her objection to the Court's considering the defendant's sure receipt of a mandatory minimum sentence when assessing his credibility as a witness (5)
(continued...)

37

2

Defendant's "evidence" is neither "new" nor credible and his ineffective assistance claims are either inaccurate, frivolous or wholly unbelievable. The record conclusively demonstrates that the defendant is entitled to nothing and his motion should be denied summarily.

## Statement of the Case

On August 28, 1989, the grand jury indicted the defendant on one count each of possession with the intent to distribute heroin and possession of cocaine (D.C. Code § 33-541). A bench trial before Judge Ronald Wertheim began and ended on February 26, 1990, when the Court returned guilty verdicts on both counts. On May 9, 1990, Judge Wertheim sentenced the defendant to a ten-to-thirty year term of incarceration for the possession with the intent to distribute heroin count, followed by one year's incarceration for cocaine possession.

## The Trial

## The Government's Evidence

At 7:00 p.m., on August 22, 1989, Detective Gary O'Neal -- an eighteen year veteran of the Metropolitan Police Department's First District and a member of its drug enforcement section -- was walking west in an alley behind 146 L Street, S.E., (a "block" known as one of the most prodigious "open air drug distribution centers within the first district") when he observed the defendant

---

1/(...continued)
to file a suppression motion and (6) explicitly to request that the Court consider the lesser included offense of heroin possession.

38

3

with an unidentified black female in the alley walkway (Tr. 5-7, 9).2/ As he approached them, Detective O'Neal saw several blue-tinted glassine plastic packets containing white powder protruding from the defendant's outstretched open right hand (Tr. 5-6, 8). As the female -- carrying a shoulderbag -- reached her hand to one inch of the defendant's, Detective O'Neal (from five or six feet away) interrupted them by identifying himself and demanding that they emerge from the walkway (Tr. 6-7, 18-21, 24). Quickly, the defendant dropped his hand to his side and the woman "snatched" her hand back and fled (Tr. 6-7, 47).

Detective O'Neal and the defendant struggled (Tr. 6). Eventually, the detective retrieved nine small blue-tinted packets of white powder from the defendant's right hand (Tr. 6-7). He led the defendant to the mouth of the alley to the 1000 block of Second Street (Tr. 7). Officer Kemper Agee -- also with the First District -- searched the defendant and found an off white rock-like substance and $74 in currency inside a small, zippered, black bicycle pouch strapped around the his waist (Tr. 7, 29-30). The powder was heroin, the rock, crack cocaine (Tr. 55).

Officer David Stroud, an expert in the street trafficking and packaging of illicit drugs in the District of Columbia, told the Court that the nine small blue-tinted glassine bags of heroin, ordinarily sold for twenty dollars apiece on the street, were of an amount, percentage purity, weight and packaging consistent with

---

2/ "Tr." refers to the 114-page transcript of the trial proceedings held on February 26, 1990.

39

4

street distribution, not personal use (Tr. 54-56). Addicts do not purchase nine individually wrapped bags of heroin for $180 because they can buy the same amount (perhaps of better quality) in bulk for only $60, he elaborated (Tr. 57). Besides saving money, Officer Stroud explained that addicts also buy in bulk or buy at most one or two bags at a time (employing a "use as you go" method) as opposed to multiple individual bags to reduce the risk of getting a "burn" bag -- i.e, a ziplock containing "baking soda or a plain cutting agent" -- instead of heroin (Tr. 54-59). Moreover, he explained, heroin addicts do not "stockpile" their supply (Tr. 59).

In Officer Stroud's experience, the most heroin addict would use in a one day period was "six bags" (Tr. 58). Even the rare addict (i.e., one who had a six-bag-a-day habit) "wouldn't buy six bags at a time" but would "sell or do a little bit of running" to support his habit (Tr. 58).3/ Typically, he continued, "they'll work for somebody who actually is holding the heroin and for every ten bags they sell they're allowed to keep, like, one out of that ten. And once that's done they'll take the bag, ingest it, go off in a corner somewhere and nod off for a few hours" (Tr. 58-59). He added that drug dealers often store their stash in pouches (including bicycle pouches), whereas users likely would "have [their] works or [their] paraphernalia" in the pouch with "maybe

---

3/ Officer Stroud clarified during cross-examination that his "knowledge" of the amount of heroin an addict would use in a one day period was drawn solely from his conversations with addicts who had been arrested, and not personal observation (Tr. 62-63, 64).

*40*

5

one or two bags" of the chosen drug for ready access to use (Tr. 60, 66, 68).

## The Defense Case

The defendant claimed that on August 22, 1989, he took his girlfriend's "camcorder, one of those cameras that you take picture for[sic]" to the 2d and L Street, S.E., area to trade it for drugs (Tr. 70- 71, 85).4/ "I wanted to at least get $200 worth of money or heroin" but instead sold the camcorder5/ to "[t]he female that the officer had seen6/ with me" -- a woman he "grew up with" named "Robin Lyles" and who was "known to sell heroin"7/ -- for the nine bags the police recovered from him (Tr. 71-72, 82).8/

The defendant vowed that he intended to use all nine bags of heroin himself within the next 24 hours (Tr. 75).9/ His habit was

_____

4/ Defendant claimed he "borrowed" the camcorder from his girlfriend earlier that day (Tr. 85-86).

5/ Defendant says that "Robin" placed the twelve-by-six inch camcorder inside her shoulderbag (Tr. 71-72).

6/ The defendant claimed that the transaction took place behind a wooden fence with one-and-one-half inch slats on either side (Tr. 74-75). He said that until he opened fence for him, he was unable to see Officer O'Neal (Tr. 74-75). Defendant did not explain how he opened the fence with his closed fist containing the nine blue bags.

7/ The defendant -- claiming to have known Robin "all my life" -- revealed that he had bought heroin previously from her (Tr. 72).

8/ Asked why he didn't use the $74 in currency to purchase heroin instead of taking a loss on the value of the camcorder, the defendant replied "I wanted to sell the camera" (Tr. 85).

9/ The defendant said he intended to smoke the rock of crack cocaine to offset the depressive effects of the heroin (Tr. 77). He explained "[i]t's a up and down process. When the dope (continued...)

*41*

6

to do "three bags and then do two about four or five hours later"
saving two "for the next day so I won't wake up and be sick" (Tr.
75-76). The amount of heroin he used daily had increased since he
began injecting in 1980, because the strength of the drug sold on
the street has decreased (Tr. 76). He elaborated that "if you
don't sell that day the cut is going to eat the purity of the drugs
up. So that's why you have to sell it [cut heroin] that day." (Tr.
76, 91)10/

The defendant claimed that in addition to $74 and the rock of
crack, he had his identification card and "a couple of drug needles
and cookers" in his bicycle pouch (Tr. 87).11/ Admitting he had no
bicycle, the defendant said that he wore the pouch because
"[i]nstead of carrying a big bag with me to put my ID and drug
paraphernalia and whatever I might have in my pockets in a bag,
it's easy to just" use a pouch when wearing "a sweat suit with no
pockets" (Tr. 91-92). Finally, despite two prior convictions for

---

9/(...continued)
take me so far down I want to hit a little piece of the coke so
it can bring me back up so I won't be nodding all over the
place." (Tr. 78.)

10/ On cross-examination the defendant claimed that he did
not purchase in bulk because "it's easy to buy nine bags but to
buy a spoon or a dipper or uncut dope, you're not likely to find
that person on the corner selling those. It's easy to get
individual bags of scramble that's already cut up." (Tr. 84.)

11/ Officer Agee earlier testified that he recovered only
the money and the rock of crack from defendant's pouch (see
supra). Officer Stroud earlier opined that a user likely would
carry his "works" in that pouch (see supra). Defendant was, of
course, present in the courtroom during both officers' testimony.

7

drug distribution,12/ the defendant swore that this time he was "buying. I wasn't distributing anything, I was buying." (Tr. 76-77.)

### The Verdict

The Court, crediting Detective O'Neal's testimony, found that the defendant was interrupted during a drug transaction in which he was the seller (Tr. 111). Applying "common sense" and recognizing the defendant's "powerful motivation to lie" to avoid the mandatory minimum sentencing,13/ the Court disbelieved that he purchased the heroin for a "trade-in" on the camcorder and that he had drug paraphernalia in his bicycle pouch with the rock of crack cocaine and currency (Tr. 111).14/ It found the defendant guilty on both counts (Tr. 111).

### Argument

Defendant seeks a second trial claiming that he has "discovered new evidence" since his first, and that his counsel then ineffectively represented him. In support of his "newly discovered evidence" claim, defendant appends the affidavits of

---

12/ The defendant was previously convicted of distributing heroin (1985), distributing PCP (1985), forgery (1984), carrying a pistol without a license (1983), and burglary II (1982) (Tr. 78-79).

13/ During closing arguments, the Court asked the prosecutor whether it could consider the defendant's desire to avoid the mandatory minimum penalty for possession with the intent to distribute in assessing his credibility (Tr. 102-106). The prosecutor said yes, defense counsel said no, and the Court considered it (see Tr. 104-106).

14/ The Court remarked that, had the police found paraphernalia in the defendant's pouch, they likely would have charged him with its unlawful possession (Tr. 111).

43

8

three fellow Lorton inmates who recount in part his version of the events of August 22, 1989. He also offers a 1985 discharge summary from a detoxification unit of the Veterans Administration Hospital which, he declares, corroborates the magnitude of his drug habit in 1989. In decrying counsel's performance, defendant suggests several areas where -- in his opinion -- she divested him of his Sixth Amendment right to representation: <u>i.e.,</u> she failed to investigate, to call witnesses, to object to improper expert testimony, to file a motion to suppress, to bolster his claim of mere possession by introducing the hospital discharge summary and to ask the Court explicitly to consider the lesser included charge of heroin possession.

Despite its misleading length, defendant's motion offers neither "new" evidence nor evidence that his counsel's actions separately or in the aggregate constituted ineffective assistance. He received a fair trial.

I.    <u>Defendant's Counsel Effectively Represented Him.</u>

In evaluating claims of ineffective assistance of counsel, this Court applies the two-prong <u>Strickland</u> test. <u>See</u> <u>Strickland</u> v. <u>Washington</u>, 466 U.S. 668 (1984). Under <u>Strickland</u>, the defendant must show both that his counsel's performance was deficient, -- <u>i.e.,</u> "that [she] made errors so serious that counsel was not functioning as the counsel guaranteed defendant by the Sixth Amendment," -- and that he was prejudiced by those deficiencies. <u>Strickland</u>, <u>supra</u>, 466 U.S. at 687-689. Significantly, "judicial scrutiny of counsel's performance must be

9

highly deferential ... [A] Court must indulge a strong presumption that counsel's conduct falls with the wide range of reasonable professional assistance." Strickland, supra, 466 U.S. at 689. Accord, McAdoo v. United States, 515 A.2d 412, 419 (D.C. 1985). Accordingly, the Court should not "engage in vague speculation about the kind of investigation counsel might have made or what witnesses he might have called," Atkinson v. United States, 366 A.2d 450, 453 (D.C. 1976); accord, Curry v. United States, 498 A.2d 534, 540 (D.C. 1985), and should not find ineffective assistance on the basis of tactical decisions gone awry or errors in judgment that became apparent in light of subsequent events. Carter v. United States, 475 A.2d 1118, 1123 (D.C. 1984), cert. denied, 469 U.S. 122622 (1985); Wesley v. United States, 499 A.2d 282, 284 (D.C. 1982).

Under Strickland, the defendant must show that counsel's negligence prejudiced him, i.e., there must be "a reasonable probability that, but for counsel's unprofessional errors, the results of the proceeding would have been different." Strickland, supra, 466 U.S. at 694. Thus, even if perchance he demonstrates counsel's deficiency, the defendant is not entitled to relief unless counsel's incompetence led to a trial with an "unreliable" result. Id. at 697. See McAdoo v. United States, supra, 515 A.2d at 426-427; Godfrey v. United States, 454 A.2d 293, 295 (D.C. 1982). Moreover, the Court may address the Strickland-prongs in any order and need not consider both prongs if it finds that the defendant has made an insufficient showing on either.

45

10

Finally, a hearing is unnecessary under D.C. Code § 23-110
(even when a defendant attacks his counsel's effectiveness) if (1)
the claim is wholly incredible, (2) the claim, even if true, would
not entitle the movant to relief, and (3) the allegations are vague
and conclusory.   See Luckey v. United States, 562 A.2d 130, 132
(D.C. 1989); Ellerbe v. United States, 545 A.2d 1197, 1198-1199
(D.C.), cert. denied, 469 U.S. 936 (1988); White v. United States,
484 A.2d 553, 559 (D.C. 1984).   Thus, even if the movant's
allegations appear adequate, if the files and records of the case
refute them, a hearing is superfluous.   Luckey v. United States,
supra, 562 A.2d at 132; Ellerbe v. United States, supra, 545 A.2d
at 1199.

A.   Counsel Investigated Thoroughly.

Defendant hypothesizes that had counsel investigated properly,
she would have unearthed the witnesses he now offers -- three
fellow inmates at Lorton -- presented their testimony at trial,
bolstered his story about attempting to sell a camcorder for drugs
and procured his acquittal.   This is nonsense.   Defendant either
expects his counsel to perform unheard of feats of investigation
by tracking down witnesses without knowing they exist or he imbues
her with clairvoyance.   The affidavits he appends to his motion
affirm that the defendant must have known of at least two of these
new witnesses before trial,15/ -- i.e., Anthony Salley and Ivan

_____

15/   Anthony Salley's affidavit says that he "ran into
Melvyn Johnson" between 5 and 6 p.m. on August 22, 1989, before
the defendant was arrested.   Likewise, Ivan Driver's affidavit
relates that he "was approached by Melvyn Douglas" on August 22,
                                                 (continued...)

46

11

Driver -- but strangely opted not to tell his counsel about them or to mention them during his trial testimony. (See Exhibit 1; Affidavit of Susan Borecki, ¶ 4 [hereinafter "Affidavit"]; Defendant Motion For a New Trial [hereinafter "Motion"], Exhibits 1, 2, & 3). Counsel plainly has no obligation to interview witnesses of whom she is unaware. See Townsend v. United States, 549 A.2d 724, 728 (D.C. 1988) (counsel is not ineffective for failing to unearth witness whose testimony would not have changed result), cert. denied, 109 S. Ct. 2457 (1989); White v. United States, 484 A.2d 553, 558-559 (D.C. 1984) (investigatory decisions of counsel are necessarily reliant on information supplied by the defendant). Cf. Harris v. United States, 441 A.2d 268, 273-273 (D.C. 1982) ("failure to make reasonable efforts to interview and utilize known witnesses having a direct bearing on the substantial defense" may be considered ineffective assistance of counsel).

The fact is that defendant's assailment of counsel's pretrial investigation as dilatory is a sham. He directed the course of counsel's pretrial investigation by telling her of only one witness before trial: a woman he eventually identified as "Robin"16/ whom

---

15/(...continued)
1989, between 5 and 6 p.m. Based on these statements, defendant must have known of these witnesses existence before trial.

16/ Defendant eventually gave counsel "Robin's" first name before trial (See Affidavit ¶ 5). Counsel's credibility on this point is bolstered by defendant's reaction to being asked to reveal her full name by the prosecutor:

    Q. Now, sir, did you say that you had
       purchased drugs from this black female on
       other occasions?
    A. Yes.

                (continued...)

12

he claimed accompanied him to the area to purchase heroin to share.17/ (See Affidavit ¶ 6). He never told her of others (See Affidavit ¶¶ 5, 6). He never told her about Ivan Driver or Anthony Salley (See Affidavit ¶ 4). In short, he steered his counsel to prepare a totally different version of events than the yarn he ultimately spun while at trial and that he now, in hindsight, seeks to corroborate.

In addition to not knowing about other witnesses, counsel had no idea (despite their numerous meetings and telephone conversations) that the defendant was going to claim that he was in the area to trade a camcorder for drugs, that "Robin" sold the drugs to him or that she was a well known dealer. (See Affidavit ¶¶ 3, 6, 7). Counsel's ignorance of the defendant's newest version is understandable. On November 14, 1989, defendant outlined in a written statement his version of the events and counsel relied on it when preparing his defense. (See Affidavit ¶ 6 & Exhibit B). Contrary to his trial testimony, defendant claims in that statement

---

16/(...continued)
Q. And in fact, one time earlier the same day?
A. No, not the same day.
Q. That day you purchased from her once.
A. Yes.
Q. And what was her name?
A. Do I have to say her name? Her name is Robin Lyles. (Tr. 82.)

17/ Crediting either of defendant's versions -- i.e., that "Robin" was the seller or a co-buyer -- she was unavailable to him as a witness because she had a Fifth Amendment privilege. Even had she learned Robin's last name and located her before trial, therefore, counsel could not be remiss in failing to call her as a witness.

13

that he went with Robin to purchase heroin to use together. Consistent with his earlier story to counsel, defendant did not mention other witnesses or a camcorder. There is a simple explanation for this gap. Defendant improvised the newer version while on the stand.18/ · Given that the Court when issuing its verdict mused that his story was in part "plausible" (see Tr. 110), defendant is now simply attempting fraudulently to embellish it. His ability "to secure sworn affidavits from three witnesses subsequent to his incarceration" demonstrates his ability to suborn perjury, not his "trial counsel's deficient performance." (See Motion at 10-11).

Even if, however, the newer version is true and his earlier story false, defendant's eleventh hour revelation of it to counsel does not render her assistance ineffective.19/ Defendant had every opportunity to fully inform counsel of his recollection of events on August 22, 1889, prior to his trial -- seven face-to-face meetings and several telephone conversations -- but kept her in the

_____

18/   There are several plausible explanations for defendant's strategy.  Foremost, defendant may have been reluctant to tell his counsel the camcorder story lest she investigate and find it to be a fabrication.  If the defendant's story about the camcorder were true, surely counsel would have presented defendant's girlfriend as a witness at trial.  [Indeed, if defendant's story were true, he would have included his girlfriend's affidavit with those of his fellow Lorton inmates.]  Second, if defendant told counsel that "Robin Lyles" sold him the drugs before trial, she would have been able to locate her and "Robin" likely would have denied his story.  By keeping his counsel in the dark regarding "Robin's" role, the defendant was free to make up his version after having heard the testimony of the police officers.

19/   Nowhere in his lengthy motion does defendant claim that told his counsel of other witnesses or of the camcorder.

*49*

**14**

dark. (<u>See</u> Affidavit ¶ 3). Significantly, counsel told her client before trial that she would ask for a continuance if he had other witnesses he wished her to contact or any other investigation of his defense he wanted her to perform. (<u>See</u> Affidavit ¶ 8). Defendant responded (and signed a letter to this affect) that he was satisfied with her performance, that he wanted to proceed with a bench trial20/ and that there were no witnesses to call other than "Robin." (<u>See</u> Affidavit ¶ 8 & Exhibit B). There was simply nothing else that counsel could have done to assist him further. Before trial, defendant plainly believed that his storytelling aptitude would assure his acquittal. Justly, that aptitude -- not his counsel's performance -- proved to be deficient.

> **B.  Counsel Could Not Call Witnesses of Whom She Was Unaware.**

Defendant labels his counsel ineffective for failing to call at trial "witnesses to corroborate his version of the incident and his long-term drug addiction." (Motion at 8). Defendant offers three individuals -- "Mr. Driver, Mr. Upshaw and Mr. Salley," present acquaintances at Lorton -- as examples of the witnesses who "would have corroborated the defendant's version that he was trying to sell the camcorder and in fact, did sell the camcorder to the woman from whom he purchased the drugs" (Motion at 8).

For the reasons outlined above, defendant's ineffectiveness claim in this regard is absurd. Defendant never told defense counsel of these witnesses and there is no reason to believe, based

---

20/  Counsel advised her client against a bench trial. (<u>See</u> Affidavit ¶ 8 & Exhibit B).

15

on the version he had revealed to her, that counsel could have discovered them independently. (See Affidavit ¶¶ 4, 6). Also noted above, until the defendant said it on the stand, counsel was operating under the assumption that he and "Robin" jointly bought the drugs to share. Thus, counsel was utterly taken aback21/ by the version he chose to reveal on the stand, that he was in that area to exchange for drugs a camcorder he had appropriated from his girlfriend.22/ (See Affidavit ¶¶ 6,7).

Defendant's claim that counsel was deficient in opting not to present evidence to corroborate his testimony regarding the magnitude of his drug addiction is insupportable. At trial, defendant quantified his habit on the date of his arrest -- August 22, 1989 -- by saying that within 24 hours, all of the nine bags of heroin in his possession would be gone. Officer Stroud testified that -- in his experience gleaned by talking to addicts -- the maximum amount of heroin packets one would consume in a day

---

21/ Counsel's surprise at defendant's testimony is somewhat evident in the beginning of her direct examination of him. After a few opening questions she asked:

> Q. [defense counsel] You had gone there
> [between 2d and L Street, S.E.] that
> day?
> A. [defendant] Yeah. 2d and L Street, S.E.,
> by the Navy yard off M Street.
> Q. You had gone there that day?
> A. Yeah.
> Q. Were you with anybody?
> A. I was by myself. (Tr. 70-71.)

Plainly, counsel expected a different response.

22/ Again, noticeably lacking in the trilogy of affidavits he submits to support his trial "version" is the affidavit of defendant's girlfriend stating that she even owned a camcorder.

16

was six.  Defendant's Veteran's Hospital discharge summary reveals
that in 1985 the defendant claimed that he had a "5 to 6 quarters
of 'street' heroin per day" habit. (See Motion, Exhibit 4).  The
discharge summary thus adds little or nothing to the testimony
already submitted in defendant's behalf at trial.  It was, if
relevant, merely cumulative.  Defense counsel was not ineffective
in failing to present cumulative evidence.  Moreover, the document
did not contradict the expert's opinion about an addict's maximum
heroin intake, but supported it.  At the zenith of his addiction,
i.e., when seeking treatment, defendant claimed that he was
consuming precisely the amount the expert predicted the heavy user
would inject.

Counsel's failure to call any other witnesses (whom defendant
does not name) to support his claim that his habit was great enough
to justify purchasing nine packages at once, when testimony on that
subject was merely cumulative of his own, does not constitute
ineffective assistance.  As a matter of law, "[a]lthough
[defendant] may disagree with his counsel's reasoning, the decision
of whether to put witnesses on the stand is clearly a tactical
decision." Curry v. United States, supra, 498 A.2d at 545; Smith
v. United States, 454 A.2d 822, 825 (D.C. 1983) (decision to call
witnesses is judgment left entirely within defense counsel's
discretion); Atkinson v. United States, supra, 366 A.2d at 453
(decision to call witnesses is a choice of trial tactics that must
be left to counsel's judgment).  Counsel's possible "[e]rrors in
judgment and tactics as disclosed by hindsight do not, by

*52*

17

themselves, constitute ineffectiveness." <u>Curry</u> v. <u>United States</u>, <u>supra</u>, 498 A.2d at 545.

Finally, counsel's decision not to further corroborate defendant's habit did not effect the outcome of the trial. The Court based its verdict that the defendant possessed with the intent to distribute the heroin on Detective O'Neal's testimony that he saw an aborted transaction where the defendant was the seller, and discredited defendant's claim that he was trading in a camcorder for drugs. He did not specifically discredit defendant's testimony regarding the magnitude of his heroin habit. Indeed, the government never disputed that defendant was a drug user and the defendant told the Court that he had undergone treatment (unsuccessfully) twice before (Tr. 77).23/    Given his prior record, however, there was also no dispute that defendant was a drug seller. In short, any failure by counsel to corroborate defendant's testimony regarding the magnitude of his habit did not effect the outcome because that evidence did not address the most important element of the government's case (Detective O'Neal's observation of the aborted transaction) and thus its omission was "not so prejudicial as to deprive [defendant] of a fair and reasonable trial." <u>Curry</u> v. <u>United States</u>, <u>supra</u>, 498 A.2d at 545.

C.  Counsel Properly Chose Not To File a Frivolous

---

23/  In fact, the defendant testified that he had attended the Veterans Hospital program (Tr. 77). The hospital discharge summary quantifying his habit was thus plainly cumulative of his testimony.

18

## Pretrial Suppression Motion.

Defendant asserts that his counsel was deficient in failing to move to suppress the tangible evidence, *i.e.,* the drugs recovered from his hand and his pouch. This claim is legally and factually insupportable and should be dismissed summarily.

Defendant's claim here is without merit not only because counsel's decision to eschew a suppression motion was not deficient but because, on the record, he plainly was not prejudiced by counsel's failure to challenge a legal detention, search and seizure. Where -- as here -- counsel had no grounds upon which to question the admissibility of the drugs, she obviously could not in good faith file a motion to suppress them. See <u>United States</u> v. <u>Madewell</u>, 917 F.2d 301, 304-305 (7th Cir. 1990) (if defendant's motion to suppress evidence on Fourth Amendment grounds would have failed, counsel was not ineffective in failing to file it).<u>24</u>/

As the government's proof at trial established,<u>25</u>/ defendant had no Fourth Amendment claim to challenge the admissibility of the drugs. Detective O'Neal, an eighteen-year Metropolitan Police veteran who had made hundreds of drug arrests, testified that while on foot in plain clothes in a high drug area he observed from only

---

<u>24</u>/  It is axiomatic that "the failure to file a suppression motion does not constitute <u>per se</u> ineffective assistance of counsel." <u>Kimmelman</u> v. <u>Morrison</u>, 477 U.S. 365, 384 (1986).

<u>25</u>/  In deciding whether a motion to suppress would have been denied, the Court may consider the undisputed trial testimony. <u>See Lewis</u> v. <u>United States</u>, No. 89-1277, <u>slip op.</u> (D.C. July 19, 1991) (<u>citing Masiello</u> v. <u>United States</u>, 113 U.S. App. 32, 34, 304 F.2d 399, 401 (1962) <u>and Carroll</u> v. <u>United States</u>, 267 U.S. 132, 162 (1925)).

19

five or six feet away defendant's outstretched hand brimming with blue-tinted glassine bags, which (because of his experience) he knew to be heroin. When he announced his presence, the woman fled and the defendant -- unable to flee -- closed and dropped the hand containing the bags to his side.   Given this sequence of events, the detective plainly had an articulable suspicion that the defendant was involved in a drug transaction.   His observations amply supported a Terry 26/ investigatory stop and -- once the defendant resisted -- the brief detention that occurred. See Price v. United States, 429 A.2d 514, 516 (D.C. 1981).  Once he retrieved the bags from the defendant's hand, field-tested its contents and determined that it was heroin, he had probable cause to arrest him. Rucker v. United States, 455 A.2d 889, 891 (D.C. 1983); Price v. United States, supra, 429 A.2d at 516.  Once lawfully arrested, the officers were entitled to conduct a search of the defendant's person. Gustafson v. Florida, 414 U.S. 260 (1973).  Seizure of the rock of crack cocaine and $74 in currency from his bicycle pouch plainly did not violate the defendant's Fourth Amendment right against unlawful seizures.  In sum, had counsel sought to suppress either the drugs or the money, the trial testimony establishes that the Court would have denied the motion.  Thus, even if for some reason (not apparent to the government) counsel was deficient in failing to file a motion, the defendant plainly was not prejudiced because the evidence was admissible.  See United States v. Wood, 879 F.2d 927, 933 (D.C. Cir. 1989) (when the ineffectiveness claim

---

26/ Terry v. Ohio, 392 U.S. 1 (1968).

55

20

concerns an attorney's failure to raise a Fourth Amendment issue, the defendant must show that the Fourth Amendment claim has merit and that there was a reasonable possibility that the verdict would have been different absent the excludable evidence).

### D. Counsel Timely Objected to All Potential Trial Errors.

Defendant's claim that his counsel failed to object to the Court's factoring in his possible desire to avoid serving a mandatory minimum prison sentence in assessing his credibility (defendant admitted possession of, but disputed his intent to distribute, the heroin) is simply incorrect. Counsel did object to the Court's consideration of defendant's possible sentence in assessing the credibility of his testimony. Despite counsel's objection, the Court ruled that it could consider the defendant's motivation to lie to avoid the mandatory minimum sentence when determining whether he had the requisite intent to distribute. Counsel was not deficient: she properly has preserved the issue for appeal.

The issue arose in the following context. During the prosecutor's closing argument, the Court asked him whether it could consider defendant's interest in avoiding the mandatory minimum when assessing his credibility (Tr. 102). The prosecutor told the Court that it could (Tr. 103-104). At the beginning of her closing argument, however, defense counsel disagreed:

> MS. BORECKI [defense counsel]: With regard to the last point, Your Honor, I would simply note that the Court is the trier of facts in this case, as obviously, with a jury.

*56*

21

And it would appear to me in answering your question that it would be improper for the Court to take all that into consideration with regard -- that is potential punishment.

The jury wouldn't be able to hear it. I would not object to it today simply because I know that Your Honor is aware of such things and Your Honor does not read your instruction to himself.

THE COURT: But isn't every citizen presumed to know the law, and that would, I imagine, include sentencing law?

MS. BORECKI: Well, if the idea is to instruct the jury about sentencing that's not proper.

THE COURT: No. I'm not talking about that. Assuming that the jury, without any instruction on the subject, because like all good citizens, they all know the law, they are aware that about four weeks before the arrest the applicable sentences for distribution of a controlled substance in the District of Columbia were very substantially increased and the mandatory minimums were very substantially increased and that the defendant's prior record disqualifies him for the addict exception, you have ordinary citizens who spend their time reading Title 33 of the District of Columbia code knows that because the law, presuming; so even if he had given him no instruction wouldn't they be free to take that into account in evaluating the credibility of the defendant?

MS BORECKI: No, Your Honor. You are getting two very, very fine lines of --

THE COURT: Well, it doesn't sound so fine to me. I have been sitting here wondering why Mr. Johnson would go to trial in this case and the minute I hear about his prior record I say, uh-huh, he wants to avoid a mandatory-minimum.

MS. BORECKI: Well, I think that one can[sic] say that if the jury would know about any

57

22

> kind of increased penalty. I think that
> they are asked to put those things out of
> their minds. And with regard to
> punishment, because of the punishment,
> therefore, we have a defendant who is
> therefore more likely to misrepresent his
> intent, I think that is a leap that cannot
> be made simply because the initial
> surmising regarding the punishment is not
> allowed and they are not allowed to
> consider that.
>
> The next move stems directly from what
> the punishment is and since they are not
> already supposed to consider that,
> therefore, they cannot even reach the
> point as to whether or not Mr. Johnson is
> simply avoiding the mandatory minimum. So
> I would simply submit that it just
> wouldn't even get to that point were we to
> have a jury in this case, Your Honor. (Tr.
> 104-106; emphasis added).

Contrary to defendant's claim, the above passage illustrates that

defense counsel strenuously objected to the Court's consideration

of defendant's desire to avoid of his looming mandatory punishment

as a factor in assessing his credibility regarding his intent to

distribute. The Court considered it anyway. Counsel's performance

was not deficient simply because the Court ruled against her.

> E.   The Defendant Was Unharmed by Counsel's
>      Failure Explicitly To Request the Court To
>      Consider the Lesser Included Offense of
>      Possession.

Defendant claims that counsel's failure explicitly to request

the Court to consider the lesser included offense of possession of

heroin was harmful to him. This is absurd. It is indisputably

clear from the record that his entire defense to the charge of

possession with the intent to distribute heroin charge was that he

merely possessed the nine packets. The Court was well aware that

defendant was asking it to decide that he committed the lesser

58

23

offense and not the greater.  Indeed, the Court's findings clarify its options:

> THE COURT:  But I think the quantity of heroin found on the defendant, interpreted in the light of Officer's Stroud's testimony, and common sense as to what a drug dealer will accept in return for a bag of heroin, I don't believe we've got any real doubt. I think I am entitled to take into account the defendant's desire to avoid the mandatory minimum sentence in evaluating his credibility.  That does not substitute evidence but it does give him a very powerful motivation not to tell the truth on this very specific narrow point of intent to distribute. (Tr. 111.)

Even if counsel was remiss in not ceremoniously requesting the Court to consider simple possession, the Court plainly did consider it and thus the defendant simply cannot demonstrate -- under the second prong of Strickland -- that he was harmed by counsel's technical omission.  Cf. Chaverria v. United States, 505 A.2d 59, 66 (D.C. 1986) (where failure to give cautionary instruction is not plain error, defense counsel's failure to request it cannot be said to raise to a reasonable probability that the result of the proceeding would have been different); Curry v. United States, 498 A.2d 534, 545 (D.C. 1985) (counsel's failure to request jury instruction though error deemed to be harmless and thus defendant cannot meet his burden to show that he was denied his Sixth Amendment right to effective representation)

> G.    Officer Stroud Testimony Was Within His Scope
>        of Proffered Expertise.

Defendant complains that his counsel failed to object to a portion of Officer Stroud's testimony that fell outside his area

24

of proffered expertise.  On the contrary, as demonstrated below,
Officer Stroud's testimony adhered to the proffer.  The following
exchange precipitated the parties' stipulation that Officer Stroud
was qualified as a drug expert:

> THE COURT:  What is it that you wish to have
> Officer Stroud qualifies as an expert in?
>
> MR. KLINGENSTEIN [the prosecutor]:  I want him
> qualified as an expert in now[sic] the way
> that the drugs are sold in the street.
>
> THE COURT:  You mean trafficking patterns?
>
> MR. KLINGENSTEIN:  Right, trafficking
> patterns.
>
> THE COURT:  Anything else?
>
> MR. KLINGENSTEIN:  Also the way these drugs
> are packaged.  We are stipulating as to
> the chain of custody --
>
> THE COURT:  Wait a minute.  Let's get the one
> thing at a time.  This isn't a chain of
> custody witness, is he?
>
> MR. KLINGENSTEIN:  Not any more he's not, Your
> Honor.
>
> THE COURT:  All right.  Well, what is it you
> want to stipulate he's an expert in?
>
> MR. KLINGENSTEIN:  Those two areas.
>
> THE COURT:  Not usable amount?
>
> MR. KLINGENSTEIN:  Yes, Your Honor, although
> -- yes.  I don't think he needs
> specifically to be qualified as an expert.
>
> THE COURT:  All right.  Just the way drugs are
> sold and packaged on the street?
>
> MS. BORECKI:  That's my understanding is the
> stipulation, Your Honor, yes.
>
> THE COURT:  Well, do you agree that the
> witness is an expert in those subjects?

25

> MS. BORECKI:  Yes, he's qualified to testify
> in those areas.  Thank you.
>
> THE COURT:  I've got a page and-a-half of
> notes on his background in the last case
> he testified in.  I'm tired of writing
> about every three day seminar.
>
> MS. BORECKI:  Yes, Your Honor.
>
> THE COURT:  All right.  By agreement of the
> parties, the Court will find the witness
> qualified as an expert in street
> trafficking and packaging of illicit
> drugs. (Tr. 54-55.)

Although Officer Stroud was not explicitly offered as an expert in

heroin "use", he implicitly was qualified as such.  By definition,

"street trafficking" includes "use." 27/  Moreover, defense counsel

effectively cross-examined Officer Stroud in this area of his

expertise.  Through her probing, Officer Stroud admitted that his

opinion regarding the amount of heroin an addict might use in a

single day was gleaned solely from his conversations with

incarcerated addicts, and not on personal observation.

> Q. [Ms. Borecki]: As far as you know, then,
> with the purchase of however number of bags
> that addicts might use during the course
> of 24 hours, is purely what you've been
> told by people you have arrested?
>
> A. [Officer Stroud]: Yes.  Like I say, I don't
> have any first hand experience about that
> myself. (Tr. 62-63.)

Defendant plainly was not harmed by this testimony.  Finally,

because the Court based its findings on whether a drug dealer might

---

27/  The American Heritage Dictionary (2d Ed. 1985) defines
"trafficking" as (1) "to carry on trade" and (2) "to utilize
something."

6/

26

take a camcorder as a trade-in for heroin and not upon whether the defendant actually could consume all of the heroin he possessed within 24 hours, defendant was not harmed by any of Officer Stroud's testimony that disputed his on that point.

II.  **Defendant Has Not Discovered "New Evidence."**

Defendant's "newly discovered" evidence claim is a ruse. His submissions are either palpably incredible, cumulative or immaterial and, if offered at a second trial, certainly unlikely to produce his acquittal. The affidavits defendant submits by three fellow Lorton inmates (who just happen to have been eyewitnesses to his possession of the camcorder moments before his arrest) are inherently incredible and immaterial. The hospital report he appends to his motion is simply cumulative of the defendant's testimony that he possessed the heroin for personal use and not to distribute it. Defendant's "new evidence" is far too deficient to justify a hearing on the motion, let alone retrial.

To satisfy Johnson-Heard and obtain a second trial because he discovered evidence since his first, the defendant must show that:

> (1) the evidence was newly discovered since the trial; (2) the defendant was diligent in attempting to procure the newly discovered evidence; (3) the evidence relied on is not merely cumulative or impeaching; (4) the evidence is material to the issues involved; and (5) the evidence is of such a nature that in a new trial it would probably produce an acquittal.

Smith v. United States, 466 A.2d 429, 432 (D.C. 1983); Thompson v. United States, 88 U.S. App. D.C. 235, 236, 188 F.2d 652, 653 (1951). See also Gibson v. United States, 566 A.2d 473, 476 (D.C.

27

1989); Doepel v. United States, 510 A.2d 1044, 1047 n.10 (D.C. 1986) (materiality and probability of acquittal are prerequisites to granting retrial on the grounds of newly discovered evidence).28/

Regarding Mr. Salley's and Mr. Driver's affidavits, defendant plainly was not diligent in attempting to procure their testimony at his first trial. A plain reading of their affidavits demonstrates that the defendant must have know of these witnesses' existence at the time of his arrest, yet he neither mentioned them to his counsel before trial nor to the Court during his testimony. The simple explanation for his oversight is that the witnesses' stories are post-trial fabrications.

Moreover, even if defendant introduced the testimony of these three witnesses at a second trial, it is unlikely that he would be acquitted. The credibility of all three of these witnesses would be severely impeached by their numerous prior convictions. Anthony Salley has 1978 and 1980 petit larceny convictions, a 1974 Carrying a dangerous weapon conviction, 1976 marijuana possession conviction, 1978 grand larceny conviction, a 1984 possession of heroin conviction, a 1986 distribution of heroin conviction, a 1986 possession with the intent to distribute heroin conviction and a

---

28/ A hearing on the new trial motion is unnecessary if the proffer of "new" evidence is sufficiently weak or plainly would not produce an acquittal even if admitted at a second trial. Wilson v. United States, 380 A.2d 1001, 1004 (D.C. 1977) ("[g]enerally, the trial court may decide a motion for new trial without a hearing"). See also Payne v. United States, 516 A.2d 484, 501 (D.C. 1986) (defendant has burden of making "the kind of proffer that would justify a hearing" on his new trial motion).

28

1989 carrying a pistol without a license (felony) conviction.29/
Twenty year old Charles Upshur is presently serving his first adult
sentence for armed robbery and two counts of assault with a
dangerous weapon.30/  Ivan Driver has 1976 and 1977 petit larceny
convictions, a 1983 armed robbery and forgery conviction.  He was
paroled for the last offense on August 2, 1989, just twenty days
before defendant's arrest in this case.  He has since violated
parole and is serving his backup time.31/

Setting aside that the affiants' numerous impeachable
convictions severely undermine their credibility as witnesses in
a retrial, the very substance of their testimony only marginally
corroborates the defendant's story and thus would have little
impact at a second trial.  Moreover, each of the affidavits contain
an identical inaccurate recollection, fatally undermining their
reliability and implying the witnesses' collusion.  Although the
statements indeed corroborate defendant's story about his attempt
to barter a camcorder for drugs on August 22, 1989, all three
witnesses place the defendant -- and the woman named "Robin" -- in
the 2d and L Street, S.E. area between 5 and 6 p.m., concluding
that the defendant was arrested during that hour.  The
uncontroverted trial testimony and, indeed all of the police
reports, however, place the time of the incident and the arrest at

---

29/ These constitute only Mr. Salley's convictions in the
District of Columbia.

30/ Mr. Upshur also has a juvenile record.

31/ Certified copies of most of these prior convictions are
appended to the government's opposition as Exhibits.

29

after 7 p.m. (Tr. 4; Government 's Exhibit 2, Police Department Forms 163 & 251). It is difficult enough to believe that three witnesses would remember nearly two years after the arrest the exact time they witnessed these events. That all three would recall the time incorrectly in the same manner, however, invites credulity. In sum, given that: (1) this new "evidence" is the hindsight product of defendant's fellow Lorton inmates; (2) their extensive prior records; and (3) that the affiants are identically inaccurate in their recollection of the time of the incident and defendant's arrest, the government submits that the affidavits are inherently incredible and should be wholly ignored.

Regarding the Veterans Hospital discharge summary, defendant plainly was not diligent in attempting to procure this document before his first trial. Even if he did not know of the reports existence, defendant knew of (and indeed testified about) his treatment at the hospital in 1986 and thus could have provided corroborating evidence regarding the magnitude of his addiction at the first trial. Moreover, because the discharge summary documents the defendant's habit in 1985, it is immaterial to establishing the magnitude of his addition in 1989. In short, defendant fails utterly to demonstrate that the Court should grant retrial based on this submission.

65

30

WHEREFORE, the United States respectfully submits that the defendant's petition for relief under D.C. Code § 23-110 should be summarily denied.

Respectfully submitted,

JAY B. STEPHENS
United States Attorney

JOHN M. FACCIOLA
Assistant United States Attorney

BARBARA J. VALLIERE
Assistant United States Attorney

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that service of the foregoing Government's Opposition to Defendant's Motion to Vacate Sentence has been made by mailing a copy to his attorney of record, Joseph Virgilio, Esquire, 1730 K Street, N.W., Suite 304, Washington, D.C. 20006, this 29th day of July, 1991.

BARBARA VALLIERE
Assistant United States Attorney

66

# EXHIBIT  3

Government's brief filed in the D.C. Court of Appeals in <u>Melvyn A. Johnson v. United States</u>, No. 90-566, 91-1406, on December 1, 1992

## BRIEF FOR APPELLEE

### DISTRICT OF COLUMBIA COURT OF APPEALS

### No. 90-566, 91-1406

MELVYN A. JOHNSON,                                          Appellant,

    v.

UNITED STATES OF AMERICA,                                   Appellee.

### APPEAL FROM THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA CRIMINAL DIVISION

JAY B. STEPHENS,
United States Attorney.

JOHN R. FISHER,
THOMAS C. BLACK,
* KATHLEEN S. DAVIES,
Assistant United States Attorneys.

* Counsel for Oral Argument

555 4th Street, N.W.
Room 4229
Washington D.C. 20001
(202) 514-7088

Cr. No. F-9926-89

FILE COPY
12-1-92

I N D E X

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . .   1

 The Trial . . . . . . . . . . . . . . . . . . . . . .   2

 The Government's Evidence . . . . . . . . . . . . . .   2

 The Defense Case . . . . . . . . . . . . . . . . . .   5

 The Verdict . . . . . . . . . . . . . . . . . . . . .   7

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . .  14

 I.  The evidence was sufficient to support appellant's
   conviction for possession with intent to distribute
   heroin, and therefore appellant's motion for
   judgment of acquittal was properly denied . . . . .  14

 II. Appellant's Constitutional Right to the Effective
   Assistance of Counsel was not Violated . . . . . .  25

   A.  Counsel Investigated Thoroughly . . . . . . .  27

   B.  Counsel Properly Chose not to File a Frivolous
     Pretrial Suppression Motion . . . . . . . . .  30

   C.  Counsel Timely Objected to the Trial Court's
     Consideration of the Mandatory/Minimum
     Sentence to Judge Appellant's Credibility . .  33

   D.  Appellant was not Harmed by Counsel's Failure
     to Explicitly Request the Court to Consider
     the Lesser Included Offense of Possession . .  35

   E.  There was no Ineffective Assistance from
     Failing to Object to Officer Stroud's Expert
     Testimony . . . . . . . . . . . . . . . . . .  37

   F.  Counsel's Failure to Renew her Motion for a
     Judgment of Acquittal at the End of the
     Defense Case Did Not Result in Ineffective
     Assistance of Counsel . . . . . . . . . . . .  40

 III. The Trial Court Did Not Commit Reversible Error
   When it Considered the Possible Punishment
   Appellant was Facing in Determining Appellant's
   Credibility . . . . . . . . . . . . . . . . . . . .  41

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . .  43

## TABLE OF CASES

Abdulshakur v. United States, 589 A.2d 1258 (D.C. 1991) . . 24

Atkinson v. United States, 366 A.2d 450 (D.C. 1976) . . 26, 29

* Bourjailly v. United States, 483 U.S. 171 (1987) . . . . . 20

Carroll v. United States, 267 U.S. 132 (1925) . . . . . . . 31

Carter v. United States, 475 A. 2d 1118 (D.C. 1984),
   cert. denied, 469 U.S. 1226 (1985) . . . . . . . . . . 26

Chaconas v. United States, 326 A. 2d 792
   (D.C. 1974) . . . . . . . . . . . . . . . . . . . . 15, 21

* Chambers v. United States, 564 A.2d 26 (D.C. 1989) . . . 15-18

Chaverria v. United States, 505 A.2d 59 (D.C. 1986) . . . . 36

* Curry v. United States, 498 A.2d 534
   (D.C. 1985) . . . . . . . . . . . . . . . 26, 29, 30, 36

Fernandez v. United States, 375 A.2d 484
   (D.C. 1977) . . . . . . . . . . . . . . . . . . . 30, 39

* Fox v. United States, 421 A.2d 9 (D.C. 1980) . . . . . . . 15

Franey v. United States, 382 A.2d 1019 (D.C. 1978) . . . . 16

Godfrey v. United States, 454 A.2d 293 (D.C. 1982) . . . . 27

Gustafson v. Florida, 414 U.S. 260 (1973) . . . . . . . . 32

Hall v. United States, 454 A. 2d 314 (D.C. 1982) . . . . . 15

Harris v. Rivera, 454 U.S. 339 (1981) . . . . . . . . . . . 42

Harris v. United States, 441 A.2d 268 (D.C. 1982) . . . . . 28

* Harris v. United States, 489 A.2d 464
   (D.C. 1985) . . . . . . . . . . . . . . . . . . . . . 16

Head v. United States, 451 A. 2d 615 (D.C. 1982) . . . . . 15

* Hinnant v. United States, 520 A.2d 292
   (D.C. 1987) . . . . . . . . . . . . . . . . . . . 17, 20

Hockman v. United States, 517 A.2d 44 (D.C. 1986) . . . . . 31

Holland v. United States, 348 U.S. 121 (1954) . . . . . . . 21

ii

\* <u>In re Melton</u>, 597 A.2d 892 (D.C. 1991) . . . . . . . . 24, 39

\* <u>Irick</u> v. <u>United States</u>, 565 A.2d 26 (D.C. 1989) . . . . . . 21

<u>Jackson</u> v. <u>United States</u>, 395 A.2d 99 (D.C. 1978) . . . . . 15

<u>Lewis</u> v. <u>United States</u>, 594 A.2d 542 (D.C. 1991) . . . . . 31

<u>Masiello</u> v. <u>United States</u>, 113 U.S. App. 32, 304
     F.2d 399 (1962) . . . . . . . . . . . . . . . . . . . . . 31

<u>McAdoo</u> v. <u>United States</u>, 515 A.2d 412 (D.C. 1986) . . . 26, 27

<u>Moore</u> v. <u>United States</u>, 609 A.2d 1133 (D.C. 1992) . . . . . 42

<u>Price</u> v. <u>United States</u>, 429 A.2d 514 (D.C. 1981) . . . . . 32

\* <u>Shorter</u> v. <u>United States</u>, 506 A.2d 1133
     (D.C. 1985) . . . . . . . . . . . . . . . . . . . . . . 17, 18

<u>Singletary</u> v. <u>United States</u>, 519 A.2d 701
     (D.C. 1987) . . . . . . . . . . . . . . . . . . . . . . . 42

<u>Smith</u> v. <u>United States</u>, 454 A.2d 822 (D.C. 1983) . . . . . 29

<u>Smothers</u> v. <u>United States</u>, 403 A. 2d 306
     (D.C. 1979) . . . . . . . . . . . . . . . . . . . . . . . 16

\* <u>Strickland</u> v. <u>Washington</u>, 466 U.S. 668 (1984) . . . . . 25-27

<u>Terry</u> v. <u>Ohio</u>, 392 U.S. 1 (1968) . . . . . . . . . . . . 32

<u>Townsend</u> v. <u>United States</u>, 549 A. 2d 724 (D.C. 1988),
     <u>cert. denied</u>, 109 S. Ct. 2457 (1989) . . . . . . . . . . 27

<u>United States</u> v. <u>Davis (Joseph)</u>, 183 U.S. App. D.C. 162,
     562 F.2d 681 (1977) . . . . . . . . . . . . . . . . . . . 17

<u>United States</u> v. <u>Gibbs</u>, 284 U.S. App. D.C. 232,
     904 F. 2d 52 (1990) . . . . . . . . . . . . . . . . . . . 20

<u>United States</u> v. <u>Johnson</u>, 174 U.S. App. D.C. 72,
     527 F.2d 1381 (1976) . . . . . . . . . . . . . . . . . . 19

<u>United States</u> v. <u>Madewell</u>, 917 F.2d 301 (7th Cir. 1990) . . 31

\* <u>United States</u> v. <u>Payne</u>, 256 U.S. App. D.C. 358,
     805 F.2d 1062 (1986) . . . . . . . . . . . . . . . . . . 17

\* <u>United States</u> v. <u>Raper</u>, 219 U.S. App. D.C. 243, 676
     F.2d 841 (1982) . . . . . . . . . . . . . . . . . . . . 17-19

<u>United States</u> v. <u>Sherrod</u>, 295 U.S. App. D.C. 148,
   964 F.2d 1501 (1992) . . . . . . . . . . . . . . . . . 16

<u>United States</u> v. <u>Staten</u>, 189 U.S. App. D.C. 100,
   72, 581 F.2d 878 (1978) . . . . . . . . . . . . . . . . 17

<u>United States</u> v. <u>Wood</u>, 279 U.S. App. D.C. 81, 879
   F.2d 927 (D.C. Cir. 1989) . . . . . . . . . . . . . . . 32

<u>Wesley</u> v. <u>United States</u>, 449 A.2d 282 (D.C. 1982) . . . . . 26

<u>White</u> v. <u>United States</u>, 484 A. 2d 553 (D.C. 1984) . . . . . 27

<u>White</u> v. <u>United States</u>, 582 A.2d 774 (D.C. 1990),
   <u>reversed in part on other grounds</u>, 613 A.2d
      869 (D.C. 1992) . . . . . . . . . . . . . . . . . . . 41

## OTHER REFERENCES

D.C. Code § 33-541 . . . . . . . . . . . . . . . . . . . . 1

D.C. Code § 33-541(a)(1) . . . . . . . . . . . . . . . . 16

Criminal Jury Instruction for the District of
Columbia 2.71 (3rd ed. 1978) . . . . . . . . . . . . . . 42

Criminal Jury Instructions for the District of
Columbia, No. 4.32 (3d ed. 1978) . . . . . . . . . . . . 16

---

\* Cases chiefly relied upon are marked with an asterisk.

iv

DISTRICT OF COLUMBIA
COURT OF APPEALS

No. 90-566, 91-1406

MELVYN A. JOHNSON,                                        Appellant,

v.

UNITED STATES OF AMERICA,                                 Appellee.

APPEAL FROM THE SUPERIOR COURT
OF THE DISTRICT OF COLUMBIA
CRIMINAL DIVISION

BRIEF FOR APPELLEE

STATEMENT OF THE CASE

On September 6, 1989, the grand jury indicted appellant on one count each of possession with intent to distribute heroin and possession of cocaine (D.C. Code § 33-541) (R 7-8)[1]. A bench trial before Judge Ronald Wertheim began and ended on February 26, 1990, when the court returned guilty verdicts on both counts (Tr. 111). On May 9, 1990, Judge Wertheim sentenced the defendant to an enhanced ten-to-thirty year term of incarceration for the

---

[1] "R." refers to the record on appeal for appeal #90-566. "R. II" refers to the record on appeal for appeal #91-1406. "Tr." refers to the 114-page transcript of proceedings held before Judge Ronald Wertheim on February 26, 1990. "Hr." refers to the 77-page transcript of proceedings held before Judge Ronald Wertheim on October 30, 1991.

possession with intent to distribute heroin count because of his two prior drug distribution convictions, followed by one year's incarceration for cocaine possession (R. 5). Trial counsel, Susan Borecki, filed a notice of appeal on May 25, 1990 (Id.).

On May 16, 1991, appellant's appellate counsel, Joseph Virgilio, filed a motion for a new trial, pursuant to Rule 33 of the District of Columbia Rules of Criminal Procedure and the District of Columbia Code, Section 23-110 (R. II 14). In his motion, appellant alleged that his right to effective assistance of trial counsel had been violated and that newly discovered evidence had been uncovered (Id.). Appellant's appeal was stayed pending his motion for a new trial.

On October 30, 1991, Judge Ronald Wertheim determined after a hearing that appellant's motion for a new trial should be denied (Hr. 76). Following the denial of appellant's motion for a new trial, appellant sought the appointment of new counsel. Michael L. Spekter was appointed on January 22, 1992.

## The Trial

### The Government's Evidence

At 7:00 p.m., on August 22, 1989, Detective Gary O'Neal was walking west in an alley behind 146 L Street, S.E., an area known as one of the most prodigious "open air drug distribution centers within the first district" (Tr. 5-7, 9). Detective O'Neal observed appellant with an unidentified black female in the alley walkway (Tr. 5-7, 9). As he approached, Detective O'Neal could see

2

appellant with his right hand opened and outstretched, and the female with her hand reaching within one inch of appellant's hand (Tr. 5-6, 21). Appellant had several blue-tinted glassine plastic packets containing white powder protruding from his outstretched hand (Tr. 5-6,8). Although Detective O'Neal could not determine whether there had been actual contact between appellant's hand and the female's hand, he believed that he was observing a drug transaction (Tr. 18). Although Detective O'Neal's view was unobstructed, he could not determine whether the female was moving her hand toward appellant's or away from appellant's (Tr. 13, 24). Once Detective O'Neal was within five to six feet of appellant and the female, he identified himself and demanded that they emerge from the walkway (Tr. 6-7, 18-21, 24). Appellant quickly dropped his hand to his side and the female "snatched" her hand back and fled (Tr. 6-7, 47). Detective O'Neal struggled with appellant and eventually was able to retrieve the nine small blue-tinted packets of white powder from appellant's hand (Tr. 6-7).

Detective O'Neal then led appellant to the mouth of the alley, to the 1000 block of Second Street, where Officer Kemper Agee searched appellant (Tr. 7). Pursuant to the search, Officer Agee found an off-white rock-like substance and $74 in currency inside a small, zippered, bicycle pouch strapped around appellant's waist (Tr. 7, 29-30). Field tests revealed that the white powder was heroin and the rock was crack cocaine (Tr. 55).

At trial, Detective O'Neal stated that he was an eighteen year veteran of the Metropolitan Police Department's First District and

3

a member of its drug enforcement section (Tr. 3-4). Based on the area and his experience that heroin was sold in blue glassine bags, Detective O'Neal concluded that he had interrupted what he believed to be a drug transaction (Tr. 8-9, 19). Furthermore, he stated that the packaging of the heroin and the number of packets was more consistent with an intent to distribute than personal use (Tr. 9).

Officer David Stroud, an expert in the street trafficking and packaging of illicit drugs in the District of Columbia, testified that the nine small blue-tinted glassine bags of heroin, ordinarily sold for twenty dollars apiece on the street, were of an amount, percentage purity, weight and packaging consistent with street distribution, not personal use (Tr. 54-56). Officer Stroud further stated that addicts do not purchase nine individually wrapped bags of heroin for $180 because they can buy the same amount in bulk for only $60 (Tr. 57). Besides saving money, Officer Stroud explained that addicts also buy in bulk or buy at most two bags at a time as opposed to multiple bags to reduce the risk of getting a "burn" bag instead of heroin (Tr. 54-59).[2] Moreover, he explained, heroin addicts do not "stockpile" their supply, they employ a "use as you go" method (Tr. 59).

In Officer Stroud's experience, the most a heroin addict would use in a one-day period was six bags (Tr. 58). Even the rare addict with a six-bag-a-day habit would not buy six bags at a time, but instead would "sell or do a little bit of running" to support

_____

[2]    Officer Stroud explained that a "burn" bag was a bag that contained for example: baking soda, a fake drug or a plain cutting agent (Tr. 57).

4

his habit (Tr. 58).   Typically, he continued, "they'll work for somebody who actually is holding the heroin and for every ten bags they sell they're allowed to keep, like, one out of that ten.   And once that's done they'll take the bag, ingest it, go off in a corner somewhere and nod off for a few hours" (Tr. 58-59).   He added that drug dealers will sometimes sell heroin and cocaine so that they will appeal to all segments of the drug-buying community (Tr. 59).   Furthermore, dealers often store their stash in pouches, whereas users will likely have their drug paraphernalia in a pouch along with one or two bags of heroin for ready-to-use access (Tr. 60, 66, 68).

### The Defense Case

Appellant claimed that on August 22, 1989, he took his girlfriend's camcorder to the 2d and L Street, S.E., area to trade it for drugs (Tr. 70-71, 85).[3/]   Although appellant initially wanted to get $200 worth of heroin for the camcorder, he settled for $180 worth of heroin (Tr. 71-72).[4/]   Since the bags of heroin

---

[3/]     On cross-examination, appellant explained that he had not paid anything for the camcorder because it was a gift from his girlfriend.   When the court asked appellant exactly when it was that he had received this gift, appellant stated that it had not really been a gift, and added, "I borrowed it.   I don't take from my girlfriend.   We share what we got . . . I took it that day.   We was [sic] staying together" (Tr. 85-86).

[4/]     On direct examination, appellant explained that he had wanted to receive at least $200 worth of money or heroin for the camcorder, but instead sold the camcorder for nine bags of heroin-- approximately $180 worth (Tr. 71).   On cross-examination, Mr. Klingenstein [the prosecutor] asked appellant why he did not use the $74 in currency to purchase heroin instead of taking a loss on the value of the camcorder.   Appellant replied, "I wanted to sell the camera" (Tr. 85).

5

sold for $20 apiece, appellant ended up with nine bags of heroin (Tr. 71). According to appellant, he sold the camcorder to a woman he had grown up with -- a known drug dealer (Id.). Appellant further revealed that he had previously bought heroin from the same woman (Tr. 72). On cross-examination, appellant reluctantly revealed that the woman's name was Robin Lyles (Tr. 82).

On direct examination, appellant explained that he intended to use the nine bags of heroin within the next twenty-four hours, using seven bags on August 22 and saving two bags for the following day (Tr. 72-73, 75-76).[5/] The amount of heroin he used daily had increased since he began injecting in 1980, because the strength of the drug sold on the street had decreased (Tr. 76). He elaborated that "cut heroin," the kind one would normally purchase from a dealer, had to be sold the day it was cut, otherwise the cutting agent would destroy the quality of the heroin (Tr. 76, 91). On cross-examination, appellant claimed that he did not purchase heroin in bulk because "it's easy to buy nine bags, but to buy a spoon or a dipper or uncut dope, you're not likely to find that person on the corner selling those. It's easy to get individual bags of scramble that's already cut up" (Tr. 84). Furthermore,

---

[5/]    On cross-examination, Mr. Klingenstein asked:

Q:    How much at one time of this heroin you intended to use?

A:    Like I said, within 24 hours, all nine bags. I could have done three and then done two and then probably about six hours later about two more. I'm going to save two for the next day so I won't wake up and be sick (Tr. 75).

6

dealers do not usually sell "cut heroin" in bulk, rather they sell it in $20 bags (Tr. 91).

Appellant claimed that in addition to $74 and the rock of crack cocaine, he had his identification card, "cookers" and a few drug needles in his bicycle pouch (Tr. 87). Admitting that he had no bicycle, appellant said that it was easier to carry his identification and drug paraphernalia in a pouch, particularly since his sweat suit had no pockets (Tr. 91-92). Appellant maintained that he was buying and not distributing heroin on August 22, 1989 (Tr. 76-77). When asked whether he had ever sought help for his drug addiction, appellant explained that he had been in several drug programs and had already received the "addict exception" (Tr. 77).[6]

### The Verdict

The court, crediting Detective O'Neal's testimony, found that appellant was interrupted during a drug transaction in which he was the seller (Tr. 111). Applying "common sense" and recognizing appellant's "powerful motivation to lie" to avoid the mandatory minimum sentencing, the court found appellant guilty on both counts (Tr. 111).[7] In explaining his findings, the court stated that he

---

[6]    Appellant was impeached with his previous convictions of distributing heroin (1985), distributing PCP (1985), forgery (1984), carrying a pistol without a license (1983), and burglary II (1982) (Tr. 78-79).

[7]    In explaining his verdict, Judge Wertheim said the following:

"But I think the quantity of heroin

(continued...)

7

did not believe that appellant purchased the heroin for a "trade-in" on the camcorder, nor did the court believe that appellant had drug paraphernalia in his bicycle pouch. The court remarked that had the police found paraphernalia in appellant's pouch, they likely would have charged him with its unlawful possession (Id.).

## Post-Trial Proceedings

Appellant was sentenced on May 9, 1990, and his trial counsel, Susan Borecki, filed a notice of appeal on May 25, 1990 (R 5). Almost a year later, on May 16, 1991, appellant's counsel, Joseph Virgilio, filed a motion for a new trial (R. II 14). In his motion, appellant alleged that he was entitled to a new trial because his trial counsel had been ineffective (Id.). Specifically, trial counsel was alleged to have (1) failed to adequately investigate appellant's case prior to trial and to call witnesses to corroborate his version of the incident and his long-term drug addiction; (2) failed to object to the testimony of

---

[1]/(...continued)

> found on the defendant, interpreted in the light of Officer Stroud's testimony, and sommon sense as to what a drug dealer will accept in return for a bag of heroin, I don't believe we've got any real doubt. I think I am entitled to take into account the defendant's desire to avoid the mandatory minimum sentence in evaluating his credibility. That does not substitute evidence but it does give him a very powerful motivation not to tell the truth on this specific narrow point of intent to distribute (Tr. 110-111).

8

Officer David Stroud with respect to the quantity of heroin purchased and consumed by heroin addicts; (3) failed to object to the trial court's consideration of appellant's mandatory minimum sentence when determining appellant's credibility; (4) failed to file a Motion to Suppress Evidence; and (5) failed to request the lesser included offense of possession of heroin (R. II 5). The court scheduled a 23-110 hearing for October 30, 1991 (R. II 86).

At the 23-110 hearing, appellant stated that trial counsel, Susan Borecki, had met with him only two to three times (Hr. 4). Appellant further stated that he had explained to Ms. Borecki that he had traded a camcorder for the nine bags of heroin and that he had three witnesses who could verify it (Hr. 5). Although, before trial, appellant only had the first name of one of the witnesses, he stated that Ms. Borecki should have been able to locate the three witnesses simply by going to the scene of the crime (Hr. 8). Furthermore, appellant stated that he told Ms. Borecki that he had purchased the heroin from Robin Lyles and that Ms. Lyles could also be found at the scene of the crime (Hr. 12). Appellant stated that, on the day of trial, Ms. Borecki had not gone to the scene of the crime, had not sent her investigator to the scene of the crime and therefore had not obtained any photographs or witnesses to be presented at trial (Hr. 7, 12).

Appellant further complained that Ms. Borecki failed to obtain records from his drug treatment programs (Hr. 12-14). Appellant argued that the introduction of such records at trial would have verified the fact that appellant at one point had a six-bag-a-day

9

heroin habit (R. II 23).

Appellant admitted to signing a form prepared by his trial counsel which indicated that he was rejecting all felony plea offers and, against the advice of Ms. Borecki, was choosing to have a bench trial (Hr. 8-10). However, appellant complained that he signed the form because Ms. Borecki had informed him that he could not start the trial until he signed it (Hr. 9).

Appellant stated that, after trial, he was able to obtain affidavits from three fellow inmates, two who could verify that appellant was trying to sell a camcorder on the day he was arrested and one who could verify that Ms. Lyles had the camcorder after appellant was arrested (Hr. 5).[8/]  Additionally, after trial, appellant was able to obtain his drug treatment records with the assistance of appellate counsel, Mr. Virgilio (Hr. 13-14).

On cross-examination, appellant stated that he had given Ms. Borecki the name and a previous address of one of the witnesses, Ivan Driver, before trial (Hr. 16-18). Appellant further stated that he had spoken to Anthony Sally and Charles Upshur, two of the three witnesses, before he was arrested on August 22, and that he had provided their first names to Ms. Borecki before trial (Hr. 18-

---

[8/]  Appellant submitted three affidavits at the 23-110 hearing. Anthony Salley's affidavit said that he "ran into Melvyn Johnson" between 5:00 p.m. and 6:00 p.m. on August 22, 1989, before appellant was arrested. Likewise, Ivan Driver's affidavit related that he "was approached by Melvyn Douglas" on August 22, 1989, between 5:00 p.m. and 6:00 p.m. Charles Upshur's affidavit stated that he saw appellant being arrested on August 22, 1989, between 5:00 p.m. and 6:00 p.m. Furthermore, Upshur's affidavit said that a woman named "Robin" approached him after appellant had been arrested and asked him to hold a video camera for her.

19).

As for Robin Lyles, appellant stated that he provided her full name to Ms. Borecki before trial (Hr. 21). In fact, although Ms. Borecki failed to locate her, appellant's family was able to speak to Ms. Lyles before trial and Ms. Lyles indicated that she would not be willing to go to court for appellant (Hr. 20). Appellant admitted that he had not wanted to get Ms. Lyles involved and that he would only have wanted her to testify if there were "some arrangement where it could be where she won't get herself in trouble" (Hr. 21).

When asked why he did not have his girlfriend testify about the camcorder, appellant stated that he did not want to get his girlfriend involved at the trial or the hearing, although she was available to testify (Hr. 22-23). When the court asked appellant why he did not want to get his girlfriend involved, appellant merely stated that his reasons were "personal" (Hr. 23). When asked why he did not have Sally, Upshur or Driver testify at the hearing, appellant stated, "I don't know why I don't have 'em. I don't know why" (Hr. 25). When asked why he did not ask for a continuance at the time of trial to look for his witnesses, appellant replied, "Well, she -- she didn't have 'em then. So I -- so I say, well, I just wanted to get it over with because I feel that in my -- well, I was going to go in there with what I had" (Hr. 28).

Ms. Borecki testified that she had met with appellant seven times prior to trial and had given him her home phone number so

11

that he could call her whenever he needed to (Hr. 35).
Additionally, Ms. Borecki sent an investigator to speak with
appellant, visit the crime scene and attempt to locate witnesses
(Id.). When referring to her many conferences with appellant, Ms.
Borecki stated that appellant was not helpful, was fairly
belligerent, and only told her of one witness named "Robin" (Hr.
37). Furthermore, during her initial conference with appellant, he
stated that there was a woman named "Robin" in the alley when he
was arrested and, although he was not with her, the police probably
thought that he was with her (Id.). After her investigator spoke
to appellant and obtained a statement from him, Ms. Borecki
contacted appellant and questioned him about the discrepancies
between his initial statement to Ms. Borecki and his later
statement to the investigator (Hr. 41).[2] Appellant verified the
statement that he had given to the investigator (Id.). Based on
her discussion with appellant, Ms. Borecki went to the scene of the
crime and sent her investigator to the scene of the crime at least
two times (Hr. 42). Nobody seemed to know anything about
appellant's arrest (Id.). When appellant mentioned to Ms. Borecki
that he believed that "Robin" had been "locked up," Ms. Borecki
tried to locate her through the records office of the Department of
Corrections, but was unsuccessful (Hr. 43).

Although appellant had given Ms. Borecki several different

---

[2]    Appellant initially informed Ms. Borecki that he did not know
the woman he was with when he was arrested (Hr. 39). Appellant
later told Ms. Borecki's investigator that he and the woman, known
to him as "Robin", were going out together to buy drugs when he was
arrested (Hr. 44).

12

versions of what he was doing prior to his arrest, appellant never mentioned anything to Ms. Borecki about trying to sell a camcorder (Hr. 44). In fact, the first time Ms. Borecki heard anything about a camcorder was during appellant's testimony at trial (Id.). Up until that point, Ms. Borecki was under the impression that Robin Lyles was a drug dealer and that she and appellant were going to use the drugs together (Hr. 44-46).

At no point prior to or during trial did appellant mention the names of Charles Upshur, Ivan Driver or Anthony Salley to Ms. Borecki (Hr. 45). In fact, immediately prior to trial, Ms. Borecki stated that she asked appellant whether he was satisfied with the trial preparation and informed him that she could ask for a continuance if he was not satisfied (Hr. 47). Appellant told Ms. Borecki that he was satisfied with the trial preparation and signed a statement to that effect (Id.). The first time appellant voiced any displeasure with Ms. Borecki's representation was after he had already been sentenced (Hr. 51).

The court found Ms. Borecki's testimony to be "fully credible and I do not credit [appellant's] testimony in those areas where there are factual differences between witnesses" (Hr. 74). On the issue of whether appellant informed Ms. Borecki about the three witnesses -- Upshur, Driver and Salley -- before trial, the court was satisfied that appellant had not. This decision was based on the testimony of appellant and Ms. Borecki at the hearing, and the

13

discrepancies found in the affidavits (Hr. 75).[10/]   The court
further noted that the affidavits did not "carry very much weight
in the circumstances when the witnesses were available to be called
today" (Id.)  The court concluded that the other issues were
addressed well in the government's opposition to appellant's Motion
for a New Trial and accordingly denied appellant's motion (Hr.
76).[11/]

## ARGUMENT

I.   The evidence was sufficient to support appellant's
conviction for possession with intent to distribute
heroin, and therefore appellant's motion for
judgment of acquittal was properly denied.

Appellant argues that there was insufficient evidence
presented at trial to prove that he was guilty of more than simple
possession as to both counts of the indictment (Brief for Appellant
at 10).  Appellant moved for a judgment of acquittal at the close
of the government's case but did not renew it after the close of
all the evidence (Tr. 69).  This motion was denied and the court,
after appellant put on his defense, found appellant to be guilty as
charged (Tr. 69, 110-111).

_____

[10/]   At the 23-110 hearing, Judge Wertheim concluded the following:
"It does in particular seem very unlikely that three people who
[appellant] encounters in prison subsequent to his conviction and
sentencing should all coincidentally have been at the scene of his
offense.  He didn't have at least their last names before that.
And they all have the same recollection, placing themselves at this
scene between 5:00 and 6:00 p.m.   And they are all consistently
inaccurate in view of the evidence both at trial and the police
reports that the offense and the arrest occurred at 7:00 p.m.

[11/]   A copy of that opposition is attached to this brief as an
appendix as a convenience to the Court.

Appellant's contention that the evidence was insufficient to support his conviction should be rejected. The circumstances surrounding his arrest, and the quantity, packaging and variety of drugs he possessed, provided a sufficient basis for the court to have found that he was guilty of possession with intent to distribute heroin.[12/]

In reviewing a trial court's denial of a motion for judgment of acquittal, this Court must determine whether there was sufficient evidence from which a reasonable juror, or in this case a reasonable judge, could fairly conclude guilt beyond a reasonable doubt. Head v. United States, 451 A. 2d 615, 622 (D.C. 1982). In so doing, the Court must review the evidence in the "light most favorable to the government, giving full play to the right of the [trier of fact] to determine credibility, weigh the evidence and draw justifiable inferences of fact." Hall v. United States, 454 A. 2d 314, 317 (D.C. 1982). The Court should not make a distinction between direct and circumstantial evidence. Chambers v. United States, 564 A.2d 26, 30-31 (D.C. 1989); Jackson v. United States, 395 A.2d 99, 102 (D.C. 1978). The government is not required to negate every possible suggestion of innocence, nor must the evidence compel a verdict of guilty. Fox v. United States, 421 A.2d 9, 12-13 (D.C. 1980); Chaconas v. United States, 326 A. 2d 792 (D.C. 1974). Only if the Court concludes that no reasonable [trier of fact] could have been convinced beyond a reasonable doubt of

---

[12/]    Appellant does not challenge on appeal his conviction for possession of crack cocaine.

15

appellant's guilt should the denial of a motion for judgment of acquittal be reversed. Chambers, supra, 564 A.2d at 31; Smothers v. United States, 403 A. 2d 306, 312 (D.C. 1979).[13]

In order to establish that appellant possessed a controlled substance with intent to distribute, the government must prove that (1) appellant possessed a useable amount of a controlled substance, (2) appellant did so knowingly and intentionally, and (3) appellant did so with the specific intent to distribute the controlled substance. See Harris v. United States, 489 A.2d 464, 470 (D.C. 1985); D.C. Code § 33-541(a)(1); Criminal Jury Instructions for the District of Columbia, No. 4.32 (3d ed. 1978). Appellant challenges only the element of intent to distribute the crack in this appeal.

In the instant case, the evidence viewed in the light most favorable to the government was sufficient to sustain the convictions. Since "intent" must often be proven through circumstantial evidence, it is important to look at the types of such evidence the court could have reasonably relied upon in finding beyond a reasonable doubt that appellant possessed the seized heroin with the intent that it be distributed.

Clearly, an important factor in establishing specific intent to distribute a controlled substance is possession of a quantity of

_____

[13]    Since appellant chose to put on evidence at trial, he waived any challenge in this Court to the sufficiency of the government's evidence. Franey v. United States, 382 A.2d 1019, 1021-1022 (D.C. 1978). There is also authority for the notion that, since appellant did not renew his motion for judgment of acquittal after the close of all the evidence, he waived any appellatE claim of that issue. United States v. Sherrod, 295 U.S. App. D.C. 148, 964 F.2d 1501 (1992). Because appellant's trial was not before a jury, however, we do not press a waiver claim in this case.

drugs exceeding a reasonable supply for personal use. Hinnant v. United States, 520 A.2d 292, 294 (D.C. 1987); Shorter v. United States, 506 A.2d 1133, 1135 (D.C. 1985); United States v. Raper, 219 U.S. App. D.C. 243, 247, 676 F.2d 841, 845 (1982); United States v. Staten, 189 U.S. App. D.C. 100, 108 n. 72, 581 F.2d 878, 886 n.72 (1978); United States v. (Joseph) Davis, 183 U.S. App. D.C. 162, 166-167, 562 F.2d 681, 685-686 (1977). Another important factor in establishing an intent to distribute a controlled substance is the value and packaging of drugs found in the defendant's possession. Chambers v. United States, supra, 564 A.2d 26, 31 (D.C. 1989). Hinnant v. United States, supra, 520 A.2d at 294; United States v. Raper, supra, 219 U.S. App. D.C. at 247, 676 F.2d at 845. Additionally, an intent to distribute a controlled substance can be inferred from a defendant's arrest in an area with a high incidence of drug trafficking. United States v. Payne, 256 U.S. App. D.C. 358, 362, 805 F.2d 1062, 1066 (1986); Hinnant v. United States, supra, 520 A.2d at 294; United States v. Raper, supra, 219 U.S. App. at 247, 676 F.2d at 845. At trial, the government introduced facts supporting each of these factors as well as expert testimony explaining precisely how these facts demonstrate appellant's intent to distribute the cocaine. Thus the government amply provided evidence sufficient for a reasonable trier of fact to find appellant guilty beyond a reasonable doubt.

First, appellant was in possession of a quantity of drugs (nine packets of heroin and one rock of cocaine), which was, according to Detective O'Neal and Officer Stroud, more consistent

17

with an intent to distribute than possession for personal use since an individual user would not "stockpile" such a significant quantity of drugs (Tr. 9, 56 and 59). See Shorter v. United States, supra, 506 A.2d at 1135 (possession of a quantity of drugs that exceeds reasonable supply is significant evidence of an intent to distribute); see also United States v. Raper, supra, 219 U.S. App. at 247, 676 F.2d at 845 (the court determined that thirteen packets of heroin "was far greater than that needed for personal use"). Second, the packaging and value of nine individual packets of heroin seized from appellant additionally suggests possession with intent to distribute. See Chambers v. United States, supra, 564 A.2d 26, 31 (D.C. 1989) (court held cocaine possessed in three separate packages rather than one large mass was evidence of an intent to distribute). As expert testimony at trial pointed out, an individual user of drugs would not be likely to purchase nine separate packets, but rather would be more likely to purchase drugs in "bulk" (Tr. 57). In this case, it is not only the actual value of the nine packets that is important. It is that value's relationship to the cost at which a heroin buyer could buy the same amount for his own use. Judge Wertheim was entitled to view appellant as a sophisticated and knowledgeable heroin addict who would not purposely pay more for his habit than he needed to.

Possession of two types of a controlled substance, as in this case, heroin and cocaine, is also consistent with an intent to distribute. A dealer possessing two types of drugs, according to the expert testimony, increases his potential clientele by

18

appealing to more segments of the drug buying community (Tr. 59).
Finally, although the value of the heroin possessed by appellant,
$180, is not as large as in some decided cases, we believe that it
also tends to suggest an intent to distribute. See United States
v. Raper, supra, 219 U.S. App. D.C. at 247, 676 F.2d at 844 (the
court determined that possession of heroin valued at $520 and $780
was consistent with an inference the drugs were being possessed
with an intent to distribute). Cf. United States v. Johnson, 174
U.S. App. D.C. 72, 74-75 n.6, 527 F.2d 1381, 1383-84 n.6 (1976)
(court allows expert testimony which explains that drug users tend
to possess drugs of minimal value since they are often in fear of
being robbed).

The circumstances surrounding appellant's arrest also support
an inference that he was possessing the seized heroin with an
intent to distribute. He was arrested in an area known for a high
incidence of drug dealing. In fact, it was referred to at trial as
one of the "more pervasive open air drug distribution centers
within the first district" (Tr. 9). When Detective O'Neal walked
up to appellant, appellant had his hand open and outstretched
toward an unknown female. Inside of appellant's hand, Detective
O'Neal could see what he initially suspected and later confirmed
were bags of heroin (Tr. 5-8). The female appeared to be reaching
into appellant's open hand, bringing her hand within one inch of
appellant's hand, when Detective O'Neal identified himself. At
that point, the female "snatched" her hand back and appellant
closed his hand and put it by his side (Tr. 7). The trial court

19

certainly could have reasonably inferred from these facts that appellant possessed the seized heroin with an intent to distribute it. See Hinnant v. United States, supra, 520 A.2d at 294 (a factor in establishing intent to distribute is possession in an area known for a high incidence of drug trafficking); United States v. Gibbs, 284 U.S. App. D.C. 232, 237, 904 F.2d 52, 57 (1990).

Appellant argues, however, that these aforementioned facts and circumstances equally support a conclusion that appellant was possessing the drugs as a buyer and not a seller (Brief for Appellant at 16). This argument is without merit. Based on the facts presented at trial (i.e. high drug area quantity, packaging, variety, value of heroin and circumstances of the arrest), the court had evidence sufficient to establish beyond a reasonable doubt that appellant had the intent to distribute the heroin in question. Cf. Bourjailly v. United States, 483 U.S. 171, 179-180 (1987) ("Individual pieces of evidence, insufficient in themselves to prove a point, may in cumulation prove it. The sum of an evidentiary presentation may well be greater than its constituent parts.") Appellant's presence in a high drug area, joined with the fact that he possessed nine individual packets of heroin, one rock of cocaine, $74, and none of the requisite drug paraphernalia for personal use, provided the court with sufficient basis to reasonably conclude that appellant's possession of the heroin in question was with the intent to distribute.

Moreover, it is well recognized that the government is not

20

required to negate all possible inferences of innocence.[14/]  See also <u>Irick</u> v. <u>United States</u>, 565 A.2d 26, 30-31 (D.C. 1989).  In <u>Irick</u>, for example, the defendant, in an attempt to establish that evidence presented at trial was insufficient to convict him of possession of cocaine with intent to distribute, argued that his actions were also consistent, as the government's expert at trial acknowledged, with someone who had no intention of selling drugs, but rather intended to steal a would-be drug purchaser's money (<u>Id.</u> at 30).  In rejecting this argument, this Court noted that it is well settled that in evaluating a motion for judgment of acquittal, the government's evidence need not "exclude every reasonable hypothesis other than guilt." <u>Id.</u>, <u>citing</u> <u>Holland</u> v. <u>United States</u>, 348 U.S. 121, 139-140 (1954); <u>Chaconas</u> v. <u>United States</u>, <u>supra</u>, 326 A.2d 792, 798 (D.C. 1974).

Appellant argues that Detective O'Neal's testimony was too vague and contradictory to support a conviction for possession with intent to distribute heroin (Brief for Appellant at 20). Specifically, appellant asserts that Detective O'Neal initially stated that he saw appellant with his right hand outstretched and an unknown female reaching into appellant's hand (Brief for Appellant at 15).  Later, on cross-examination, appellant points out that Detective O'Neal admitted that he could not determine whether the female was "actually taking or reaching in" (Brief for Appellant 15-16).  Appellant claims that this admission is "crucial" and further asserts that Detective O'Neal's observation

---

14/   See text at 15, <u>supra</u>, and cases cited.

merely indicates that appellant was in possession of heroin (Brief for Appellant at 16). Appellant misreads the record. Clearly, Detective O'Neal stated that he saw the unknown female reaching into appellant's outstretched hand, placing her hand within one inch of appellant's hand (Tr. 20-21). When the government asked Detective O'Neal to describe how the female was reaching into appellant's hand, Detective O'Neal explained, "The right hand was outstretched. The right hand of [appellant] was outstretched. She was reaching in. And I couldn't tell whether or not she had gotten all the way or just where, but she was reaching in and his head was looking right at it when I identified myself as an officer" (Tr. 20-21). Detective O'Neal further explained that he did not know whether he had interrupted the unknown female "before she had actually gotten to this stage of the actual taking" (Tr. 21). When the government asked Detective O'Neal whether he saw anything fall from the female's hand, Detective O'neal stated, "I can't say. I don't know" (Tr. 22). Clearly, based upon the above testimony, the trial court had a sufficient basis to determine that appellant was in the process of distributing heroin to the unknown female when Detective O'Neal identified himself.

Appellant also argues that there was a six-foot high wooden fence between appellant and Detective O'Neal at the time of the alleged drug transaction and that therefore Detective O'Neal could not have seen what he testified to (Brief for Appellant at 14). Contrary to appellant's assertion, Detective O'Neal testified that the wooden or metal fence was not between him and appellant and

22

therefore did not obstruct his view of appellant and the unknown female (Tr. 12-14). As a result of Detective O'Neal's testimony about the wooden or metal fence near where appellant and the buyer stood, the prosecutor inquired whether O'Neal's view had been obstructed (Tr. 13). O'Neal responded, "No, no, no. There was not a wall or fence between us." (Id.). The witness even stepped down from the witness stand to demonstrate his line of sight (Id.).

Next, appellant argues that Officer Stroud's testimony pertaining to drug "use" was insufficient to base a conviction on because Officer Stroud did not have any expertise in the area of drug "use" (Brief for Appellant at 19). Again, appellant misreads the record. Officer Stroud testified that he had been a police officer with the Metropolitan Police Department for about twenty-one years and had worked on the narcotics task force for approximately seven years (Tr. 51). On direct examination, both parties stipulated that Officer Stroud qualified as "an expert in street trafficking and packaging of illicit drugs" (Tr. 54). When questioned on cross-examination about his direct experience with heroin addicts, Officer Stroud stated that his experience stemmed from watching heroin addicts "shoot-up" and interviewing heroin addicts after they have been arrested (Tr. 61-62). Appellant claims that Officer Stroud's testimony should have been discounted in its entirety based on the fact that the officer had not conducted any laboratory analysis, consulted any psychoanalytical experts or spoken to any drug counselors (Tr. 19).

Appellant does not explain an appeal why he believes that the

23

trial court should have completely discounted Officer Stroud's opinion about how many bags of heroin on addict is likely to buy at one time. In the context of his sufficiency claim, it should be too late to raise this issue since appellant did not mention it as a ground his motion for acquittal (Tr. 69). Abdulshakur v. United States, 589 A.2d 1258 (D.C. 1991). Moreover, with no objection at trial to Stroud's testimony (Tr. 51-68), the trial court was entitled to credit that opinion if he found it persuasive, which the court must have done.

Appellant seems to suggest that Stroud's opinion was inadmissible or improperly considered because it was based in part on conversations with arrestees and not on "laboratory analysis" or consultations with "psychoanalytical experts" or "drug counselors" (Brief for Appellant at 19). Surely, admission of and reliance upon Officer Stroud's opinion could not, on this basis, constitute error, much less plain error, in light of In re Melton, 597 A.2d 892 (D.C. 1991)(en banc), where this Court held that an expert's reliance upon hearsay statements in forming his opinion is generally permissible. Id. at 901-903. There are many safeguards to protect against any undue prejudice from such testimony, almost none of which appellant utilized here. However, appellant did cross-examine Stroud on this very point, and called to the trial court's attention his position that the officer's opinion on this matter was not worth very much. The trial court evidently disagreed and, having lost the argument before Judge Wertheim, appellant is extremely hard-pressed to overturn on appeal what is

24

really a credibility determination or, perhaps, a decision about what weight to give such testimony. Either decision is clearly a matter for the trier of fact and appellant has given this Court no reason to reverse the judgment on this basis.

###    II.    Appellant's Constitutional Right to the Effective Assistance of Counsel was not Violated.

Appellant argues that his right to the effective assistance of counsel was violated and that therefore he is entitled to a new trial (Brief for Appellant at 24). In decrying counsel's performance, appellant asserts that Ms. Borecki divested him of his Sixth Amendment right to representation by failing to investigate his case before trial, failing to call witnesses at trial, failing to object to what appellant believes to be improper expert testimony, failing to file a motion to suppress the drugs before trial, failing to introduce appellant's drug treatment records and failing to explicitly ask the trial court to consider the lesser included charge of heroin possession (Brief for Appellant at 24-26). However, appellant's brief fails to offer any evidence that Ms. Borecki's actions either separately or in the aggregate constituted ineffective assistance of counsel or prejudiced him. In fact, it is clear from the record that appellant received effective assistance and a fair trial.

In evaluating claims of ineffective assistance of counsel, this Court applies the two-prong Strickland test. See Strickland v. Washington, 466 U.S. 668 (1984). Under Strickland, the defendant must show both that his counsel's performance was

25

deficient, -- *i.e.*, "that [she] made errors so serious that counsel was not functioning as the counsel guaranteed defendant by the Sixth Amendment," -- and that he was prejudiced by those deficiencies. Strickland, supra, 466 U.S. at 687-689. Significantly, "judicial scrutiny of counsel's performance must be highly deferential . . . [A] Court must indulge a strong presumption that counsel's conduct falls with the wide range of reasonable professional assistance." Strickland, supra, 466 U.S. at 689. Accord, McAdoo v. United States, 515 A.2d 412, 419 (D.C. 1986). Accordingly, the Court should not "engage in vague speculation about the kind of investigation counsel might have made or what witnesses he might have called," Atkinson v. United States, 366 A.2d 450, 453 (D.C. 1976); accord, Curry v. United States, 498 A.2d 534, 540 (D.C. 1985), and should not find ineffective assistance on the basis of tactical decisions gone awry or errors in judgment that became apparent in light of subsequent events. Carter v. United States, 475 A. 2d 1118, 1123 (D.C. 1984), cert. denied, 469 U.S. 1226 (1985); Wesley v. United States, 449 A.2d 282, 284 (D.C. 1982).

Under Strickland, the defendant must show that counsel's ineffective assistance prejudiced him, *i.e.*, there must be "a reasonable probability that, but for counsel's unprofessional errors, the results of the proceeding would have been different." Strickland, supra, 466 U.S. at 694. Thus, even if perchance he demonstrates counsel's deficiency, the defendant is not entitled to relief unless counsel's incompetence led to a trial with an

"unreliable" result.  <u>Id.</u> at 697.  <u>See</u> <u>McAdoo</u> v. <u>United States</u>, <u>supra</u>, 515 A.2d at 426-427; <u>Godfrey</u> v. <u>United States</u>, 454 A.2d 293, 295 (D.C. 1982).  Moreover, the Court may address the <u>Strickland</u> prongs in any order and need not consider both prongs if it finds that the defendant has made an insufficient showing on either.

### A.    <u>Counsel Investigated Thoroughly.</u>

Appellant asserts that had counsel investigated properly, she would have unearthed Ivan Driver, Anthony Salley and Charles Upshur -- the three fellow inmates appellant obtained affidavits from -- and thus would have been able to present their testimony at trial to bolster appellant's story about attempting to sell a camcorder for drugs (Brief for Appellant at 24).  This is nonsense. Appellant testified at the 23-110 hearing that he had only given Ms. Borecki the first name of one of the above witnesses (Tr. II 8).  Ms. Borecki then testified that appellant never mentioned the above three witnesses to her before or during trial (Hr. 44).  The trial court credited Ms. Borecki's testimony.  With the little information that appellant gave her, Ms. Borecki and her investigator were unable to locate any defense witnesses at the scene of the crime despite numerous attempts (Tr. 42).  Counsel plainly has no obligation to interview witnesses of whom she is unaware.  <u>See</u> <u>Townsend</u> v. <u>United States</u>, 549 A. 2d 724, 728 (D.C. 1988) (counsel is not ineffective for failing to unearth witness whose testimony would not have changed result), <u>cert.</u> <u>denied</u>, 109 S. Ct. 2457 (1989); <u>White</u> v. <u>United States</u>, 484 A. 2d 553, 558-559

27

(D.C. 1984) (investigatory decisions of counsel are necessarily reliant on information supplied by the defendant). Cf. Harris v. United States, 441 A.2d 268, 273-274 (D.C. 1982) ("failure to make reasonable efforts to interview and utilize known witnesses having a direct bearing on the substantial defense" may be considered ineffective assistance of counsel).

Appellant also argues that Ms. Borecki was deficient in opting not to present evidence to corroborate his testimony regarding the magnitude of his drug addiction (Brief for Appellant at 22). This claim is insupportable. At trial, appellant quantified his habit on the date of his arrest by saying that within twenty-four hours, all of the nine bags of heroin in his possession would be gone (Tr. 73). Officer Stroud then testified the maximum amount of heroin one would consume in a day was six packets (Tr. 58). Appellant's Veteran's Hospital discharge summary presentenced at the post-trial hearing reveals that in 1985, appellant claimed that he had a "5 to 6 quarters of 'street' heroin per day" habit. (See attached exhibit). The discharge summary thus adds little or nothing to the testimony already submitted on appellant's behalf at trial. It was, if relevant, merely cumulative. Ms. Borecki was not ineffective in failing to present cumulative evidence. Moreover, the document did not contradict Officer Stroud's expert opinion about an addict's maximum heroin intake, but supported it. At the zenith of his addiction, i.e., when seeking treatment, appellant claimed that he was consuming precisely the amount Officer Stroud predicted the heavy user would inject.

28

Ms. Borecki's failure to call any other witnesses to support appellant's claim that his habit was great enough to justify purchasing nine packets at once, when testimony on that subject was merely cumulative of his own, does not constitute ineffective assistance.    As a matter of law, "[a]lthough [defendant] may disagree with his counsel's reasoning, the decision of whether to put witnesses on the stand is clearly a tactical decision."  Curry v. United States, supra, 498 A.2d at 545; Smith v. United States, 454 A.2d 822, 825 (D.C. 1983) (decision to call witnesses is judgment left entirely within defense counsel's discretion); Atkinson v. United States, supra, 366 A.2d at 453 (decision to call witnesses is a choice of trial tactics that must be left to counsel's judgment).  Counsel's possible "[e]rrors in judgment and tactics as disclosed by hindsight do not, by themselves, constitute ineffectiveness."  Curry v. United States, supra, 498 A.2d at 545.

Finally, counsel's decision not to further corroborate appellant's habit did not affect the outcome of the trial.  The court based its verdict on Detective O'Neal's testimony that he saw an aborted transaction where appellant was the seller, and discredited appellant's claim that he was trading in a camcorder for drugs (Tr. 110-111).  The court did not specifically discredit appellant's testimony regarding the magnitude of his heroin habit. In fact, the government never disputed that appellant was a drug user and appellant informed the court that he had unsuccessfully

29

undergone treatment on two previous occasions (Tr. 77).[15/]  Given his prior record, however, there was also no dispute that appellant was a drug seller.  In short, any failure by counsel to corroborate appellant's testimony regarding the magnitude of his habit did not affect the outcome because that evidence did not address the most important element of the government's case -- Detective O'Neal's observation of the aborted transaction.  Thus, its omission was "not so prejudicial as to deprive [defendant] of a fair and reasonable trial."  Curry v. United States, supra, 498 A.2d at 545.


B.    Counsel Properly Chose not to File a
      Frivolous Pretrial Suppression Motion.

Appellant asserts that Ms. Borecki was deficient in failing to move to suppress the heroin and cocaine found on appellant (Brief for Appellant at 22).  This claim is legally and factually unsupportable.

Appellant's claim here is without merit because Ms. Borecki's decision not to file a motion to suppress was not deficient and because appellant plainly was not prejudiced by Ms. Borecki's failure to challenge a legal detention, search and seizure.  Where, as here, counsel had no grounds upon which to question the admissibility of the drugs, she obviously could not in good faith file a motion to suppress them.  Fernandez v. United States, 375 A.2d 484, 487 (D.C. 1977) (counsel "not required to file frivolous

---

[15/]    In fact, appellant testified that he had attended the Veterans Hospital program (Tr. 77).  The hospital summary quantifying his habit was thus plainly cumulative of his testimony.

30

or baseless motions."); <u>see</u> <u>United States</u> v. <u>Madewell</u>, 917 F.2d 301, 304-305 (7th Cir. 1990) (if defendant's motion to suppress evidence on Fourth Amendment grounds would have failed, counsel was not ineffective in failing to file it).

Appellant's support for this claim must come solely from the allegations in his post-trial motion since he did not address it at the October 30, 1991, hearing. We have attached a copy of both appellant's and the government's pleadings as appendices to this brief. Manifestly, appellant has not produced, as he could not, "whatever evidence will be necessary to succeed with suppression." <u>Hockman</u> v. <u>United States</u>, 517 A.2d 44, 50 n.9 (D.C. 1986). Moreover, as the government's proof at trial established,[16] appellant had no Fourth Amendment claim to challenge the admissibility of the drugs. Detective O'Neal, an eighteen-year Metropolitan Police veteran who had made hundreds of drug arrests (Tr. 4), testified that on August 22, 1989, he was on foot, in plain clothes, in a high drug area (Tr. 5, 9). As he came to within five to six feet of appellant and the unknown female, he saw what he believed to be a drug transaction (Tr. 5). Detective O'Neal made this determination based on the fact that appellant had several packets of suspected heroin in the palm of his open, outstretched hand (<u>Id.</u>). When he announced his presence, the unknown female fled and appellant closed and dropped the hand

---

[16]    In deciding whether a motion to suppress would have been denied, the Court may consider the undisputed trial testimony. <u>See</u> <u>Lewis</u> v. <u>United States</u>, 594 A.2d 542 (D.C. 1991) (<u>citing</u> <u>Masiello</u> v. <u>United States</u>, 113 U.S. App. 32, 34, 304 F.2d 399, 401 (1962) and <u>Carroll</u> v. <u>United States</u>, 267 U.S. 132, 134 (1925).

31

containing the drugs to his side.  Given this sequence of events, Detective O'Neal plainly had an articulable suspicion that appellant was involved in a drug transaction.  His observations amply supported a Terry[17] investigatory stop and, once appellant resisted, the brief detention that occurred.  See Price v. United States, 429 A.2d 514, 516 (D.C. 1981).  Once he retrieved the bags from appellant's hand, field-tested the contents and determined that they contained heroin, he had probable cause to arrest appellant.  Rucker v. United States, 455 A.2d 889, 891 (D.C. 1983); Price v. United States, supra, 429 A.2d at 516.  Once lawfully arrested, the officers were entitled to conduct a search of the defendant's person.  Gustafson v. Florida, 414 U.S. 260 (1973).  Seizure of the rock of crack cocaine and $74 in currency from appellant's bicycle pouch plainly did not violate appellant's Fourth Amendment right against unlawful seizures.  In sum, had counsel sought to suppress either the drugs or the money, the trial testimony establishes that the court would have denied the motion.  Thus, even if for some unapparent reason, counsel was deficient in failing to file a motion to suppress, appellant plainly was not prejudiced because the evidence was admissible.  See United States v. Wood, 279 U.S. App. D.C. 81, 87, 879 F.2d 927, 933 (D.C. Cir. 1989) (when the ineffectiveness claim concerns an attorney's failure to raise a Fourth Amendment issue, the defendant must show that the Fourth Amendment claim has merit and that there was a reasonable possibility that the verdict would have been different

---

[17]    Terry v. Ohio, 392 U.S. 1 (1968).

32

absent the excludable evidence).

> **C. Counsel Timely Objected to the Trial Court's Consideration of the Mandatory/Minimum Sentence to Judge Appellant's Credibility.**

Appellant claims that Ms. Borecki failed to object to the court's consideration of the potential mandatory minimum sentence in determining appellant's credibility (Brief for Appellant at 22). This is simply incorrect. Counsel did object to the court's consideration of appellant's possible sentence in assessing the credibility of his testimony (Tr. 104). Despite counsel's objection, the court ruled that it could consider appellant's motivation to lie to avoid the mandatory minimum sentence when determining whether he had the requisite intent to distribute (Tr. 105-106). Counsel properly preserved the issue for appeal and therefore was not deficient.

The issue arose in the following context. During the prosecutor's closing argument, the court asked him whether it could consider appellant's interest in avoiding the mandatory minimum when assessing appellant's credibility (Tr. 102). The prosecutor told the court that it could (Tr. 103-104). At the beginning of her closing argument, however, defense counsel disagreed:

> Ms. Borecki: With regard to the last point, Your Honor, I would simply note that the court is the trier of facts in this case, as obviously, with a jury. And it would appear to me in answering your question that it would be improper for the court to take all that into consideration with regard --

33

that is potential punishment.

The jury wouldn't be able to hear it. I would not object to it today simply because I know that Your Honor is aware of such things and Your Honor does not read your instruction to himself.

The Court: But isn't every citizen presumed to know the law, and that would, I imagine, include sentencing law?

Ms. Borecki: Well, if the idea is to instruct the jury about sentencing that's not proper.

The Court: No. I'm not talking about that. Assuming that the jury, without any instruction on the subject, because like all good citizens, they all know the law, they are aware that about four weeks before the arrest the applicable sentences for distribution of a controlled substance in the District of Columbia were very substantially increased and the mandatory minimums were very substantially increased and that the defendant's p r i o r record disqualifies him for the addict exception, you have ordinary citizens who spend their time reading Title 33 of the District of Columbia Code knows that because the law, presuming; so even if he had given him no instruction wouldn't they be free to take that into account in evaluating the credibility of the defendant?

Ms. Borecki: No, Your Honor. You are getting two very, very fine lines of --

The Court: Well, it doesn't sound so fine to me. I have been sitting here wondering why [appellant] would go to trial in this case and the minute I hear about his prior record. I say, uh-huh, he wants to avoid a

34

mandatory minimum.

Ms. Borecki: Well, I think that one can [sic] say that if the jury would know about any kind of increased penalty. I think that they are asked to put those things out of their minds. And with regard to punishment, because of the punishment, therefore, we have a defendant who is therefore more likely to misrepresent his intent, I think that is a leap that cannot be made simply because the initial surmising regarding the punishment is not allowed and they are not allowed that.

The next move stems directly from what the punishment is and since they are not already supposed to consider that, therefore, they cannot even reach the point as to whether or not [appellant] is simply avoiding the mandatory minimum. So I would simply submit that it just wouldn't even get to that point were we to have a jury in this case, Your Honor (Tr. 104-106).

Contrary to appellant's claim, the above passage illustrates that Ms. Borecki strenuously objected to the court's consideration of appellant's desire to avoid his looming mandatory punishment as a factor in assessing his credibility regarding his intent to distribute. The court considered it anyway. Counsel's performance was not deficient simply because the court ruled against her.

D.  Appellant was not Harmed by Counsel's Failure to Explicitly Request the Court to Consider the Lesser Included Offense of Possession.

Appellant claims that counsel's failure to explicitly request the court to consider the lesser included offense of possession of

35

heroin was harmful to him (Brief for Appellant at 22). This argument is without merit. It is clear from the record that appellant's entire defense to the charge of possession with intent to distribute heroin was that he merely possessed the nine packets. The court, unlike a jury which has not been informed about the alternative lesser-included offense, was well aware that appellant was asking it to decide that he committed the lesser offense and not the greater. Indeed, the court's findings clarify its options:

> The Court: But I think the quantity of heroin found on the defendant, interpreted in the light of Officer Stroud's testimony, and common sense as to what a drug dealer will accept in return for a bag of heroin, I don't believe we've got any real doubt. I think I am entitled to take into account the defendant's desire to avoid the mandatory minimum sentence in evaluating his credibility. That does not substitute evidence but it does give him a very powerful motivation not to tell the truth on this very specific narrow point of intent to distribute. (Tr. 111).

Even if counsel was remiss in not ceremoniously requesting the court to consider simple possession, the court plainly did consider it and thus the defendant simply cannot demonstrate that he was harmed by counsel's technical omission. Cf. Chaverria v. United States, 505 A.2d 59, 66 (D.C. 1986) (where failure to give cautionary instruction is not plain error, defense counsel's failure to request it cannot be said to raise to a reasonable probability that the result of the proceeding would have been different); Curry v. United States, 498 A.2d 534, 545 (D.C. 1985)

36

(counsel's failure to request jury instruction though error deemed to be harmless and thus defendant cannot meet his burden to show that he was denied his Sixth Amendment right to effective representation.)

E.    **There was no Ineffective Assistance from Failing to Object to Officer Stroud's Expert Testimony.**

Appellant complains that his counsel failed to object to a portion of Officer Stroud's testimony that fell outside his area of proffered expertise (Brief for Appellant at 22). However, as demonstrated below, it is clear that Officer Stroud's testimony adhered to the proffer. The following exchange precipitated the parties' stipulation that Officer Stroud was qualified as a drug expert:

> The Court: What is it that you wish to have Officer Stroud qualified as an expert in?
>
> Mr. Klingenstein [the prosecutor]: I want him qualified as an expert in now [sic] the way that the drugs are sold in the street.
>
> The Court: You mean trafficking patterns?
>
> Mr. Klingenstein: Right, trafficking patterns.
>
> The Court: Anything else?
>
> Mr. Klingenstein: Also the way these drugs are packaged. We are stipulating as to the chain of custody --
>
> The Court: Wait a minute. Let's get the one thing at a time. This

37

isn't a chain of custody witness, is he?

Mr. Klingenstein:  Not any more he's not, Your Honor.

The Court:  All right.  Well, what is it you want to stipulate he's an expert in?

Mr. Klingenstein:  Those two areas.

The Court:  Not usable amount?

Mr. Klingenstein:  Yes, Your Honor, although -- yes.  I don't think he needs specifically to be qualified as an expert.

The Court:  All right.  Just the way drugs are sold and packaged on the street?

Ms.  Borecki:      That's  my understanding is the stipulation, Your Honor, yes.

The Court:  Well, do you agree that the witness is an expert in those subjects?

Ms. Borecki:  Yes, he's qualified to testify in those areas.  Thank you.

The Court:  I've got a page-and-a-half of notes on his background in the last case he testified in.  I'm tired of writing about every three day seminar.

Ms. Borecki:  Yes, Your Honor.

The Court:  All right.  By agreement of the parties, the court will find the witness qualified as an expert in street trafficking and packaging of illicit drugs (Tr. 54-55).

Although the parties did not use the term heroin "use", when

Officer Stroud was accepted as an expert, he implicitly was

38

qualified as such.  By definition, "street trafficking" includes
"use".  [18/]  In any event, had counsel raised the matter at trial,
it surely would have been within the court's broad discretion to
qualify Stroud as an expert in the "use" of heroin, based upon what
the officer testified to at trial as the basis for his opinion.
See Melton, supra, 599 A.2d at 901-903.  Thus, appellant cannot
make any showing that Ms. Borecki was ineffective or that the
outcome of the trial would have been different had the baseless
objection been made.  Cf. Fernandez, supra, 375 A.2d at 487.
Moreover, defense counsel effectively cross-examined Officer Stroud
in this area of his expertise.  Through counsel's probing, Officer
Stroud admitted that his opinion regarding the amount of heroin an
addict might use in a single day was gleaned from his conversations
with incarcerated addicts (Tr. 62-63).  Appellant plainly was not
harmed by this testimony.  Finally, because the court based its
findings on whether appellant was credible when he testified that
a drug dealer might take a camcorder as a "trade-in" for heroin and
not upon whether appellant actually could consume all of the heroin
he possessed within twenty-four hours, appellant was not harmed by
any of Officer Stroud's testimony that disputed his on that point
(Tr. 110-111).  [19/]

---

[18/]    The American Heritage Dictionary (2d Ed. 1985) defines
"trafficking" as (1) "to carry on trade" and (2) "to utilize
something."

[19/]    For the reasons set out in this section, as well as in
response to appellant's sufficiency claim, this Court should reject
his separate claim that it was plain error to admit Officer
Stroud's opinion because it was outside the scope of his expertise
(Brief for Appellant at 31).

F.    **Counsel's Failure to Renew her Motion for a Judgment of Acquittal at the End of the Defense Case Did Not Result in Ineffective Assistance of Counsel.**

Appellant argues that Ms. Borecki was ineffective in her representation when she failed to renew her motion for a judgment of acquittal at the close of the Defense case (Brief for Appellant at 22). Clearly, this argument is without merit. Appellant fails to recognize the fact that his was a bench trial and not a jury trial. There was no need for the trial court to consider a renewed motion for acquittal after all the evidence. The question presented by such a motion, i.e., whether a reasonable trier of fact could find guilt beyond a reasonable doubt, is subsumed by Judge Wertheim's decision demonstrating that he in fact found appellant guilty. There was no deficiency or harm from Ms. Borecki's actions in this regard. The transcript indicates that the court weighed all of the evidence presented at trial, determined which witnesses to believe and which witnesses to discredit, and then applied its common sense in determining the verdicts in this case (Tr. 110-111). The record also reflects that appellant's motion for a judgment of acquittal was denied at the close of the government's case (Tr. 69). The only evidence presented in the defense case was the appellant's testimony. Since the court discredited appellant's testimony, it follows that the court would have certainly denied any renewal of the motion for judgment of acquittal (Tr. 110-111).

40

III. **The Trial Court Did Not Commit Reversible Error When it Considered the Possible Punishment Appellant was Facing in Determining Appellant's Credibility.**

Appellant argues that the trial court committed reversible error when it considered the potential punishment in determining appellant's credibility (Brief for Appellant at 27). This argument is without merit. The court chose to discredit appellant's testimony by stating the following:

> ". . . I don't believe we've got any real doubt. I think I am entitled to take into account the defendant's desire to avoid the minimum mandatory sentence in evaluating his credibility. That does not substitute evidence but it does give him a very powerful motivation not to tell the truth on this specific narrow point of intent to distribute. I see no reason at all why Detective O'Neal, with eighteen years experience, would lie in order to get just one more street drug bust. I have no real reasonable doubt of the defendant's intent to distribute and I find him guilty on both counts as charged (Tr. 111).

A trial court sitting as a trier of fact, just as a jury, is permitted to take into account a defendant's interest in the outcome of the case when judging the party's credibility. White v. United States, 582 A.2d 774, 780 (D.C. 1990), reversed in part on other grounds, 613 A.2d 869 (D.C. 1992)(en banc). In this case, Judge Wertheim did no more than articulate the extent of appellant's bias, which depended upon the almost certain imposition

41

of a mandatory minimum sentence.[20]  The court took account of no information he was not entitled to have and he made no improper use of the fact of the application of the mandatory sentence.  The use of that information was limited to its effect upon appellant's credibility.

Admittedly, a jury would not be entitled to base its credibility assessment of appellant upon the length of his likely prison sentence if convicted.  That prohibition, however, derives from the reality that since the jury has no role in imposing sentence, it should not be informed of the offense's possible punishment.  See Criminal Jury Instruction for the District of Columbia 2.71 (3rd ed. 1978).  There is also a question of the jury's improper use of the information about punishment that counsel against allowing them to learn of it.  Manifestly, Judge Wertheim had a right to know, and could not be expected to misapprehend, the consequences of appellant's two admitted convictions disqualifying him for the addict exception (see Tr. 77).  The court's use of that information here also raises no question of possible misuse since Judge Wertheim carefully considered whether he was permitted to take it into account and, as a judge, is knowledgeable of the law and capable of refraining from any improper use of the information.  See Moore v. United States, 609 A.2d 1133, 1136 (D.C. 1992) (quoting Singletary v. United States, 519 A.2d 701, 702 (D.C. 1987); see also Harris v. Rivera,

---

[20]  It is noteworthy that appellant seemed to inject the issue into the trial first when, on direct examination, he admitted to having received the addict exception before (Tr. 77).

42

454 U.S. 339, 346 (1981).  For these reasons, appellant's claim
fails.

## CONCLUSION

WHEREFORE, appellee respectfully submits that the judgment of
the Superior Court should be affirmed.

_____
JAY B. STEPHENS
United States Attorney

_____
JOHN R. FISHER
Assistant United States Attorney

_____
THOMAS C. BLACK
Assistant United States Attorney

_____
KATHLEEN S. DAVIES
Assistant United States Attorney

555 4th Street, N.W.
Room 4229
Washington D.C. 20001
(202) 514-7088

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that two copies of the foregoing Brief have
been mailed to counsel for appellant Melvyn A. Johnson: Michael P.
Spekter, Esquire, 1660 L Street, N.W., Suite 316, Washington, D.C.
20036, on this 1st day of December 1992.

_____
KATHLEEN S. DAVIES
Assistant United States Attorney

43

# EXHIBIT 4

Notice of Compliance, Report of Chain of Custody and Certificate of Compliance, Report of Drug Property Collected Purchased or Seized, Laboratory Analysis Comparison Report, Forensic Chemist Worksheet, notes, and test results (all of which were filed and served upon Plaintiff prior to his criminal trial)

SUPERIOR COURT OF THE DISTRICT OF COLUMBIA

CRIMINAL DIVISION - FELONY BRANCH

UNITED STATES OF AMERICA    *    CRIMINAL NO. F-9926-89

                v.

                      *    JUDGE WERTHEIM

MELVIN A. JOHNSON    *    TRIAL DATE:  February 26, 1990

## NOTICE OF COMPLIANCE PURSUANT TO 33 D.C. CODE §556

The United States of America, by its attorney, the United States Attorney for the District of Columbia, herewith is serving upon the defense and filing with the Court copies of the official reports of chain of custody and of analysis of a controlled substance relevant to this case, together with a certificate of legal custody.   The Government thus has complied with the provisions of 33 D.C. Code §556 and accordingly intends to offer those reports into evidence at trial.

Should the defense elect to subpoena the chemist for examination, as provided for in 33 D.C. Code §556, we respectfully request that they follow these procedures:

1.   All subpoenas must contain the relevant DEA Laboratory Number(s).  All reports and files are stored by reference to this number and a chemist is unable to testify about any given case without it.

2.  To avoid possible scheduling conflicts, it is imperative that subpoena be received by the DEA Laboratory as far in advance of the trial date as possible. Chemists may be unable to respond to belated subpoenas because of other court appearance, previously scheduled leave or training periods, etc.

3.  Pursuant to a long-standing arrangement, chemists under subpoena for a particular day are available on one half hour call. This procedure avoids needless waste of their time. It will be assumed that any subpoena served on a chemist places him or her on one half hour call at 275-6478.

4.  The normal work day for most of the chemists at the DEA laboratory ends before 5:00 p.m. Thus it is essential to notify a chemist before 3:00 p.m. if he or she will be needed later that afternoon, in order that the chemist can plan to stay and make alternative transportation plans for going home. Again, all chemists may be contacted by telephone at 275-6478.

5.  Similarly it is essential to keep the chemist apprised if a trial carries over beyond its scheduled date on the subpoena. Every chemist receives an average of 2-3 subpoenas for each day and often more. Unless he or she is informed otherwise, a chemist will properly assume that a subpoena has lapsed if the scheduled trial date passes with no word from the party who issued the subpoena.

Respectfully submitted,

JAY B. STEPHENS
UNITED STATES ATTORNEY

ANDREW D. KLINGENSTEIN
ASSISTANT UNITED STATES ATTORNEY



U.S. Department of Justice

Drug Enforcement Administration

*Mid-Atlantic Field Laboratory*
*400 New York Avenue, SW*
*Washington, D.C. 20532-0001*

### REPORT OF CHAIN OF CUSTODY AND CERTIFICATE OF COMPLIANCE PURSUANT TO 33 D.C. CODE SECTION 556

RE: Lab. No. __BM 125__

I hereby certify that I am a chemist employed by the United States Department of Justice, Drug Enforcement Administration and that I am charged with an official duty to perform analyses of suspected controlled substances.

All suspected controlled substances which are received by the Drug Enforcement Administration for analysis arrive in sealed containers to which has been affixed a label bearing a unique Drug Enforcement Administration Laboratory Number. When I first received the container bearing the label with the Laboratory Number set out above, I inspected the container and verified that it was still in a sealed condition and properly analyzed its contents for the presence of controlled substances by reliable analytical methods. (If there were smaller containers inside the original sealed container which I opened, I may have copied the Laboratory Number from the label on the original sealed container onto those smaller containers inside.)

The analysis which I conducted was accomplished safeguarding the chain of custody of the substance being analyzed. The results of my analysis are accurately set forth on the attached official report, DEA Form-7, which also bears the DEA Laboratory Number set out above. After I completed my analysis, I placed the original sealed container which I have received and all of its contents (except for the substance(s) consumed or removed during analysis), and only those materials, into a container which I then sealed in such a manner that any tampering with the container would be readily evident.

Thereafter that officially sealed container bearing the above Laboratory Number was returned to the evidence vault for proper storage by authorized personnel.

I further certify that this is the official report of chain of custody of the evidence bearing the above Laboratory Number while it was in my possession and that I am the officer having legal custody of this report and of the attached official report of analysis, DEA Form-7, relating to this Laboratory Number.

_____
Forensic Chemist

Subscribed to and sworn/affirmed before me this 20th day of
___Dec___, 19 __89__.

_____
Notary Public

My Commission Expires August 31, 1992

My commission expires _____

19

WILSON, GREGORYNM, #1
1st DISTRICT

Read instructions on reverse
before completing

## REPORT OF DRUG PROPERTY COLLECTED, PURCHASED OR SEIZED

| 1. HOW OBTAINED (Check) | | 2. FILE NO. | 3. G DEP IDENTIFIER |
|---|---|---|---|
| ☐ Lab. Seizure  ☐ Purchase  ☒ Seizure  ☐ Free Sample | | 480-918 | FELONY |
| ☐ Other (Specify  ☐ Money Flashed  ☐ Compliance Sample (Non-Criminal) | | 4. FILE TITLE | |

| 5a. WHERE OBTAINED (City, State/Country) | 5b. DATE OBTAINED | JOHNSON, MELVIN ANTHONY |
|---|---|---|
| 1000blk 2nd ST S.E. WASH D.C. | 8-22-89 | |

| 6a. REFERRING AGENCY (Name) | 6b. REFERRAL | | |
|---|---|---|---|
| MPDC | ☐ Case No.  OR ☐ Seizure No.  No. | 7. DATE PREPARED  8-22-89 | 8. OFFICE SUBUNIT  1-D VICE |

| 9. Exhibit No. | 10. FDIN (8 characters) | 11. ALLEGED DRUGS | MARKS OR LABELS (Describe fully) | APPROX. GROSS QUANTITY | | 15. Purchase Cost |
|---|---|---|---|---|---|---|
| | | | | 13. Seized | 14. Submitted | |
| 1 | J07169 | heroin | powder | 9 | 9 | 0 |
| 2 | J07170 | cocaine | crack | 1 | 1 | 0 |

16. WAS ORIGINAL CONTAINER SUBMITTED SEPARATE FROM DRUG?   ☒ NO (Included above)   ☐ YES (If Yes, enter exhibit no. and describe original container fully)

REMARKS: ON the above date the file title was observed about to put a packet of white powder in unidentified blk females hand. Thxs The file title observed the police and tried to hide the packet In his hand. The file title was stopped and the plastic packet was recovered and field tested and produced a positive color reaction for herion. The file title was placed under arr and incidental to arrest exhibit 1 (which the original packet is a part of) was recovered, a with exhibit #2. Which was field tested and produced a positive color for cocaine. Prop bk 186, PAGE91 PCNO#21262

| 17. SUBMITTED BY SPECIAL AGENT (Signature) | 18. APPROVED BY (Signature & Title) |
|---|---|

### LABORATORY EVIDENCE RECEIPT REPORT

| 19. No. PACKAGES | 20. RECEIVED FROM (Signature & Date) |
|---|---|
| 22. SEAL  ☐ Broken  ☐ Unbroken | 23. RECEIVED BY (Signature & Date) |

### LABORATORY ANALYSIS/COMPARISON REPORT

25. ANALYSIS SUMMARY AND REMARKS

| 26. Exhibit No. | 27. Lab. No. | 28. ACTIVE DRUG INGREDIENT (Established or Common Name) | WEIGHT PER UNIT ANALYZED | | | 32. TOTAL NET | 33. RESERVE |
|---|---|---|---|---|---|---|---|
| | | | 29. Strength | 30. Measure | 31. Unit | | |
| | | | | | | | |
| | | | | | | | |

| 34. ANALYST (Signature) | 35. TITLE | 36. DATE COMPLETED |
|---|---|---|
| 37. APPROVED BY | 38. TITLE | 39. LAB. LOCATION |

DEA Form — 7
(Oct. 1987)

Previous Editions are OBSOLETE.

1 - Prosecution

Read instructions on reverse
before completing.

## ...ORT OF DRUG PROPERTY COLLECTED, PURCHASED OR SEIZED

| ☐ Purchase  ☒ Seizure  ☐ Free Sample | **2. FILE NO.** | **3. G-DEP IDENTIFIER** |
|---|---|---|
| ☐ Money Flashed  ☐ Compliance Sample (Non-Criminal) | 480-918 | FELONY |

**4. FILE TITLE**

JOHNSON, MELVIN ANTHONY

| ...ED (City, State/Country) | **5b. DATE OBTAINED** |
|---|---|
| ...ST S.E. WASH D.C. | 8-22-89 |

| ...G AGENCY (Name) | **6b. REFERRAL** |
|---|---|
| | ☐ Case No. OR ☐ Seizure No. |
| | No. |

| **7. DATE PREPARED** | **8. OFFICE SUBUNIT** |
|---|---|
| 8-22-89 | 1-D VDCE |

| ...o. | **10. FDIN**<br>(8 characters) | **11. ALLEGED DRUGS** | **12. MARKS OR LABELS (Describe fully)** | **APPROX. GROSS QUANTITY** | | **15.** |
|---|---|---|---|---|---|---|
| | | | | **13. Seized** | **14. Submitted** | |
| 1 | | heroin | powder | 9 | 9 | |
| 2 | | cocaine | crack | 1 | 1 | |

**16 WAS ORIGINAL CONTAINER SUBMITTED SEPARATE FROM DRUG ?** ☒ NO (Included above) ☐ YES (If Yes, enter exhibit no. and descr. original container fully)

**REMARKS:**

ON the above date the file title was observed about to put a packet of white powder unidentified blk females hand. Thhx The file title observed the police and tried to hide packet in his hand. The file title was stopped and the plastic packet was recovered and tested and produced a positive color reaction for heroin. The file title was placed under and incidental to arrest exhibit 1 (which the original packet is a part of) was recovered with exhibit #2. Which was field tested and produced a positive color for cocaine. Prop bk 186, PAGE 91 PCNQ#Z962

| **17. SUBMITTED BY SPECIAL AGENT (Signature)** | **18. APPROVED BY (Signature & Title)** |
|---|---|
| | |

### LABORATORY EVIDENCE RECEIPT REPORT

| **19. No. PACKAGES** | **20. RECEIVED FROM (Signature & Date)** | 8-23-89 |
|---|---|---|

| **22. SEAL**<br>☐ Broken ☐ Unbroken | **23. RECEIVED BY (Signature & Date)** | **23. TITLE** 8-23-89 |
|---|---|---|

### LABORATORY ANALYSIS/COMPARISON REPORT

**25. ANALYSIS SUMMARY AND REMARKS**

| Exh. | Amt. Rec'd: | Analysis Summary |
|---|---|---|
| 1 | 0.701g | 9 small blue ziplock bags of white powder found to contain heroin & quinine |
| 2 | 0.117g | 1 small, colorless ziplock bag of chunky material found to contain cocaine base |

| **26. Exhibit No.** | **27. Lab. No** | **28. ACTIVE DRUG INGREDIENT**<br>(Established or Common Name) | **WEIGHT PER UNIT ANALYZED** | | | **32. TOTAL NET** | **33. RESER...** |
|---|---|---|---|---|---|---|---|
| | | | **29. Strength** | **30. Measure** | **31. Unit** | | |
| 1 | BM 125 | Heroin (Calc as hydrochloride) | 29 | % | | 0.203g | 0.455g |
| 2 | BM 125 | Cocaine base | 90 | % | | 0.105g | none |

| **34. ANALYST (Signature)** | **35. TITLE** | **36. DATE COMPLETED** |
|---|---|---|
| Lois C. Lamb | Forensic Chemist | 12-18-89 |

| **37. APPROVED BY** | **38. TITLE** | **39. LAB. LOCATION** |
|---|---|---|
| Paul De Zan | Laboratory Chief | Wash. D.C. |

1st DISTRICT

Read instructions on reverse
before completing.

## REPORT OF DRUG PROPERTY COLLECTED, PURCHASED OR SEIZED

| 1. HOW OBTAINED (Check) | | | 2. FILE NO. | 3. G-DEP IDENTIFIER |
|---|---|---|---|---|
| ☐ Lab. Seizure  ☐ Purchase  ☒ Seizure  ☐ Free Sample | | | 480-918 | FELONY |
| ☐ Other (Specify)  ☐ Money-Flashed  ☐ Compliance Sample (Non-Criminal) | | | 4. FILE TITLE | |

| 5a. WHERE OBTAINED (City, State/Country) | 5b. DATE OBTAINED | JOHNSON,MELVIN ANTHONY |
|---|---|---|
| 1000blk 2nd ST S.E. WASH D.C. | 8-22-89 | |
| 6a. REFERRING AGENCY (Name) | 6b. REFERRAL | |
| MPDC | ☐ Case No. OR ☐ Seizure No.  No. | 7. DATE PREPARED  8-22-89 |

| 8. OFFICE SUBUNIT |
|---|
| 1-D VICE |

| 9. Exhibit No. | 10. FDIN (8 characters) | 11. ALLEGED DRUGS | 12. MARKS OR LABELS (Describe fully) | APPROX. GROSS QUANTITY | | 15. Purchase Cost |
|---|---|---|---|---|---|---|
| | | | | 13. Seized | 14. Submitted | |
| 1 | | heroin | powder | 9 | 9 | 0 |
| 2 | | cocaine | crack | 1 | 1 | 0 |

16. WAS ORIGINAL CONTAINER SUBMITTED SEPARATE FROM DRUG ?   ☒ NO (Included above)   ☐ YES (If Yes, enter exhibit no. and describe original container fully)

REMARKS:

ON the above date the file title was observed about to put a packet of white powder in a unidentified blk females hand. Than The file title observed the police and tried to hide the packet in his hand. The file title was stopped and the plastic packet was recovered and field tested and produced a positive color reaction for herion. The file title was placed under arrest and incidental to arrest exhibit 1 (which the original packet is a part of) was recovered, also with exhibit #2. Which was field tested and produced a positive color for cocaine. Prop bk 186, PAGE91 PCN0 A-61

| 17. SUBMITTED BY SPECIAL AGENT (Signature) | 18. APPROVED BY (Signature & Title) |
|---|---|

### LABORATORY EVIDENCE RECEIPT REPORT

| 19. No. PACKAGES | 20. RECEIVED FROM (Signature & Date) | 21. DATE  8-23-89 |
|---|---|---|
| 22. SEAL  ☐ Broken  ☐ Unbroken | 23. RECEIVED BY (Signature & Date)  8-23-89 | 24. TITLE |

### LABORATORY ANALYSIS/COMPARISON REPORT

25. ANALYSIS SUMMARY AND REMARKS

| Exh. | Amt. Rec'd | Analysis Summary |
|---|---|---|
| 1 | 0.701g | 9 small blue ziplock bags of white powder found to contain heroin & quinine |
| 2 | 0.117g | 1 small, colorless ziplock bag of chunky material found to contain cocaine base |

| 26. Exhibit No. | 27. Lab. No. | 28. ACTIVE DRUG INGREDIENT (Established or Common Name) | WEIGHT PER UNIT ANALYZED | | | 32. TOTAL NET | 33. RESERVE |
|---|---|---|---|---|---|---|---|
| | | | 29. Strength | 30. Measure | 31. Unit | | |
| 1 | RM 125 | Heroin (Calc as hydrochloride) | 29 | % | | 0.203g | 0.453g |
| 2 | RM 125 | Cocaine base | 90 | % | | 0.105g | none |

| 34. ANALYST (Signature)  Lois C. Lamb | 35. TITLE  Forensic Chemist | 36. DATE COMPLETED  12-18-89 |
|---|---|---|
| 37. APPROVED BY  Paul De Zan | 38. TITLE  Laboratory Chief | 39. LAB. LOCATION  Wash. D.C. |

DEA Form - 7
(Rct. 1987)

Previous Editions are OBSOLETE.

4 - Lab. File

Re I B 2/16

## FORENSIC CHEMIST WORKSHEET

Page _____ of _____

| RECEIVED | | 3. SEALS | 4. FILE NO. / EXHIBIT NO. / LAB. NO. |
|---|---|---|---|
| **1. From** Leonard | **2. Date** 12-14-89 | ☒ Intact  ☐ Broken  ☐ None | BM125 |

**5. DESCRIPTION OF EVIDENCE**

1 HSEE (sealed & intact) cont 1 red rubber band and Ex1- 9 blue sm ziplock bags of white powder and Ex 2 - 1 sm ziplock bag of chunky material

**6. SUMMARY OF FINDINGS**

Exh and rec'd        description

1        0.701 g        9 small, blue ziplock bags of white powder found to contain heroin and quinine

2        0.117 g        1 small, colorless ziplock bag of chunky material found to contain cocaine base

| 7. EXH. NO. | 8. LAB. NO. | 9. ACTIVE DRUG INGREDIENT | 10. QUANTITATIVE RESULTS | 11. TOTAL NET | 12. RESERVE |
|---|---|---|---|---|---|
| 1 | BM125 | heroin (calc as HCl) | 29% | 0.203 g | 0.455 g |
| 2 | BM125 | cocaine base | 90% | 0.105 g | 0 g |

**13. RESERVE EVIDENCE**

HS in ziplocks, HS in new HSEE, RTU

**14. FORENSIC CHEMIST'S SIGNATURE**

James C Lamb        GM 12/18/89

**15. DATE REPORTED**

12-18-89

**16. REMARKS:**

|  | 1 | 2 | |
|---|---|---|---|
| EXHIBIT .............. | 1 | 2 | |
| 99XX/NN/AA ...... | | | |
| DIL X/N/A .......... | | | |
| BALLISTICS ........ | | | |
| FINGERPRINT ... | | | |
| SPEC., ATTN. ...... | | | |
| HOURS .............. | 2 | 2 | |
| **HEROIN** .......... | J07069 | J07170 | |
| HEROIN SIG. ...... | | | |
| HER C/C/G ...... | | | |
| DIL C/C/G .......... | | | |

**DEA Form** (Dec. 1985) — 86

Previous edition dated 9/84 may be used.

BM 125

R 11-14-84
F Leonard
O 12-15-88
S 12-18-89

| weights | initial | final | initial | final | |
|---------|---------|-------|---------|-------|---|
| gross | 2.072g | 1.400g | 0.230g | consumed | |
| tare | 1.371g | 0.945g | 0.113g | in | |
| net | 0.701g | 0.455g | 0.117 | analysis | |

color tests              x1 (9)              x2 (.1)
    Marquis        dk    (f) purple    dk    ⊖
    Scotts         dk    ⊖                   ⊕ (mod)

tlc 18:1, BED, S2  vis  UV, iodoplatinate
    x1 (9)   heroin, quinine
    x2 (.1)  cocaine

composite :  x1 - 9 pkgs as per sampling plan

gcms  HP5995, 270°C
    x1 : heroin

gcms / FTIR  Mattson, KBr, diluted
    x2 : cocaine base

gc-quant   HP5980A, HP5 cap col, auto inj
    x1  std heroin HCl 1.008 mg/ml in 0.300 mg/ml tetracosane / CHCl₃ : MeOH (9:1)
        102 mg /10ml   3 ml /10 ml
        heroin (CHCl) = 29 %
            net  0.203 g
    x2 :  std cocaine HCl 0.400 mg/ml in 0.300 mg/ml tetracosane / CHCl₃
          cocaine
          cocaine base = 90 %
          net 0.105 g



```
* SEQ  START

RUN #   1    DEC 15, 1989  13:20:42
START    heroin  HCP std  1.008 mg/ml
         BR                          0.175
                0.745
                  1.555

STOP

Closing signal file A:Q97E782B.BNC

RUN#    1         DEC 15, 1989  13:20:42

SAMPLE NAME: HEROIN STD      SAMPLE#  11
METHOD NAME: M:HERL.MET
LCL

SIGNAL FILE: A:Q97E782B.BNC
AREA%
     RT      AREA TYPE  WIDTH     AREA%
    .745    27099  PB   .018   36.82030
   1.555    46499  PB   .029   63.17971

TOTAL AREA= 73598
MUL FACTOR=1.0000E+00


* PREP  CALIB  @         heroin std
                         12-15-89
E = EXTERNAL STANDARD    LCLamb
I = INTERNAL STANDARD
N = NORMALIZATION

CALIB PROCEDURE [E*/I/N]: I

REF % RTW [   5.000]:
NON-REF % RTW [   5.000]:

RF BASED ON AREA OR HEIGHT [A*/H]:
CAL#    RT       AMT        NAME
  1 :.745     :.300      :TETRACOSANE

  2 :1.555    :1.008     :HEROIN
  3 :
REF PK CAL#:
ISTD CAL#: 1
```

BM125 ex1



filename : c:\icon\IR36
scans : 3
detector : DTGS

COCAINE BASE
LC LAB
BW 128   EX 2

Wavelength (um)

Wavenumbers

Fri Dec 15 15:21:04 1989

signal gain : 1
resolution : 4



RUN #    1       DEC 15, 1989   :39:44
START    *cocaine std  0.400 mg/ml*
                                       0.170
    AR
                    0.930
                    1.284

STOP

Closing signal file A:Q97E8AB0.BNC

RUN#    1            DEC 15, 1989  14:39:44

SAMPLE NAME: COCAINE STD       SAMPLE#   11
METHOD NAME: M:COCL.MET
LCL

SIGNAL FILE: A:Q97E8AB0.BNC
AREA%
      RT      AREA TYPE  WIDTH      AREA%
    .930     22658  PB    .020    44.15818
   1.284     28653  PB    .026    55.84182

TOTAL AREA=  51311
MUL FACTOR=1.0000E+00


*  PREP  CALIB   @           *cocaine std*
                             *LCLamb*
E = EXTERNAL STANDARD        *12-15-89*
I = INTERNAL STANDARD
N = NORMALIZATION

CALIB PROCEDURE [E*/I/N]: I

REF % RTW [   5.000]:
NON-REF % RTW [   5.000]:

RF BASED ON AREA OR HEIGHT [A*/H]:
CAL#    RT        AMT        NAME
  1  :.930     :.400      :COCAINE
  2  :1.284    :.300      :TETRACOSANE

  3  :
REF PK CAL#:
ISTD CAL#: 2

GROUP PEAKS [Y/N*]:    BREAK

*  SEQ  START

RUN #    2    DEC 15, 1989  14:45:01
START  ..

# EXHIBIT   5

February 24, 1992 letter from Plaintiff to Paul De Zan, the then Laboratory Director of the DEA's Mid-Atlantic Field Laboratory

DEPARTMENT OF JUSTICE
DRUG ENFORCEMENT
~~~~~~~~~

Feb. 24 1992

'92 FEB 28 P2:23

TO: Mr. Paul De Zan
    Mid-Atlantic Field Laboratory
    460 NewYork Ave. N.W.
    Washington D.C., 20532-0001

FROM: Mr. Melvyn Johnson
      D.C.D.C.# 206-575
      P.O. Box 25
      Lorton Virginia, 22199

RE: Chemist Analysis (Controlled  Substance) Lab# 125

Dear Mr. De Zan,

     I am currently incarcerated at the Lorton Correctional Facility at Lorton
Virginia, serving a sentence of thirty (30) years for possession of a controlled
substance.  The severity of my  sentence is a direct result of the potent quality
of heroin which I alledgedly possessed.  Throughout my trial, it was my contention
that the drugs found on my person  was for my personal use.  However, because of
the quality reported by a certified chemist in your laboratory, I was subsequently
convicted.  In an effort to appeal my conviction, I have thoroughly researched
my case and, as a result, I too, find the test results to be somewhat at variance
with qualities consistent with street level substance abuse.  Attached is a copy
of the D.E.A. 7 Laboratory report.  I'm sure your staff is conpetent, However we're
all subject to human error.  Please reassess the report.  Your cooperation in this
matter is of the utmost importance in my case, but more importantly to the life
of a man condemned to servitude.  Thank you in advance for your time and consideration.

                                        Sincerely,

                                        Melvyn Johnson #206-575
                                        P.O. Box 25
                                        Lorton Virginia, 22199

P.S.    The quality of twenty-nine (29%) transforms my image from a urban city
        drug addict to a supplier from Amsterdam.



MR. PAUL DE ZAN (LABORATORY CHIEF)
MID-ATLANTIC FIELD LABORTORY
460 NEWYORK AVE, N.W.
WASHINGTON D.C., 20532

MR. MELVYN JOHNSON 206-575
P.O. BOX 25
LORTON VIRGINIA, 22199

(LEGAL MAIL )

# EXHIBIT   6

Declaration of Bettie E. Goldman, Associate Chief Counsel of Civil Litigation, in the Office of Chief Counsel, U.S Department of Justice, Drug Enforcement Administration

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| MELVYN A. JOHNSON, **Plaintiff** ) ) ) ) ) | |
| v. ) ) ) | Civil Action No. 07-0935-RMC |
| MAYOR ADRIAN FENTY, **et al.,** ) ) ) | |
| **Defendants** ) ) ) | |

### DECLARATION OF BETTIE E. GOLDMAN

I, Bettie E. Goldman, declare and say:

1.       I am the Associate Chief Counsel, Civil Litigation Section, in the Office of Chief Counsel, U.S. Department of Justice, Drug Enforcement Administration (DEA).

2.       As such, I am the custodian of DEA records relating to the filing, evaluation, and disposition of administrative claims presented to DEA under the Federal Tort Claims Act (FTCA). DEA procedures require that all FTCA claims over five hundred dollars ($500.00) be submitted to this office for review.

3.       As a routine business practice, this office maintains a record of each such FTCA claim. FTCA claims are indexed by claimant. This system has been in effect for over ten (10) years.

4.       On or about July 5, 2007, I caused a thorough search to be made of the FTCA

claim records of this office to determine whether a claim has been presented to DEA by Melvyn

Johnson arising out the incidents alleged in the complaint.

5.    No such FTCA claim was presented to DEA by Melvyn Johnson.

6.    I declare under the penalty of perjury that the foregoing statements are true and

correct.

DATE: 7/5/07

BETTIE E. GOLDMAN

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| MELVYN A. JOHNSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 07–0935 (RMC) |
| | ) | ECF |
| ADRIAN M. FENTY, Mayor, | ) | |
| | ) | |
| UNITED STATES DEPARTMENT, | ) | |
| OF JUSTICE, | ) | |
| DRUG ENFORCEMENT AGENCY, | ) | |
| | ) | |
| UNITED STATES ATTORNEY'S | ) | |
| OFFICE FOR THE DISTRICT OF | ) | |
| COLUMBIA, | ) | |
| | ) | |
| DEPARTMENT OF CORRECTIONS, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## <u>ORDER</u>

UPON CONSIDERATION of Federal Defendants' Motion to Dismiss, or in the

Alternative, for Summary Judgment, Plaintiff's Opposition thereto, and the entire record herein,

it is this _____ day of _____, 2007,

ORDERED that Federal Defendants' Motion be and hereby is granted; and it is

FURTHER ORDERED that the above-captioned action should be, and hereby is

DISMISSED from the Court's docket, with prejudice.

_____
ROSEMARY M. COLLYER
United States District Court Judge

Copies of this order to:

Melvyn A. Johnson
R 07904-007
Federal Correctional Complex
Petersburg-Medium
P.O. Box 90043
Petersburg, VA 23804

Jonathan C. Brumer
Special Assistant United States Attorney
United States Attorney's Office
  for the District of Columbia
555 Fourth Street, N.W., Room E-4815
Washington, D.C. 20530